UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY,<br>ALLSTATE PROPERTY & CASUALTY INSURANCE<br>COMPANY,<br>ALLSTATE FIRE & CASUALTY INSURANCE COMPANY,<br>AND ALLSTATE INDEMNITY COMPANY,<br><br>           Plaintiffs,<br><br>v.<br><br>ANTHONY ROSE, SR.,<br>RAMY E. HANNA, M.D.,<br>BAY MEDICAL, P.C.,<br>MICHAEL GORELIK, D.C.,<br>ARIEL CHIROPRACTIC, P.C.,<br>CYRUS CHIROPRACTIC, P.C.,<br>PALM CHIROPRACTIC, P.C.,<br>ALEKSANDR BELOTSERKOVSKIY, L.Ac.,<br>BELAM ACUPUNCTURE, P.C.,<br>AMBEL ACUPUNCTURE, P.C.,<br>DAVID COLARUSSO, D.C.,<br>MICHAEL S. MINICK, D.C.,<br>C&M CHIROPRACTIC, P.C.,<br>COLIN CLARKE, M.D.,<br>COLIN CLARKE, M.D., P.C.,<br>BASEM SALAH EL-DIN MANSOUR, P.T.,<br>BASEM MANSOUR P.T. P.C.<br><br>           Defendants. | C.A. No. _____ |

## PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Allstate Insurance Company, Allstate Property and Casualty Insurance

Company, Allstate Fire and Casualty Insurance Company, and Allstate Indemnity Company

(collectively, "Allstate" and/or "plaintiffs"), by their attorneys, King, Tilden, McEttrick & Brink,

P.C., allege as follows:

1

## I.    <u>INTRODUCTION</u>

1.    This case is about a set of "mirror image" multi-disciplinary clinics through which laypersons and healthcare providers colluded to access and exploit the generous benefits available to automobile accident victims under New York's "No-Fault" insurance laws.

2.    The defendants' scheme was designed to achieve several goals, including: (a) allowing laypersons to participate in the ownership, operation, and control of a multi-disciplinary healthcare facility, (b) providing—and then collecting payment for—a substantial volume of healthcare tests and services, regardless of clinical necessity, and (c) channeling to the laypersons the professional fees and profits generated through the operation of the facility.

3.    The defendants attempted to conceal this scheme by changing the names of the entities operating from each clinic, and by installing different physicians to act as the "owner" and/or principal referrer for each clinic.

4.    However, the exploitative course of treatment to which patients were subjected at both clinics remained virtually identical.

5.    As detailed herein, Defendant Anthony Rose, Sr. ("Rose") owned and operated two "multi-disciplinary" healthcare facilities located at 488 Lafayette Ave., Brooklyn, NY (the "Lafayette Ave. Clinic"), and 2273 65th St., Brooklyn, NY (the "65th St. Clinic"), which served as the epicenters of this scheme to defraud.

6.    As a layperson, Rose was not legally authorized to (a) provide professional healthcare services, (b) hold an ownership or controlling interest in any entity organized to provide professional healthcare services, or (c) share in the fees or profits generated through the delivery of professional healthcare services.

7.     Rose installed Aleksandr Belotserkovskiy, L.Ac., ("Belotserkovskiy"), a licensed acupuncturist, as the "manager" of the 65th St. and Lafayette Ave. Clinics.

8.     In this capacity, Belotserkovskiy facilitated Rose's scheme and ensured Rose received a cut of all revenue generated by the clinics.

9.     As the owners and managers of the 65th St. and Lafayette Ave. Clinics, Rose and Belotserkovskiy (collectively, the "Management Defendants") recruited the Provider Defendants to participate in this scheme, and had the Provider Defendants utilize a series of entities owned in their names as vehicles to submit No-Fault benefit claims to Allstate.

10.     In furtherance of the Lafayette Ave. scheme, the Provider Defendants operated through the following entities: Ambel Acupuncture, P.C. ("Ambel Acupuncture"), Basem Mansour P.T. P.C. ("Mansour PT"), Colin Clarke, M.D., P.C. ("Clarke PC"), and Palm Chiropractic, P.C. ("Palm Chiropractic") (collectively, the "Lafayette Ave. Defendants").

11.     In furtherance of the 2273 65th St. scheme, the Provider Defendants operated through the following entities: Bay Medical, P.C. ("Bay Medical"), Ariel Chiropractic, P.C. ("Ariel Chiropractic"), Belam Acupuncture, P.C. ("Belam Acupuncture"), C&M Chiropractic, P.C. ("C&M Chiropractic"), and Cyrus Chiropractic, P.C. ("Cyrus Chiropractic") (collectively, the "65th St. Defendants").

12.     The 65th St. Defendants and Lafayette Ave. Defendants (collectively, the "PC Defendants") were incorporated for the specific purpose of providing excessive or medically unnecessary treatment to patients across multiple healthcare disciplines, including chiropractic, physical therapy, diagnostic testing, and acupuncture, and then seeking payment for such treatment even though it was excessive, medically unnecessary, and not provided as reported.

13. The various entities controlled by the Management Defendants allowed them to accomplish the main objective of this scheme, which was to take advantage of the generous benefits available under New York's No-Fault insurance laws.

14. The Management Defendants each engaged in unlawful referral and fee-splitting arrangements with the providers at the Lafayette Ave. Clinic and 65th St. Clinic.

15. To conceal this scheme, the Management Defendants conspired to recruit licensed healthcare professionals to serve as nominal owners of the PC Defendants. These nominal owners included Michael Gorelik, D.C. ("Gorelik"), Aleksandr Belotserkovskiy, L.Ac. ("Belotserkovskiy"), David Colarusso, D.C. ("Colarusso"), Michael S. Minick, D.C. ("Minick"), Basem Salah El-Din Mansour, P.T. ("Mansour"), and Colin Clarke, M.D. ("Clarke") (collectively, the "Provider Defendants").

16. A number of the Provider Defendants owned entities that operated from both the 65th St. Clinic and the Lafayette Ave. Clinic.

17. Recruiting the Provider Defendants allowed the PC Defendants to be organized using the nominal owners' licensing credentials, thus making it appear that the entities were separately owned and operated by qualified licensees.

18. The fraudulent incorporation and control of the PC Defendants allowed the Management Defendants to achieve their goal of reaping as much profit as possible from No-Fault insurers such as Allstate by treating a high volume of patients far beyond the standard of care, by offering treatment across multiple disciplines to rapidly drive up costs, and by billing for treatment that was never actually rendered to patients.

19. Throughout the course of this scheme, the defendants or their agents purposely induced Allstate to pay the PC Defendants for excessive and medically unnecessary tests and

services purportedly provided to Allstate Claimants with knowledge that the charges for said tests and services were not compensable under New York law.

20.  These No-Fault benefit claims were not compensable under New York law because the PC Defendants (a) were not legally formed or operated in accordance with New York law, (b) rendered medically unnecessary and excessive treatment, (c) rendered treatment and services pursuant to unlawful referrals, (d) fraudulently billed for treatments and services that were not actually rendered, and/or (e) billed for treatments and services even though the PC Defendants' owners did not engage in the practice of the profession for which the PC Defendant was incorporated.

21.  The success of the defendants' scheme to defraud relied on the transmission to Allstate, through the U.S. Mail, of invoices, bills, and other No-Fault claim reimbursement documents warranting the PC Defendants' eligibility to collect No-Fault benefits under New York law.

22.  Allstate reasonably relied on the facial validity of the PC Defendants' documents— and representations contained therein—when paying No-Fault claims submitted by (or on behalf of) the PC Defendants.

23.  By this Complaint, Allstate asserts claims against the defendants for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq.*; (b) common-law fraud; and (c) unjust enrichment.

24.  Through this action, Allstate seeks to recover all monies wrongfully paid to Bay Medical, Ariel Chiropractic, Belam Acupuncture, C&M Chiropractic, Cyrus Chiropractic, Ambel Acupuncture, Mansour PT, Clarke PC, and Palm Chiropractic.

25.     Specifically, Allstate seeks to recover actual damages totaling $2,292,445.78, which represent No-Fault benefit payments that Allstate was wrongfully caused to make to the defendants during the course of this scheme.

26.     Allstate also seeks a declaration that it has no legal obligation to make any payments on any No-Fault claims that have been submitted by (or on behalf of) Bay Medical, Ariel Chiropractic, Belam Acupuncture, C&M Chiropractic, Cyrus Chiropractic, Ambel Acupuncture, Mansour PT, Clarke PC, and Palm Chiropractic because the treatments and services purportedly provided to Allstate-covered patients were rendered in direct violation of one or more New York State licensing requirement necessary to provide such treatments and services, thus rendering Bay Medical, Ariel Chiropractic, Belam Acupuncture, C&M Chiropractic, Cyrus Chiropractic, Ambel Acupuncture, Mansour PT, Clarke PC, and Palm Chiropractic completely ineligible to seek No-Fault reimbursement under prevailing New York laws and regulations.

27.     All of the acts and omissions of the defendants described throughout this Complaint were undertaken purposely, knowingly, and intentionally.

28.     Each defendant named herein conspired with at least one other defendant to accomplish and to further the objectives of their scheme to defraud.

29.     The defendants purposely designed and executed this scheme with the express aim of eliciting payments of automobile insurance contract proceeds from Allstate to Bay Medical, Ariel Chiropractic, Belam Acupuncture, C&M Chiropractic, Cyrus Chiropractic, Ambel Acupuncture, Mansour PT, Clarke PC, and Palm Chiropractic for the benefit of each and all of the defendants named herein.

30.    In each claim detailed throughout this Complaint and in the accompanying Exhibits, an Allstate automobile insurance contract was the platform upon which the defendants perpetuated their scheme to defraud.

31.    The defendants knew that the patients identified in this Complaint were eligible for insurance coverage for automobile insurance policies issued by Allstate.

32.    Allstate estimates that the defendants, in furtherance of this scheme, purposely and knowingly submitted to Allstate hundreds of bills on behalf of the PC Defendants knowing that none of the bills were lawfully compensable under prevailing New York law relative to No-Fault insurance coverage and reimbursement eligibility.

**The "Mirror Image" Multidisciplinary Facilities:**

| 65th St. Clinic | Lafayette Ave. Clinic |
|---|---|
| **Lay Owner:** Anthony Rose, Sr. <br> **Manager:** Aleksandr Belotserkovskiy <br><br> **Medical and Physical Therapy Services** <br> o  Medical exams <br> o  Physical therapy <br> o  ROM & strength testing <br><br><br> **Chiropractic** <br> o  Chiropractic <br> o  EDX testing <br><br> **Acupuncture** <br><br> **Providers** <br> o  Ramy Hanna, MD/Bay Medial, PC <br> o  Michael Gorelik, DC/Ariel Chiropractic, PC/Cyrus Chiropractic, PC <br> o  Aleksandr Belotserkovskiy, LAC/Belam Acupuncture, PC <br> o  David Colarusso, DC & Michael Minick, DC/C&M Chiropractic, PC | **Lay Owner:** Anthony Rose, Sr. <br> **Manager:** Aleksandr Belotserkovskiy <br><br> **Medical and Physical Therapy Services** <br> o  Medical exams <br> o  Physical Therapy <br> o  ROM & strength testing <br> o  Trigger point injections <br><br> **Chiropractic** <br> o  Chiropractic <br> o  EDX testing <br><br> **Acupuncture** <br><br> **Providers** <br> o  Colin Clarke, MD/Colin Clark MD, PC <br> o  Michael Gorelik, DC/Palm Chiropractic, PC <br> o  Aleksandr Belotserkovskiy, LAC/Ambel Acupuncture, PC <br> o  Basem Mansour, PT/Basem Mansour PT PC |

II.    **THE PARTIES**

A.  P<small>LAINTIFFS</small>

33.    Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate Indemnity Company are corporations duly organized and existing under the laws of the State of Illinois, having their principal place of business in Northbrook, Illinois.

34.    At all relevant times to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate Indemnity Company were each authorized to conduct business in New York.

B.  D<small>EFENDANTS</small>

i.  **P.C. Defendants**

1.  ***Bay Medical, P.C.***

35.    Bay Medical is organized under New York law as a professional service corporation.

36.    As organized, Bay Medical was authorized to provide professional physician services.

37.    During the relevant treatment period, Bay Medical maintained its principal place of business at 2273 65th St., Brooklyn, NY.

2.  ***Ariel Chiropractic, P.C.***

38.    Ariel Chiropractic is organized under New York law as a professional service corporation.

39.     As organized, Ariel Chiropractic was authorized to provide professional chiropractic services.

40.     During the relevant treatment period, Ariel Chiropractic maintained its principal place of business at 2273 65th St., Brooklyn, NY.

### 3. *Belam Acupuncture, P.C.*

41.     Belam Acupuncture is organized under New York law as a professional service corporation.

42.     As organized, Belam Acupuncture was authorized to provide professional acupuncture services.

43.     During the relevant treatment period, Belam Acupuncture maintained its principal place of business at 2273 65th St., Brooklyn, NY.

### 4. *C&M Chiropractic, P.C.*

44.     C&M Chiropractic is organized under New York law as a professional service corporation.

45.     As organized, C&M Chiropractic was authorized to provide professional chiropractic services.

46.     During the relevant treatment period, C&M Chiropractic maintained its principal place of business at 2273 65th St., Brooklyn, NY.

### 5. *Cyrus Chiropractic, P.C.*

47.     Cyrus Chiropractic is organized under New York law as a professional service corporation.

48.     As organized, Cyrus Chiropractic was authorized to provide professional chiropractic services.

49.     During the relevant treatment period, Cyrus Chiropractic maintained its principal place of business at 2273 65th St., Brooklyn, NY.

### 6. *Ambel Acupuncture, P.C.*

50.     Ambel Acupuncture is organized under New York law as a professional service corporation.

51.     As organized, Ambel Acupuncture was authorized to provide professional acupuncture services.

52.     During the relevant treatment period, Ambel Acupuncture maintained its principal place of business at 488 Lafayette Ave., Brooklyn, NY.

### 7. *Basem Mansour P.T. P.C.*

53.     Mansour PT is organized under New York Law as a professional service corporation.

54.     As organized, Mansour PT was authorized to provide professional physician services.

55.     During the relevant treatment period, Mansour PT maintained its principle place of business at 5607 Ave. L, Brooklyn, NY.  It regularly provided services from 488 Lafayette Ave., Brooklyn, NY.

### 8. *Colin Clarke, M.D., P.C.*

56.     Clarke PC is organized under New York Law as a professional service corporation.

57.     As organized, Clarke PC was authorized to provide professional physician services.

58.     During the relevant treatment period, Clarke PC maintained its principle place of business at 565 Plandome Rd., #303, Manhasset, NY.  It regularly provided services from 488 Lafayette Ave., Brooklyn, NY.

### 9. *Palm Chiropractic, P.C.*

59.     Palm Chiropractic is organized under New York Law as a professional service corporation.

60.     As organized, Palm Chiropractic was authorized to provide professional chiropractic services.

61.     During the relevant treatment period, Palm Chiropractic maintained its principal place of business at 488 Lafayette Ave., Brooklyn, NY.

### ii.  **Provider Defendants**

### 1. *Ramy Hanna, M.D.*

62.     Hanna resides in and is a citizen of the State of New York.

63.     At all relevant times, Hanna has been licensed to practice medicine in the State of New York.

64.     According to records on file with the New York Department of State, Hanna was the sole record shareholder, officer, and/or director of Bay Medical, P.C., during the relevant treatment period.

65.     At all relevant times, Hanna performed and/or directed his agents to perform excessive and medically unnecessary services for patients of Bay Medical.

66.     At all relevant times, Rose unlawfully controlled Bay Medical.

67.     At all relevant times, Rose directed Hanna and/or his agents at Bay Medical to perform excessive and medically unnecessary services for patients of Bay Medical.

68.     When patients sought tests and services from Bay Medical, they were caused to enter into assignment of benefits agreements with Bay Medical, thus giving Bay Medical the right to seek No-Fault payments directly from insurers.

69.     As an assignee of its patients' benefits, Bay Medical sought and collected No-Fault benefit payments directly from insurers, including Allstate.

70.     As detailed herein, Hanna purposely sought No-Fault benefit payments from Allstate knowing that Bay Medical was not lawfully eligible to seek or collect such payments.

71.     Because he directly participated in the operation and management of the Bay Medical enterprise throughout the course of this scheme, Hanna is responsible for the fraudulent and non-compensable tests and treatments rendered to patients of this entity, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to this entity.

## 2.  *Michael Gorelik, D.C.*

72.     Gorelik resides in and is a citizen of the State of New York.

73.     At all relevant times, Gorelik has been licensed to provide chiropractic services in the State of New York.

74.     According to records on file with the New York Department of State, Gorelik is the sole record shareholder, officer and/or director of Ariel Chiropractic.

75.     According to records on file with the New York Department of State, Gorelik is the sole record shareholder, officer and/or director of Cyrus Chiropractic.

76.     According to records on file with the New York Department of State, Gorelik is the sole record shareholder, officer and/or director of Palm Chiropractic.

77.     Gorelik and/or his agents caused Ariel Chiropractic to perform excessive and medically unnecessary services for patients of Ariel Chiropractic.

78.     Gorelik and/or his agents caused Cyrus Chiropractic to perform excessive and medically unnecessary services for patients of Cyrus Chiropractic.

79.     At all relevant times, Rose unlawfully controlled Ariel Chiropractic, Cyrus Chiropractic, and Palm Chiropractic.

80.     At all relevant times, Rose directed Gorelik and/or his agents at Ariel Chiropractic, Cyrus Chiropractic, and Palm Chiropractic to perform excessive and medically unnecessary services for patients of Ariel Chiropractic, Cyrus Chiropractic, and Palm Chiropractic.

81.     When patients sought tests and services from Ariel Chiropractic, Cyrus Chiropractic, or Palm Chiropractic, they were caused to enter into assignment of benefits agreements with Ariel Chiropractic, Cyrus Chiropractic, or Palm Chiropractic, thus giving Ariel Chiropractic, Cyrus Chiropractic, or Palm Chiropractic the right to seek No-Fault payments directly from insurers.

82.     As an assignee of its patients' benefits, Ariel Chiropractic, Cyrus Chiropractic, and Palm Chiropractic sought and collected No-Fault benefit payments directly from insurers, including Allstate.

83.     As detailed herein, the defendants purposely sought No-Fault benefit payments from Allstate knowing that Ariel Chiropractic, Cyrus Chiropractic, and/or Palm Chiropractic was not lawfully eligible to seek or collect such payments.

84.     Because he directly participated in the operation and management of the Ariel Chiropractic, Cyrus Chiropractic, and Palm Chiropractic enterprises throughout the course of this scheme, Gorelik is responsible for the fraudulent and non-compensable tests and treatments rendered to patients of these entities, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to these entities.

### 3.  *David Colarusso, D.C.*

85.     Colarusso resides in and is a citizen of the State of New York.

86.     At all relevant times, Colarusso has been licensed to provide chiropractic services in the State of New York.

87.     According to records on file with the New York Department of State, Colarusso is one of the record shareholders, officers and/or directors of C&M Chiropractic.

88.     At all relevant times Colarusso and/or his agents caused C&M Chiropractic to perform excessive and medically unnecessary services for patients of C&M Chiropractic.

89.     At all relevant times, Rose unlawfully controlled C&M Chiropractic.

90.     At all relevant times, Rose directed Colarusso and/or his agents at C&M Chiropractic to perform excessive and medically unnecessary services for patients of C&M Chiropractic.

91.     When patients sought tests and services from C&M Chiropractic, they were caused to enter into assignment of benefits agreements with C&M Chiropractic, thus giving C&M Chiropractic the right to seek No-Fault payments directly from insurers.

92.     As an assignee of its patients' benefits, C&M Chiropractic sought and collected No-Fault benefit payments directly from insurers, including Allstate.

93.     As detailed herein, the defendants purposely sought No-Fault benefit payments from Allstate knowing that C&M Chiropractic was not lawfully eligible to seek or collect such payments.

94.     Because he directly participated in the operation and management of the C&M Chiropractic enterprise throughout the course of this scheme, Colarusso is responsible for the fraudulent and non-compensable tests and treatments rendered to patients of this entity, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to this entity.

#### 4. *Michael S. Minick, D.C.*

95.     Minick resides in and is a citizen of the State of New York.

96.     At all relevant times, Minick has been licensed to provide chiropractic services in the State of New York.

97.     According to records on file with the New York Department of State, Minick is one of the record shareholders, officers and/or directors of C&M Chiropractic.

98.     At all relevant times, Minick and/or his agents caused C&M Chiropractic to perform excessive and medically unnecessary services for patients of C&M Chiropractic.

99.     At all relevant times, Rose unlawfully controlled C&M Chiropractic.

100.    At all relevant times, Rose directed Minick and/or his agents at C&M Chiropractic to perform excessive and medically unnecessary services for patients of C&M Chiropractic.

101.    When patients sought tests and services from C&M Chiropractic, they were caused to enter into assignment of benefits agreements with C&M Chiropractic, thus giving C&M Chiropractic the right to seek No-Fault payments directly from insurers.

102.    As an assignee of its patients' benefits, C&M Chiropractic sought and collected No-Fault benefit payments directly from insurers, including Allstate.

103.    As detailed herein, the defendants purposely sought No-Fault benefit payments from Allstate knowing that C&M Chiropractic was not lawfully eligible to seek or collect such payments.

104.    Because he directly participated in the operation and management of the C&M Chiropractic enterprise throughout the course of this scheme, Minick is responsible for the fraudulent and non-compensable tests and treatments rendered to patients of this entity, and is thus

also jointly and severally liable for the payments that Allstate was wrongfully induced to make to this entity.

### 5. *Basem Salah El-Din Mansour, P.T.*

105.    Mansour resides in and is a citizen of the State of New York.

106.    At all relevant times, Mansour has been licensed to provide physical therapy services in the State of New York.

107.    According to records on file with the New York Department of State, Mansour is the record shareholder, officer and/or director of Mansour PT.

108.    At all relevant times, Mansour and/or his agents caused Mansour PT to perform excessive and medically unnecessary services for patients of Mansour PT.

109.    At all relevant times, Rose unlawfully controlled Mansour PT.

110.    At all relevant times, Rose directed Mansour and/or his agents at Mansour PT to perform excessive and medically unnecessary services for patients of Mansour PT.

111.    When patients sought tests and services from Mansour PT, they were caused to enter into assignment of benefits agreements with Mansour PT, thus giving Mansour PT the right to seek No-Fault payments directly from insurers.

112.    As an assignee of its patients' benefits, Mansour PT sought and collected No-Fault benefit payments directly from insurers, including Allstate.

113.    As detailed herein, the defendants purposely sought No-Fault benefit payments from Allstate knowing that Mansour PT was not lawfully eligible to seek or collect such payments.

114.    Because he directly participated in the operation and management of the Mansour PT enterprise throughout the course of this scheme, Mansour is responsible for the fraudulent and

non-compensable tests and treatments rendered to patients of this entity, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to this entity.

### 6. *Colin Clarke, M.D.*

115.     Clarke resides in and is a citizen of the State of New York.

116.     At all relevant times, Clarke has been licensed to provide physician services in the State of New York.

117.     According to records on file with the New York Department of State, Clarke is the record shareholder, officer and/or director of Clarke PC.

118.     At all relevant times, Clarke and/or his agents caused Clarke PC to perform excessive and medically unnecessary services for patients of Clarke PC.

119.     At all relevant times, Rose unlawfully controlled Clarke PC.

120.     At all relevant times, Rose directed Clarke and/or his agents at Clarke PC to perform excessive and medically unnecessary services for patients of Clarke PC.

121.     When patients sought tests and services from Clarke PC, they were caused to enter into assignment of benefits agreements with Clarke PC, thus giving Clarke PC the right to seek No-Fault payments directly from insurers.

122.     As an assignee of its patients' benefits, Clarke PC sought and collected No-Fault benefit payments directly from insurers, including Allstate.

123.     As detailed herein, the defendants purposely sought No-Fault benefit payments from Allstate knowing that Clarke PC was not lawfully eligible to seek or collect such payments.

124.     Because he directly participated in the operation and management of the Clarke PC enterprise throughout the course of this scheme, Clarke is responsible for the fraudulent and non-

compensable tests and treatments rendered to patients of this entity, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to this entity.

### iii. **Management Defendants**

#### 1. *Aleksandr Belotserkovskiy, L.Ac.*

125.    Belotserkovskiy resides in and is a citizen of the State of New York.

126.    At all relevant times, Belotserkovskiy has been licensed to practice acupuncture in the State of New York.

127.    At no time has Belotserkovskiy been licensed to practice physical therapy, chiropractic, or medicine in the State of New York or elsewhere.

128.    According to records on file with the New York Department of State, Belotserkovskiy is the sole record shareholder, officer and/or director of Belam Acupuncture.

129.    According to records on file with the New York Department of State, Belotserkovskiy is the sole record shareholder, officer and/or director of Ambel Acupuncture.

130.    Belotserkovskiy acted as the "manager" of the multi-disciplinary facilities operating from the 65th St. Clinic and the Lafayette Ave. Clinic.

131.    Belotserkovskiy coordinated with Rose, providing a cut of No-Fault revenue to Rose in exchange for patient referrals.

132.    At all relevant times, Rose and Belotserkovskiy unlawfully exercised ownership and control of the PC Defendants operating from the 65th St. Clinic.

133.    At all relevant times, Rose and Belotserkovskiy performed and/or directed their agents to perform excessive and medically unnecessary services for the patients of Belam Acupuncture and other 65th St. Clinic providers.

134.    At all relevant times, Rose and Belotserkovskiy unlawfully exercised ownership and control of the PC Defendants operating from the Lafayette Ave. Clinic.

135.    At all relevant times, Rose and Belotserkovskiy performed and/or directed their agents to perform excessive and medically unnecessary services for patients of Ambel Acupuncture and other Lafayette Ave. Clinic providers.

136.    When patients sought tests and services from Belam/Ambel Acupuncture, they were caused to enter into assignment of benefits agreements with Belam/Ambel Acupuncture, thus giving Belam/Ambel Acupuncture the right to seek No-Fault payments directly from insurers.

137.    As an assignee of its patients' benefits, Belam/Ambel Acupuncture sought and collected No-Fault benefit payments directly from insurers, including Allstate.

138.    As detailed herein, the defendants purposely sought No-Fault benefit payments from Allstate knowing that Belam/Ambel Acupuncture was not lawfully eligible to seek or collect such payments.

139.    Belotserkovskiy furthered the objectives of this scheme by (a) exercising control over the 65th St. and Lafayette Ave. Defendants despite not being authorized to provide professional medical or physical therapy services, (b) devising and implementing a routine protocol of unnecessary and excessive tests, treatments, prescriptions, and referrals, (c) submitting No-Fault benefit claims to Allstate that contained false information about the 65th St. Defendants' and the Lafayette Ave. Defendants' eligibility to seek and collect No-Fault benefit payments, (d) altering and falsifying patient treatment records for the purpose of having the 65th St. Defendants and the Lafayette Ave. Defendants seek payments from Allstate and others, (e) causing the 65th St. Defendants and Lafayette Ave. Defendants to collect payments that they were not lawfully entitled to collect, (f) unlawfully channeling the professional fees and profits of the 65th St.

Defendants and Lafayette Ave. Defendants for his own personal benefit, and (g) agreeing to split professional medical fees with an unlicensed layperson (i.e., Rose).

140. Because he directly participated in the operation and management of each of the PC Defendant enterprises throughout the course of this scheme, Belotserkovskiy is responsible for the fraudulent and non-compensable tests and treatments rendered to patients of these entities, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to these entities.

### 2. *Anthony Rose, Sr.*

141. At no time has Rose been licensed or otherwise authorized to practice acupuncture, physical therapy, or medicine in the State of New York or elsewhere.

142. During the relevant period, Rose exerted control over the day-to-day operation and management of the PC Defendants operating from the 65th St. Clinic and the Lafayette Ave. Clinic.

143. Rose is not the "paper owner" of the Lafayette Ave. Facility, but has, in at least one instance, claimed ownership of the medical offices at that location.

144. In a series of Instagram posts[1] on October 17, 2015, Rose mentioned closing a deal on a medical office in Brooklyn, and thanks his new "partners," who "taught and train[ed him] in this business."

145. While the posts do not identify the "partners" by name, the attached photos clearly depict Rose standing in front of the Lafayette Ave. Facility.

---

[1] *See* https://www.instagram.com/p/88PfVbqyTL/?taken-by=tr_lifestyles and https://www.instagram.com/p/84W9ArKyVv/.



tr_lifestyles • Follow

tr_lifestyles Trlifestyles. One great move, sets up two excellent moves, this is the game of life, giving back to the neighborhood. Medical Office in Bedstuy Brooklyn, power move no one seen coming, it's always about the next great deal..#lifestyle #sobklyn #swagger #nyc #bklyn

244w

synques Nice!
244w    Reply

senorwavy Wow
244w    Reply

20 likes
OCTOBER 15, 2015

Add a comment...                    Post



tr_lifestyles • Follow
Bedford and Lafayette Avs

tr_lifestyles Trlifestyles. Today is a great day, deal closed, finishing touches on new medical office in Bedstuy Bklyn, I want to give a big thanks to the woman who taught and train me in this business, I also want to thank my new partners, and I want to also thank the team of people's , who help me get to this point. I could not have got here without all of these very important pieces in my life..#sobklyn #swagger #lifestyle #justbiz#

msashleyvictoria Congrats!

sunny_heights 👏👏👏👏

riizny Congrats TR. Wishing u much success

tomtomtravel_1 @tr_lifestyles 💙💙 @novumcollection

senorwavy Congrats Family. Keep inspiring

tiffmarei @shhh1st this is what I was talking about.....

21 likes
OCTOBER 17, 2015

Log in to like or comment.

146. During the relevant period, Rose claimed to own **_two_** multi-disciplinary facilities in the New York City area.

147. During the same time period, an individual identified as "Alex" (i.e., Belotserkovskiy) acted as the "manager" of the Lafayette Ave. Clinic and the 65th St. Clinic.

148. "Alex" was in regular telephonic communication with Rose, and conversations demonstrate that "Alex's" No-Fault recovery directly impacted Rose's finances.

149. Additionally, in an intercepted phone call between Rose and "Alex" on October 19, 2016, "Alex" indicated that he was upset about a patient Rose had referred to him being sent for an independent medical examination, as "Alex" had fabricated several of the patient's symptoms—an indication that "Alex" was a medical provider at the Clinics, or at least was drafting medical reports.

150. Rose's own assertions demonstrate his ownership interest in the Lafayette Ave. Clinic and the 65th St. Clinic.

151. As detailed herein, Rose participated in the operation and management of the PC Defendants during the entirety of this scheme, and also conducted the affairs of the PC Defendants through a pattern of mail fraud racketeering activity.

152. Rose furthered the objectives of this scheme by (a) seizing control over the PC Defendants despite not being authorized to provide, or manage the provision of, acupuncture physical therapy, or medical treatments and services, (b) exerting control over the operation and management of the PC Defendants, (c) devising and implementing a routine protocol of unnecessary and excessive tests, treatments, prescriptions, and referrals, (f) submitting No-Fault benefit claims to Allstate that contained false information about the PC Defendants' eligibility to seek and collect No-Fault benefit payments, (g) altering and falsifying patient treatment records

for the purpose of having the PC Defendants seek payments from Allstate and others, (h) causing the PC Defendants to collect payments that they were not lawfully entitled to collect, (i) unlawfully channeling the professional fees and profits of the PC Defendants for his own personal benefit using other companies under his control, and (j) bribing medical providers and first responders for confidential patient information in order to steer patients to the facilities under his control.

153.    Because he directly participated in the operation and management of each of the PC Defendant enterprises throughout the course of this scheme, Rose is responsible for the fraudulent and non-compensable tests and treatments rendered to patients of these entities, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to these entities.

## III.    **JURISDICTION AND VENUE**

154.    Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331 and 1332.

155.    Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

156.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts known to Allstate alleged herein were carried out within the Eastern District of New York.

157.    At all relevant times, the defendants have engaged in purposeful activities in New York by seeking and submitting payment demands for claims made under New York's No-Fault Laws, as detailed, *infra*.

158.    The defendants' activities and contacts with New York were purposely sought and transacted to take advantage of the benefits available under New York's No-Fault Laws.

159.    As the allegations and causes of action in the within Complaint arise from the defendants' fraudulent demands for payment under the No-Fault Laws of New York, there is no question that there exists a substantial relationship between the transactions at issue, and Allstate's causes of action.

## IV.    APPLICABLE NO-FAULT LAWS AND LICENSING STATUTES

### A.    NEW YORK'S NO-FAULT LAWS

160.    Allstate underwrites motor vehicle insurance in the State of New York.

161.    New York's No-Fault Laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay reasonable fees for necessary healthcare services

162.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act, (N.Y. INS. LAW § 5101, *et seq.*), and the regulations promulgated thereto (11 N.Y.C.R.R. § 65, *et seq.*) (collectively the "No-Fault Laws"), motor vehicle insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Allstate claimants.

163.    Under the New York No-Fault Laws, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of a motor vehicle.

164.    "Basic economic loss" is defined to include "all necessary expenses" for healthcare services.  N.Y. INS. LAW § 5102(a)(1); 11 N.Y.C.R.R. § 65-1-1.

165.    These necessary expenses include physical therapy that is rendered pursuant to a referral from a physician.  N.Y. INS. LAW § 5102(a)(1).

166.    The No-Fault benefits include up to $50,000 per Allstate claimant for reasonable expenses that are incurred for necessary healthcare goods and services.

167.     A claimant may assign his or her No-Fault Benefits to third parties, such as healthcare service providers.

168.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary healthcare services rendered using the claim form required by the New York State Department of Insurance (known by its title "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly known as an "NF-3").

169.     Alternatively, healthcare providers may submit claims to insurance carriers using the Health Insurance Claim Form (known as the "CMS-1500" form and formerly known as the "HCFA-1500" form).

170.     The NF-3 and CMS-1500 forms are important documents in the insurance industry. These certify that the provider's request for payment is not materially false, misleading, or fraudulent.  11 N.Y.C.R.R. § 65.3-11(a); N.Y. INS. LAW § 403(d).

171.     Pursuant to N.Y. Ins. Law § 403(d), each NF-3 and CMS-1500 form carry the same warning by substance: "Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent act, which is a crime."

172.     It is a material misrepresentation to submit NF-3 and CMS-1500 forms for treatment, testing, and other services that: (a) are never provided; (b) are billed as expensive/complex procedures when, in reality, a less complex and less expensive service was actually provided; or (c) are billed at a greater monetary charge than is permitted by the applicable fee schedule.

### B. NEW YORK EDUCATION LAW

173.     As the allegations and causes of action in the within Complaint arise from the defendants' fraudulent demands for payment under the No-Fault Laws of New York, there is no question that there exists a substantial relationship between the transactions New York Education Law § 6522 prohibits anyone from engaging in the practice of medicine except for those licensed to practice medicine. *See* N.Y. EDUC. LAW § 6522.

174.     Pursuant to New York Education Law § 6530(11), licensed physicians are prohibited from "permitting, aiding or abetting an unlicensed person to perform activities requiring a [medical] license."

175.     Under New York Education Law § 6530, it is professional misconduct for a licensed physician to (a) practice the profession fraudulently, (b) order excessive tests or treatments not warranted by the condition of the patient, and (c) fail to maintain a record for each patient that accurately reflects the evaluation and treatment of the patient.

176.     Under New York Education Law § 6530(19), it is also professional misconduct for a licensed physician to permit any person to share in the fees for professional services, other than a partner, employee, associate of a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee.

177.     The sharing or splitting of fees derived from the provision of professional physician services constitutes professional misconduct and subjects a physician to serious penalties, including sanctions against the offending physician's medical license.

178.     New York law prohibits anyone from engaging in the practice of physical therapy unless they are licensed to practice physical therapy. *See* N.Y. EDUC. LAW §§ 6731-6732.

179.     The practice of physical therapy includes rendering treatment pursuant to a referral from "a licensed physician, dentist, podiatrist, nurse practitioner or licensed midwife" who is acting within their own lawful scope of practice and in accordance with their own diagnosis.  N.Y. EDUC. LAW § 6731(c).

180.     New York law prohibits anyone from engaging in the practice of chiropractic services unless they are licensed to practice as a chiropractor.  *See* N.Y. EDUC. LAW §§ 6551-6552.

181.     New York law prohibits anyone from engaging in the practice of acupuncture unless they are licensed or authorized to practice acupuncture.  *See* N.Y. EDUC. LAW §§ 8211-8212.

182.     Additionally, pursuant to New York Education Law § 6509-a, it is professional misconduct for physical therapists and chiropractors to engage in the division or sharing of professional fees with a person not licensed or otherwise authorized to practice physical therapy.

### C.  NEW YORK BUSINESS CORPORATION LAW

183.     As the allegations and causes of action in the within Complaint arise from the defendants' fraudulent demands for payment under the No-Fault Laws of New York, there is no question that there exists a substantial relationship between the transactions In New York, professional service corporations are governed by §§ 1501-1516 of the Business Corporation Law.

184.     Under Business Corporation Law § 1504, professional service corporations cannot render professional services except through individuals authorized by law to render such professional services.

185.     Moreover, under Business Corporation Law § 1507, a professional service corporation cannot issue shares to individuals unless they are "engaged in the practice of such profession in such [a] corporation." It also prohibits such shareholder(s) from entering into any

agreement, granting proxies, or transferring control to individuals who are not authorized by law to practice the profession for which the professional service corporation is authorized to practice.

186.    Pursuant to Business Corporation Law § 1508, each director or officer of a professional service corporation must be authorized by law to practice in New York the profession that such corporation is authorized to practice.

187.    Taken together, the restrictions set forth under the No-Fault Laws, the Education Law, and the Business Corporation Law are designed to ensure that professional service entities are operated and controlled by individuals that are authorized to practice in the professional discipline(s) offered by the entity.

188.    New York's No-Fault Laws expressly provide that "[a] provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet __*any*__ applicable New York State or local licensing requirement necessary to perform such service in New York." 11 N.Y.C.R.R. § 65-3.16(a)(12) (emphasis added).

189.    In *State Farm Mut. Auto. Ins. Co. v. Mallela*, the New York Court of Appeals upheld 11 N.Y.C.R.R. § 65-3.16(a)(12) by holding that corporations organized and registered to provide professional healthcare services that are fraudulently incorporated under New York Business Corporation Law §§ 1507 and 1508 and New York Education Law § 6507(4)(c) (i.e., those corporations that are operated and/or controlled by individuals or entities not licensed or authorized to provide the professional healthcare services that the corporations are organized and registered to provide) are not entitled to No-Fault reimbursement. *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 320 (N.Y. 2005).

190.     As such, a professional service corporation is lawfully ineligible to seek or receive No-Fault benefit payments if the entity, or any of its members, fails to meet **_any_** applicable licensing requirement necessary to perform a service.  11 N.Y.C.R.R. § 65-3.16(a)(12)

191.     Under prevailing law, an insurer may maintain a cause of action to recover monies paid on or after April 5, 2002 (the effective date of 11 N.Y.C.R.R. § 65-3.16(a)(12)) to healthcare providers that are organized, operated, and/or controlled in violation of New York law.  *Metroscan Imaging, P.C. v. GEICO Ins. Co.*, 823 N.Y.S.2d 818, 821-22 (N.Y. App. Term, 2d Dep't 2006). *v. GEICO Ins. Co.*, 823 N.Y.S.2d 818, 821-22 (N.Y. App. Term, 2d Dep't 2006).

### D.  NEW YORK WORKER'S COMPENSATION FEE SCHEDULE

192.     As the allegations and causes of action in the within Complaint arise from the defendants' fraudulent demands for payment under the No-Fault Laws of New York, there is no question that there exists a substantial relationship between the transactions The New York Workers' Compensation Board has established a schedule of fees known commonly as the "Workers' Compensation Fee Schedule" ("Fee Schedule").

193.     Both healthcare providers and automobile insurers consult the Fee Schedule to determine the level of reimbursement payable on legitimate claims.

194.     The purpose of the fee schedule is to: (a) provide comprehensive billing guides in order to allow healthcare providers to appropriately describe their services and minimize disputes over reimbursement through the establishment of maximum permissible fees that can be charged for services included in the Fee Schedule; and (b) set limits on charges that can be advanced by healthcare service providers to protect claimants from having their medical benefit limits artificially eroded by excessive fees.

195.    Section 5102(a)(1) of the No-Fault Law defines "basic economic loss" as including "[a]ll necessary expenses incurred for…professional health services," "subject to the limitations of" Insurance Law § 5108.

196.    Insurance Law § 5108(b) provides that the Superintendent of Insurance "shall promulgate rules and regulations implementing and coordinating" the provisions of the New York No-Fault Law and the Workers' Compensation Law "with respect to charges for the professional health services" specified in Insurance Law § 5102(a)(2), "including the establishment of schedules for all such services for which schedules have not been prepared and established by the chairman of the workers' compensation board."

197.    Insurance Law § 5108(a) also provides that the "charges for services specified in" Insurance Law § 5102(a)(1) "shall not exceed the charges permissible under the schedule prepared and established by the chairman of the workers' compensation board."

**E.   APPLICABLE NEW YORK LAW PROHIBITING CERTAIN REFERRAL ARRANGEMENTS**

198.    A practitioner who is authorized to order "clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services" is prohibited from making a referral for such services to a healthcare provider who is authorized to provide such services where the practitioner or immediate family member of said practitioner has a financial relationship with the healthcare provider.  *See* N.Y. PUB. HEALTH LAW § 238-a(1)(a).

199.    A financial relationship is defined as an ownership interest, investment interest or compensation arrangement.  *See* N.Y. PUB. HEALTH LAW § 238(3).

200.    A compensation arrangement includes "any arrangement involving any remuneration between a practitioner, or immediate family member, and a healthcare provider. The

term remuneration includes any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." *See* N.Y. PUB. HEALTH LAW § 238-a(5)(a).

201. Pursuant to Section 238-a(1)(b) of the New York Public Health Law, neither a healthcare provider nor a referring practitioner may present a claim, bill or any other demand for payment for clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services when furnished pursuant to a prohibited referral arrangement.

202. Any such claims, bills or other demands made in connection with an illegal referral arrangement that results in payment to the referring practitioner or healthcare provider shall result in the referring practitioner and healthcare provider being jointly and severally liable for any amount collected. *See* N.Y. PUB. HEALTH LAW § 238-a(7).

203. With respect to referrals not prohibited under Section 238-a, a practitioner may not make a referral to a healthcare provider for the furnishing of any health or health related items or services where such practitioner or immediate family member of such practitioner has a financial relationship with the healthcare provider (i.e., ownership or investment interest or a compensation arrangement that is in excess of fair market value or that provides for compensation that varies directly or indirectly based on the volume or value of any referrals of business between the parties) without disclosing the financial relationship to the patient, which disclosure must provide notice of the financial relationship as well as inform the patient of his or her right to utilize a specifically identified alternative healthcare provider if any such alternative is reasonably available. *See* N.Y. PUB. HEALTH LAW § 238-d(1)-(2).

204. Additionally, New York Education Law § 6530(18) prohibits a licensed physician from "[d]irectly or indirectly offering, giving, soliciting, or receiving, or agreeing to receive, any

fee or other consideration to or from a, third party for the referral of a patient or in connection with the performance of professional services."

205.    Likewise, under Rule 29.1(b)(3) of the Board of Regents, applicable to "the practice of any profession licensed, certified or registered pursuant to title VIII of the Education Law"—which includes physical therapy, chiropractic, and acupuncture—practitioners are prohibited from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services." 11 N.Y.C.R.R. § 29.1(b)(3).

206.    Accordingly, New York law prohibits any licensed physician, physical therapist, chiropractor, or acupuncturist from giving and/or receiving payment to and/or from another licensee or third party in exchange for the referral of a patient.

**F.   GUIDELINES FOR CHIROPRACTORS IN A MULTIDISCIPLINARY PRACTICE**

207.    In 2012, the New York Office of Professions published a "Practice Alert" entitled "Multidisciplinary Practices," which provides guidance to chiropractors working in a multidisciplinary setting alongside a physician. *See* Exhibit 1.

208.    According to the Office of Professions, chiropractors should not employ individuals licensed to practice medicine, nor should they serve as the "controlling entity in a practice with licensees in medicine or any other profession authorized to perform procedures beyond the scope of [the] chiropractic license, which includes physical therapy" and other healthcare disciplines.

209.    Chiropractors are also advised against "making direct referrals to physical therapists since [physical therapists] are authorized to practice only on referrals from physicians,

dentists, podiatrists or nurse practitioners." Instead, chiropractors are encouraged to help their patients locate a physician who can lawfully make the referral.

210.    Further, chiropractors are prohibited from working for physicians as consultants—as such an arrangement is deemed fee splitting.

211.    The Office of Professions also advises chiropractors that they can neither "direct patient care" nor assume "complete control" over patients in a medical practice, as doing so would go beyond the scope of the practice of chiropractic.

212.    As detailed below, the defendants violated one or more of these New York statutes and regulations cited above through the operation and management of Bay Medical, Ariel Chiropractic, Belam Acupuncture, C&M Chiropractic, Cyrus Chiropractic, Ambel Acupuncture, Mansour PT, Clarke PC, and Palm Chiropractic.

## V.    FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### A.    CRIMINAL CHARGES

#### i.    Charges Against Anthony Rose, Sr.

213.    Rose has been criminally charged in the United States District Court for the Southern District of New York in connection with a No-Fault scheme in which Rose and his co-conspirators engaged in a complicated call center referral scheme to direct No-Fault claimants to a select network of lawyers and healthcare providers that would pay kickbacks to Rose in exchange for the referrals.

214.    On November 6, 2019, Rose was indicted on charges of conspiracy to violate the Travel Act in violation of 18 U.S.C. §§ 1952 and 371, wrongful disclosure of individually identifiable healthcare information in violation of 42 U.S.C. §§ 1320-6(a)(1)–3, 1320-6(b)(3), and

18 U.S.C. § 2, and payments of bribes and gratuities to an agent of a federally funded organization in violation of 18 U.S.C. §§ 666(a)(2) and 2.

215.    According to the indictment, Rose and his co-conspirators are accused of participating in this widespread No-Fault fraud scheme from approximately 2014 to 2019.

216.    The indictment identifies several individuals who conspired to pay significant sums of money to hospitals, medical service providers, police officers, and 911 operators employed by the New York Police Department (NYPD) in exchange for the confidential information of tens of thousands of motor vehicle accident victims in the New York area.

217.    The indictment alleges that after obtaining this information, Rose and his co-conspirators would contact the victims from a call center owned and operated by Rose, and would make false representations in order to steer the victims to seek medical treatment from a select network of clinics and lawyers.

218.    The indictment further alleges that the network of clinics and lawyers in question would pay kickbacks to Rose and his co-conspirators in exchange for the referrals.

219.    This fraud scheme purportedly involved the sale of the confidential medical information of about 60,000 motor vehicle accident victims, as well as kickback arrangements between the Rose Defendants and over 75 medical offices throughout the greater New York City area.

220.    Several of the Rose Defendants have recently pleaded guilty to their part in this scheme, admitting to knowingly participating in the unlawful bribery of medical providers and first responders in exchange for the disclosure of confidential patient information.

221.    While this scheme was ongoing, Rose maintained an ownership interest in the Lafayette Ave. Clinic, and referred to the Provider Defendants as his "partners" who had "train[ed him] in this business."

222.    In intercepted telephonic communications between Rose and his co-conspirators, Rose admitted to owning **_two_** multi-disciplinary facilities in the New York City area.

223.    Several of these intercepted communications involved conversations between Rose and "Alex," the "manager" of the 65th St. Clinic and Lafayette Ave. Clinic.

224.    The same conversations demonstrated that Rose's financial success was largely dependent on "Alex" following through on voluminous No-Fault recovery actions submitted on behalf of the 65th St. and Lafayette Ave. Defendants.

225.    Together, Rose and "Alex" (i.e., Belotserkovskiy) ensured the 65th St. Defendants and Lafayette Ave. Defendants received a steady stream of patients generated through unlawful referral and kickback arrangements, and treated patients according to a predetermined protocol of treatment that prioritized maximizing profits over patient wellbeing.

### ii.  Admissions of Guilt by Rose

226.    On November 17, 2021, Rose pleaded guilty to certain criminal charges related to this scheme.  *See* Anthony Rose, Sr. Guilty Plea Transcript, attached hereto as Exhibit 2.

227.    On the aforementioned date, Rose pleaded guilty to a Superseding Information charging him with: (1) Travel Act Conspiracy, (2) wrongful disclosure of individually identifiable healthcare information, (3) bribery of a federal agent, (4) healthcare fraud conspiracy, (5) aggravated identity theft, (6) money laundering conspiracy, and (7) felon in possession of a firearm.  *Id.* at 5:9-17, 35:4-19.

228.     Rose admitted that, between 2012 to November 2019, Rose paid bribes to hospital employees, emergency medical technicians (EMTs), and NYPD officers in exchange for the wrongful disclosure of confidential motor vehicle accident victim information. *Id.* at 25:6-9, 26: 10-13, 27:4-8.

229.     After unlawfully obtaining the names and phone numbers of these accident victims from his sources, Rose and his co-conspirators contacted these victims and induced them to treat at a select network of medical clinics. *Id.* at 28:18-25.

230.     These medical clinics were unlawfully controlled by non-physicians, who billed insurance companies under New York's No-Fault laws. *Id.*

231.     The network of medical clinics to which Rose and his co-conspirators referred patients then paid kickbacks to shell companies under Rose's control. *Id.* 31:1-2.

232.     Rose used these unlawful proceeds to pay his co-conspirators for additional accident victim information. *Id.* 30:17-25, 31:1-2.

233.     Rose further admitted that all of the aforementioned conduct was part of an effort to conceal and promote his healthcare fraud scheme. *Id.* at 30:17-19.

### iii.  Admissions by Rose's Co-Conspirators

234.     Several participants in the Rose fraud scheme have likewise admitted their guilt, pleading guilty to charges of conspiracy to violate the Travel Act, and solicitation/payments of bribes and gratuities by/to an agent of a federally funded organization.

### 1.  *"Payor" Conspirators*

235.     On June 28, 2021, Rose co-conspirator Nathaniel Coles ("Coles") pleaded guilty to one count of conspiracy to engage in a bribery scheme in violation of the Travel Act. *See* Nathaniel Coles Guilty Plea Transcript, attached hereto as Exhibit 3.

236.     Coles admitted under oath that, between 2014 and 2019, Coles paid bribes to several hospital employees in exchange for their disclosure of confidential patient information. *Id.* at 31:19-22.

237.     Coles then used the information he obtained from these hospital employees to contact motor vehicle accident victims and refer them to a facility owned by Coles, or select other "outsource facilities." *Id.*

238.     Coles received kickbacks from his network of corrupt clinics in exchange for these patient referrals. *Id.* at 34:2-4.

239.     Coles further admitted that he forwarded the information he received from his hospital sources to Rose so that Rose and his associates could contact victims and refer them to Rose's network of medical clinics and lawyers. *Id.* at 33:12-17.

240.     On July 6, 2021, Anthony Rose, Jr. ("Rose, Jr.") and Christina Garcia ("Garcia") likewise pleaded guilty to one count each of conspiracy to engage in a bribery scheme in violation of the Travel Act. *See* Anthony Rose, Jr., and Christina Garcia Guilty Plea Transcript, attached hereto as Exhibit 4.

241.     Rose Jr. admitted under oath that, between 2014 and 2019, he bribed EMTs in exchange for the disclosure of confidential motor vehicle accident victim information. *Id.* at 30:18-25.

242.     Garcia admitted that, between 2014 and 2019, she agreed to bribe hospital employees in New York and New Jersey in exchange for their disclosure of confidential accident victim information. *Id.* at 34:6-11.

243.     Garcia further admitted to selling the information she obtained to Rose, as well as a Brooklyn-based unindicted co-conspirator. *Id.* at 34:24-25; 35:1-6.

244.     On October 12, 2021, Jelani Wray ("Wray") pleaded guilty to one count of a Superseding Information charging Wray with federal program bribery in violation of 18 U.S.C. § 666.  *See* Jelani Wray Guilty Plea Transcript, attached hereto as Exhibit 5.

245.     Wray admitted under oath that, from 2016 to 2017, Wray bribed at least five 911 operators in exchange for their disclosure of the names and phone numbers of motor vehicle accident victims.  *Id.* at 23:17-21.

246.     Wray then transferred this information to Rose's call center, which contacted the victims and steered them to treat at particular clinics in which Rose and Wray had a financial interest.  *Id.* at 23:21-25.

247.     The aforementioned clinics paid kickbacks to Rose and Wray in exchange for their referrals.  *Id.* at 23:24-25.

248.     Wray ceased bribing his 911 operator sources in 2017 because of an internal NYPD investigation; however, Wray and Rose continued to engage in medical clinic kickback arrangements between 2016 and November 2019.  *Id.* at 24:11-22; 24:23-25; 25:5-8; 25:8-9.

### 2.  *Hospital Employee Sources*

249.     On June 22, 2021, Edward Abayev ("Abayev") and Angie Melecio ("Melecio") pleaded guilty to one count each of soliciting bribes as an agent of a federally funded organization. *See* Edward Abayev and Angie Melecio Guilty Plea Transcript, attached hereto as Exhibit 6.

250.     Abayev admitted under oath that, from 2016 to 2019, while working as a cardiac monitor technician at the Maimonides Medical Center Emergency Room, he provided patient names and phone numbers to Rose and his associates in exchange for bribe payments.  *Id.* at 37:3-21.

251.    At least sixteen (21) Allstate claimants that treated with the PC Defendants originated their treatment at the Maimonides Medical Center ER between 2016 and 2019.

252.    Abayev further admitted to sending Rose about 100 patient names and phone numbers per month, at a rate of $5.00 per name.  *Id.* at 37:6-7.

253.    Melecio admitted that, from 2016 to 2019, while working as a receptionist at Wyckoff Heights Medical Center in Brooklyn, she provided patient names and phone numbers to Rose and his associates in exchange for bribe payments.  *Id.* at 32:15-21.

254.    At least four (4) Allstate claimants that treated with the PC Defendants originated their treatment at Wyckoff Heights Medical Center between 2016 and 2019.

255.    Melecio provided Rose with about twenty-five (25) to seventy-five (75) patient names and phone numbers per month.  *Id.* at 32:21-22.

256.    On June 24, 2021, Clarence Facey ("Facey") pleaded guilty to one count of conspiracy to violate the Travel Act.  *See* Clarence Facey Guilty Plea Transcript, attached hereto as Exhibit 7.

257.    Facey admitted under oath that, from 2012 to 2015, while working as an employee of Brooklyn Hospital, he improperly provided patient names and phone numbers to Rose and his associates in exchange for bribe payments.  *Id.* at 34:10-16.

258.    Facey further admitted that, prior to leaving his employment at Brooklyn Hospital in 2015, he recruited several other hospital employees to continue providing patient information to Rose, and split bribe payments with these employees.  *Id.* at 34:17-21.

259.    At least four (4) Allstate claimants that treated with the PC Defendants originated their treatment at Brooklyn Hospital between 2012 and 2019.

260. On June 28, 2021, Stephanie Pascal ("Pascal"), Barrington Reid ("Reid"), and Berlisa Bryan ("Bryan") each pleaded guilty to one count of soliciting bribes as an agent of a federally funded organization. *See* Stephanie Pascal, Barrington Reid, and Berlisa Bryan Guilty Plea Transcript, attached hereto as Exhibit 8.

261. Pascal admitted that, from 2016 to 2019, while working as an employee at Interfaith Medical Center in Brooklyn, New York, she provided patient names and phone numbers to Rose and his associates in exchange for bribe payments. *Id.* at 33:3-5.

262. At least five (5) Allstate claimants that treated with the PC Defendants originated their treatment at Interfaith Medical Center between 2016 and 2019.

263. Pascal further admitted to recruiting another co-conspirator, Melecio, into the scheme, and receiving a cut of each of Melecio's bribe payments. *Id.* 33:1-5.

264. Reid admitted that, from 2015 to 2019, while working as an employee of an unidentified hospital, he provided patient names and phone numbers to Coles and his associates (i.e., Rose) in exchange for bribe payments. *Id.* at 37:21-25.

265. Reid disclosed approximately 100 patient names and phone numbers to Coles each month, in exchange for payment of $2,000. *Id.* at 38:1-2; 38:12-14; 39:25; 40:1-4.

266. Bryan likewise admitted that, from 2017 to 2019, in her capacity as an employee of University Hospital in Newark, New Jersey, she provided patient names and phone numbers to Rose and his associates in exchange for cash bribes. *Id.* at 41:4-12.

267. Bryan sent Rose about 720 total patient names and phone numbers over the course of the scheme, for which she was paid about $250.00 per month. *Id.* 41:4-8.

268. On August 3, 2021, Tonja Lewis ("Lewis") pleaded guilty to one count of soliciting bribes as an agent of a federally funded organization. *See* Tonja Lewis Guilty Plea Transcript, attached hereto as Exhibit 9.

269. Lewis admitted under oath that, from 2016 to 2017, in her capacity as an employee of University Hospital in Newark, New Jersey, she provided the names and phone numbers of patients to co-defendant Leon Blue in exchange for bribe payments. *Id.* at 17:24-25; 18:1-3.

270. Lewis disclosed approximately 300 patient names and phone numbers to Leon Blue over the course of this scheme. *Id.* at 18:2-3.

### 3. *NYPD Sources*

271. On June 22, 2021, Yaniris Deleon ("Deleon") pleaded guilty to one count of solicitation of bribes and gratuities by an agent of a federally funded organization. *See* Yaniris Deleon Guilty Plea Transcript, attached hereto as Exhibit 6.

272. Deleon admitted under oath that, from 2018 to 2019, while Deleon was employed by the Bronx NYPD, she improperly disclosed motor vehicle accident victim names and phone numbers to Rose and his associates in exchange for bribe payments. *Id.* at 43:12-16.

273. Deleon further admitted to giving her NYPD-issued cellphone to an unindicted co-conspirator, who used the phone to access NYPD databases in order to disclose accident victim information to Rose. *Id.* at 34:17-21.

274. Deleon disclosed approximately 50 to 100 names per day to Rose and his associates. *Id.* at 43:21-23.

275. One June 24, 2021, Latifah Abdul-Khaliq ("Abdul-Khaliq") pleaded guilty to one count of solicitation of bribes and gratuities by an agent of a federally funded organization. *See* Latifah Abdul-Khaliq Guilty Plea Transcript, attached hereto as Exhibit 7.

276. Abdul-Khaliq admitted that, from 2014 to 2018, while employed as a 911 dispatcher for the Brooklyn NYPD, Abdul-Khaliq improperly disclosed accident victim names and phone numbers to Rose and his associates in exchange for bribe payments. *Id.* at 37:20-23.

277. Abdul-Khaliq provided approximately 48,000 names and phone numbers to Rose during this four-year timeframe. *Id.* at 38:17-22.

278. On June 28, 2021, Shakeema Foster ("Foster") pleaded guilty to one count of solicitation of bribes and gratuities by an agent of a federally funded organization. *See* Shakeema Foster Guilty Plea Transcript, attached hereto as Exhibit 3.

279. Foster admitted under oath that, from January 2017 to December 2017, while employed by the NYPD, she improperly disclosed motor vehicle accident victim names and phone numbers to Rose and his associates in exchange for bribe payments. *Id.* at 36:6-18.

280. Foster recalls providing somewhere between 25 to 50 total victim names to Rose, although the precise amount is disputed. *Id.* at 36:6-18; 37:1-5; 38:23-25; 39:1-15.

281. On July 6, 2021, Angela Myers ("Myers"), Kourtnei Williams ("Williams"), and Makkah Shabazz ("Shabazz") each pleaded guilty to one count of solicitation of bribes and gratuities by an agent of a federally funded organization. *See* Angela Myers, Kourtnei Williams, and Makkah Shabazz Guilty Plea Transcript, attached hereto as Exhibit 10.

282. Myers admitted that, from 2016 to 2019, while employed as a 911 operator for the NYPD, she improperly disclosed accident victim information in exchange for bribe payments. *Id.* at 37:4-12.

283. Myers provided approximately 75 names per week to Rose and his associates. *Id.* 37:20-25.

284.     Williams admitted that, from December 2015 to January 2017, while employed by the NYPD, she improperly disclosed accident victim names and phone numbers in exchange for bribe payments.  *Id.* at 40:18-21.

285.     Williams disclosed approximately 200 names per week to Rose and his associates. *Id.* at 42:1-3.

286.     Shabazz admitted that, from 2018 to 2019, while employed by the Bronx and Brooklyn NYPD, she disclosed accident victim information in exchange for bribe payments.  *Id.* 45:5-9.

287.     Shabazz, as a supervisor at the NYPD, had access to the NYPD database, which she used to access the confidential information she disclosed to Rose and his associates.  *Id.* at 45:9-12.

288.     Shabazz disclosed approximately 200 names per day to Rose and his associates, and received about $1,000 to $2,000 per week in bribe payments.  *Id.* at 46:6-15.

### 4.  *Call Center Employees*

289.     On July 13, 2021, Ana Rivera ("Rivera") pleaded guilty to two counts of conspiracy to violate the Travel Act.  *See* Ana Rivera Guilty Plea Transcript, attached hereto as Exhibit 11.

290.     Rivera admitted under oath that, from 2013 to 2015, she worked at a call center owned by Rose on Metropolitan Avenue in Queens, New York, while knowing that Rose paid bribes to obtain patient information.  *Id.* at 22:17-25; 23:1-12.

291.     From 2014 to 2019, Rivera worked at another call center owned by Rose, knowing that Rose continued to engage in the practice of paying bribes to gain access to confidential patient information.  *Id.* at 21:9-25; 22:1-15.

292.    Rivera admitted that, at both call centers, her job was to steer patients to treat at particular medical clinics. *Id.* at 21:21-25; 22:22-23.

293.    On July 16, 2021, Dejahnea Brown ("Brown") pleaded guilty to one count of conspiracy to violate the Travel Act. *See* Dejahnea Brown Guilty Plea Transcript, attached hereto as Exhibit 12.

294.    Brown admitted under oath that, from 2016 to 2018, she was employed at Rose's call center, where she was responsible for contacting known motor vehicle accident victims, and identifying additional victims to call through attorney contacts. *Id.* at 19:11-24.

295.    Brown admitted that, at some point in 2017, she became aware that the call center was part of a conspiracy in which Rose and his associates would bribe hospital employees to obtain confidential patient information. *Id.* at 21:3-10.

296.    Brown continued to work at the call center, despite becoming aware of the unlawful bribery scheme. *Id.* at 21:12-14.

297.    On November 23, 2021, Luis Vilella ("Vilella") pleaded guilty to a Superseding Criminal Information charging him with two counts of conspiracy to engage in a bribery scheme in violation of the Travel Act. *See* Luis Vilella Guilty Plea Transcript, attached hereto as Exhibit 13.

298.    Vilella admitted that, from 2015 to 2018, he worked at Rose's call center, where his job was to contact motor vehicle accident victims by phone, misrepresent his identity, and steer these victims to treat with select doctors and lawyers. *Id.* at 19:21-235, 20:1-3.

299.    Vilella further admitted that, from December 2018 to March 2019, he worked at another Rose-owned call center, where he continued to call motor vehicle accident victims and steer them to select providers by misrepresenting his identity. *Id.* at 21:15-24.

300.    Vilella knew that his co-conspirators obtained the contact information of accident victims by unlawfully bribing hospital and NYPD employees. *Id.* at 20:3-6, 22:1-4.

301.    Vilella also knew that the clinics and law firms to which he steered accident victims paid kickbacks to the originators of this fraud scheme (i.e., Rose). *Id.* at 20:1-3, 21:24-25.

### B.  OVERVIEW OF DEFENDANTS' SCHEME TO DEFRAUD ALLSTATE

302.    The defendants knowingly and intentionally schemed to defraud Allstate and others through the submission of false and fraudulent No-Fault claims.

303.    Allstate is one of the No-Fault insurance providers victimized by this scheme.

304.    New York's No-Fault system is designed to provide patients and healthcare providers with compensation for the provision of healthcare services and is also designed to facilitate prompt payment of patient claims.

305.    As a result, the submission of facially valid bills by healthcare service providers for patient services will often result in prompt payment from a No-Fault insurer.

306.    For professional healthcare services provided in the State of New York, healthcare providers are not eligible to seek or receive No-Fault reimbursement under Insurance Law § 5102 if they fail to meet **any** New York state or local licensing requirement necessary to perform such services in New York.

307.    The Provider Defendants and the Management Defendants were aware of these conditions of reimbursement when they decided to take advantage of New York's No-Fault system and defraud Allstate by creating and controlling multiple entities that provided chiropractic, pain management, and acupuncture services to patients (i.e., the PC Defendants).

308. At all times relevant to this action, the Management Defendants conspired to recruit the Provider Defendants as nominal owners, to cause the fraudulent incorporation of the PC Defendants, and to control the operation and management of the PC Defendants.

309. In so doing, the Management Defendants were able to engage in the following misconduct as a means to propel this scheme:

- Billing Allstate for excessive and medically unnecessary treatment, and for treatment that was not rendered as reported;

- Altering and fabricating medical records to falsely represent and support the medical necessity of treatment that was, in fact, not necessary;

- Entering into unlawful referral and kickback arrangements to ensure each claimant was provided the highest amount of treatment and equipment possible, thereby grossly inflating the charges submitted to Allstate.

310. At all times relevant to this action, the Management Defendants controlled the treatment purportedly provided to patients, including one or more Allstate insured, by the PC Defendants.

311. Rose was never licensed or authorized to practice medicine, acupuncture, pain management, or chiropractic services.

312. Although Belotserkovskiy is licensed to practice acupuncture, he is not licensed to practice chiropractic, physical therapy, or professional medicine services.

313. The Management Defendants devised and enforced a protocol that ensured that unnecessary and excessive tests, treatments, prescriptions, and referrals were provided to patients of the PC Defendants.

314. Such conduct is not only prohibited under New York law, but was also dangerous to the patients who were subjected to clinically unwarranted and unneeded tests, treatments, prescriptions, and referrals.

315.     In other circumstances, the Management Defendants caused the PC Defendants to submit bills and invoices to Allstate and others seeking payment for treatment that was never actually administered, or was not administered as billed.

316.     Throughout the entirety of this scheme, the Management Defendants caused the PC Defendants to be operated in violation of New York law, and, as such, the PC Defendants' claims for No-Fault reimbursement were never lawfully compensable under New York law.

### i.     Unlawful Layperson Control of the PC Defendants

#### 1.     *Unlawful Lay Control of the Lafayette Ave. Clinic*

317.     Rose maintained an ownership interest in the Lafayette Ave. Clinic during the relevant treatment period.

318.     This ownership interest is evidenced by his 2015 Instagram posts, in which he stated that he had purchased the facility, and had been "trained" by the providers there. *See infra* at 20–21.

319.     This interest is also evidenced by his intercepted 2016 to 2017 telephonic communications, in which Rose discussed his ownership interest in two New York multi-disciplinary medical facilities.

320.     To supervise the operation of these facilities, Rose installed Belotserkovskiy as the "manager" of the Lafayette Ave. Clinic.

321.     The Lafayette Ave. Clinic consisted of a web of professional corporations that provided an array of healthcare services and were unlawfully operated, managed, and controlled by Rose and Belotserkovskiy in violation of New York Law.

322.     These professional corporations provide healthcare services in the fields of physical therapy, pain management, diagnostic testing, chiropractic, and acupuncture.

323.     At all relevant times, Rose and Belotserkovskiy participated in the unlawful operation, management, and control of Ambel Acupuncture, Mansour PT, Clarke PC, and Palm Chiropractic.

324.     Rose is not licensed or authorized to practice in any healthcare field and, as such, may not dictate, perform, or profit from treatment in the areas of, among others, physical therapy, pain management, diagnostic testing, chiropractic, or acupuncture.

325.     Belotserkovskiy is licensed to practice acupuncture in New York, but is not licensed to practice in any other healthcare field and, as such, may not dictate, perform, or profit from treatment in the areas of, among others, physical therapy, pain management, diagnostic testing, or chiropractic.

326.     Despite these prohibitions, Rose and Belotserkovskiy did unlawfully operate, manage, and/or control the Lafayette Ave. Defendants and caused these Lafayette Ave. Defendants to deliver treatment that was not medically necessary, fraudulently bill for medical treatment and services that did not occur as reported, and unlawfully profit from healthcare services purportedly rendered to Allstate insureds in violation of New York law.

327.     To circumvent New York law, Rose and Belotserkovskiy recruited and installed the Provider Defendants who owned Ambel Acupuncture, Mansour PT, Clarke PC, and Palm Chiropractic to misrepresent to the public, including Allstate, that these professional healthcare corporations were properly formed and operated by licensed professionals who were authorized to practice the healthcare discipline that each professional corporation was organized to perform.

328.     The scheme's primary objective was to deliver excessive and medically unnecessary treatment to patients, not for the benefit of the patient, but, rather, to maximize profit to the Management Defendants and Provider Defendants.

329.    To achieve this goal, the Management Defendants colluded to unlawfully operate two multi-disciplinary clinics dedicated to submitting false and fraudulent bills and invoices under a variety of healthcare disciplines.

330.    The false representations regarding the Lafayette Ave. Defendants' ownership repeatedly and intentionally were placed on bills submitted to No-Fault insurers such as Allstate for the specific purpose of obtaining payment in violation of New York law.

### 2. *Unlawful Lay Control of the 65th St Clinic*

331.    Rose maintained an ownership interest in the 65th St. Clinic during the relevant treatment period.

332.    This ownership interest is evidenced by his intercepted 2016 to 2017 telephonic communications, in which Rose discussed his ownership interest in two New York multi-disciplinary medical facilities.

333.    To supervise the operation of these facilities, Rose installed Belotserkovskiy as the "manager" of the 65th St. Clinic.

334.    The 65th St. Clinic consisted of a web of professional corporations that provided an array of healthcare services and were unlawfully operated, managed, and controlled by Rose and Belotserkovskiy in violation of New York Law.

335.    These professional corporations provided healthcare services in the fields of physical therapy, pain management, diagnostic testing, chiropractic, and acupuncture.

336.    At all relevant times, Rose and Belotserkovskiy participated in the unlawful operation, management, and control of Ariel Chiropractic, Bay Medical, Belam Acupuncture, C&M Chiropractic, and Cyrus Chiropractic.

337. Rose is not licensed or authorized to practice in any healthcare field and, as such, may not dictate, perform, or profit from treatment in the areas of, among others, physical therapy, pain management, diagnostic testing, chiropractic, or acupuncture.

338. Belotserkovskiy is licensed to practice acupuncture in New York, but is not licensed to practice in any other healthcare field and, as such, may not dictate, perform, or profit from treatment in the areas of, among others, physical therapy, pain management, diagnostic testing, or chiropractic.

339. Despite these prohibitions, Rose and Belotserkovskiy did unlawfully operate, manage, and/or control the 65th St. Defendants and caused these 65th St. Defendants to deliver treatment that was not medically necessary, fraudulently bill for medical treatment and services that did not occur as reported, and unlawfully profit from healthcare services purportedly rendered to Allstate insureds in violation of New York law.

340. To circumvent New York law, Rose and Belotserkovskiy recruited and installed the Provider Defendants who owned Ariel Chiropractic, Bay Medical, Belam Acupuncture, C&M Chiropractic, and Cyrus Chiropractic to misrepresent to the public, including Allstate, that these professional healthcare corporations were properly formed and operated by licensed professionals who were authorized to practice the healthcare discipline that each professional corporation was organized to perform.

341. The scheme's primary objective was to deliver excessive and medically unnecessary treatment to patients, not for the benefit of the patient, but, rather, to maximize profit to the Management Defendants and Provider Defendants.

342.     To achieve this goal, the Management Defendants colluded to unlawfully operate two multi-disciplinary clinics dedicated to submitting false and fraudulent bills and invoices under a variety of healthcare disciplines.

343.     The false representations regarding the 65th St. Defendants' ownership repeatedly and intentionally were placed on bills submitted to No-Fault insurers such as Allstate for the specific purpose of obtaining payment in violation of New York law.

### i. <u>Unlawful Referral and Fee Splitting Arrangements</u>

#### 1. *Referrals Based on Bribes Paid to Healthcare Providers*

344.     Medical clinics participating in the Rose fraud scheme provided payments to Rose in exchange for patient referrals.

345.     In return, Rose ensured a steady supply of patient referrals by bribing hospital employees, police officers, and first responders for confidential patient information, then cold-calling those patients and making false representations to steer them to the clinics of his choosing.

346.     In pleading guilty to solicitation of bribes and gratuities by an agent of a federally-funded organization, one Rose co-conspirator admitted that, from 2014 to 2019, he had sold the information of hundreds of patients to Rose in his capacity as an emergency room employee at Maimonides Medical Center in Brooklyn.

347.     In that same time period, at least twenty-one (21) Allstate claimants who treated with the PC Defendants were treated at Maimonides Medical Center following their automobile accidents.

348.     Similarly, three (3) other Rose co-conspirators who were employed by Wyckoff Heights Medical Center in Brooklyn, Brooklyn Hospital in Brooklyn, and Interfaith Medical

Center in Brooklyn each admitted in their respective plea hearings to selling hundreds of patient names and phone numbers to Rose in exchange for bribe payments.

349.    During the relevant period, thirteen (13) claimants who treated with the PC Defendants were treated at Wyckoff Heights Medical Center, Brooklyn Hospital, or Interfaith Medical Center.

350.    Rose maintained an ownership interest in the 65th St. Clinic and Lafayette Ave. Clinic at the time this bribery scheme was ongoing.

351.    Intercepted phone calls between Rose and Belotserkovskiy demonstrate that Rose depended on these Clinics' No-Fault payouts to maintain his financial security.

352.    On information and belief, Rose used his call-center and his far-flung network of corrupt medical providers to steer Allstate claimants to treat at the facilities he owned: the 65th St. Clinic and the Lafayette Ave. Clinic.

## 2. *Referral Arrangements Among the PC Defendants*

353.    As detailed more extensively below, treatment at the 65th St. Clinic typically centered on initial and follow-up medical evaluations by Hanna, and treatment at the Lafayette Ave. Clinic typically centered on initial and follow-up medical evaluations by Clarke.

354.    As part of the No-Fault scheme, Hanna or Clarke would use these initial and follow-up examinations to refer patients for physical therapy, chiropractic, and acupuncture services with the other PC Defendants operating from the 65th St. Clinic or the Lafayette Ave. Clinic.

355.    These referrals resulted in additional treatment, which, in turn, caused additional bills to be generated and then submitted to Allstate seeking No-Fault reimbursement.

356.    All of these claims and bills were furnished pursuant to an illegal referral arrangement through which the Management Defendants ensured that patients were referred to-

and-from professional healthcare corporations in which the Management Defendants had a financial interest, thus rendering these claims and bills ineffective.

357.    Under New York law, Allstate has no obligation to pay any claims that arise from unlawful referral arrangements.

358.    Accordingly, to the extent that Allstate paid the PC Defendants in reliance on documents created and submitted to Allstate in connection with these unlawful referrals, including, but not limited to, those payments listed in Exhibits 22-29, Allstate is entitled to recover all payments made in connection with any such services.

359.    To the extent that any of the PC Defendants' charges submitted in connection with unlawful referrals remain unpaid, Allstate is under no obligation to make any payments in connection with those transactions.

### ii.    **Fraudulent Treatment Protocol**

360.    As a crucial part of this scheme, the PC Defendants rendered and then sought payment for fraudulent treatments, tests, and services provided to patients.

361.    Indeed, the defendants intentionally designed this scheme as a so-called "multi-disciplinary" clinic to ensure that patients were subjected to numerous treatments for a prolonged period regardless of whether the patients needed—or even wanted—these services.

362.    The PC Defendants were not entitled to No-Fault reimbursement for these treatments, tests, and services because they were excessive, medically unnecessary, and because they were rendered pursuant to a pre-determined treatment protocol for the primary purpose of collecting payments from Allstate.

363.    The documents and invoices created and submitted to Allstate by (or on behalf of) the PC Defendants routinely misrepresented that the billed-for services were performed in a legitimate and clinically-reasonable manner.

364.    As alleged herein, not only has this scheme injured Allstate, but the defendants' purposeful provision of excessive and clinically unwarranted care also compromised the well-being of patients that were subjected to these grossly unnecessary treatments, tests, and services.

365.    Because of the misconduct described below, none of the PC Defendants' claims for No-Fault reimbursement under Insurance Law § 5102 are—or ever were—compensable.

### 1. *Excessive and Medically Unnecessary Physical Therapy, Chiropractic, and Acupuncture Treatment*

366.    To generate as much billing as possible, the defendants devised and implemented a protocol of excessive treatment over a prolonged period of time—treatment that was not medically necessary for the PC Defendants' patients, especially where the patients were only suffering from soft-tissue injuries caused by minor motor vehicle accidents.

367.    Indeed, the treatment records of Allstate claimants treating with one or more of the PC Defendants, when viewed as a whole, reveal an unmistakable, and egregious, pattern of over-treatment.

368.    Specifically, patients of the PC Defendants often inappropriately received physical therapy simultaneous to chiropractic and acupuncture care.

369.    These patients typically presented with soft tissue sprains and strains reflected on the patients' MRI scans.

370.    It is often reasonable for patients with such soft-tissue injuries to receive *either* physical therapy *or* chiropractic care—but not both—for a brief interval of time following the motor vehicle accident with a rapid transition to a home exercise program.

371.    There is no justification for a patient to receive simultaneous chiropractic and physical therapy treatment.

372.    Nonetheless, such concurrent chiropractic and physical therapy treatment is regularly part of the treatment plan for patients treating with the PC Defendants.

373.    Indeed, patients of the PC Defendants received concurrent physical therapy, chiropractic care, and acupuncture in nearly every case.

374.    In some instances, the physical therapy and chiropractic care rendered to patients of the PC Defendants continued unabated for five (5) to ten (10) months, which far exceeds the period of time for which such treatment would be reasonably rendered to a patient with self-limiting soft-tissue injuries.

375.    The pattern of treatment instituted at the 65th St. Clinic typically commenced with the Allstate Claimants presenting at Bay Medical for an initial evaluation shortly after the alleged accidents.

376.    The initial evaluation reports generated by Bay Medical and submitted to Allstate for each Allstate Claimant are remarkably similar for almost every patient.

377.    These initial assessments almost always concluded with Bay Medical reporting an identical plan of care for each patient, including physical therapy treatment, chiropractic treatment, and acupuncture treatment three (3) times per week for six (6) weeks followed by a reassessment.

378.    The reassessments consistently came to the same conclusion for each Allstate Claimant—i.e., that further physical therapy, chiropractic, and acupuncture treatment was needed approximately three (3) times per week for six (6) additional weeks.

379. Similarly, the pattern of treatment instituted at the Lafayette Ave. Clinic typically commenced with the Allstate Claimants presenting at one of four entities: Ambel Acupuncture, Mansour PT, Clarke PC, or Palm Chiropractic.

380. Regardless of which entity initially evaluated the patient, almost every patient underwent an initial evaluation at Clarke PC within the first few weeks of treatment.

381. The initial evaluation reports generated by Clarke PC are remarkably similar for almost every patient.

382. These initial assessments almost always concluded with Clarke PC reporting an identical plan of care for each patient, including physical therapy treatment, chiropractic treatment, and acupuncture treatment three (3) times per week for six (6) weeks followed by a reassessment.

383. The reassessments consistently came to the same conclusion for each Allstate Claimant—i.e., that further physical therapy, chiropractic, and acupuncture treatment was needed approximately three (3) times per week for six (6) additional weeks.

384. Despite the fact that the Allstate Claimants overwhelmingly presented with relatively minor sprains and strains, these identical treatment plans caused the Allstate Claimants to receive physical therapy treatment at Bay Medical and Mansour PT, chiropractic treatment at Ariel Chiropractic, C&M Chiropractic, Cyrus Chiropractic, or Palm Chiropractic, and acupuncture treatment at Ambel Acupuncture or Belam Acupuncture, several times per week for months on end.

385. In many cases 65th St. Clinic patients were subjected to more than forty (40) physical therapy and pain management visits at Bay Medical, more than forty (40) chiropractic visits at Ariel, and more than forty (40) acupuncture visits at Belam Acupuncture.

386.     Likewise, in many cases Lafayette Ave. Clinic patients were subjected to more than forty (40) acupuncture visits at Ambel Acupuncture, more than forty (40) physical therapy visits at Mansour PT, and more than forty (40) chiropractic visits at Palm Chiropractic.

387.     At the upper end, several patients visited Bay Medical, Ariel Chiropractic, Ambel Acupuncture, Bay Medical, Mansour PT, Belam Acupuncture, and Palm Chiropractic over seventy (70) times.

388.     At the 65th St. Clinic, each Allstate Claimant typically would begin chiropractic treatment with Ariel Chiropractic and acupuncture treatment with Belam Acupuncture immediately after the initial evaluation at Bay Medical.

389.     Neither Ariel Chiropractic nor Belam Acupuncture identify the referring physician in the chiropractic or acupuncture notes.

390.     Moreover, there was never any attempt to transition these patients to a home exercise program even though any legitimate physical therapy or chiropractic treatment program would call for such a transition after about fifteen (15) sessions.

391.     At the Lafayette Ave. Clinic, each Allstate Claimant typically would begin acupuncture treatment with Ambel Acupuncture, physical therapy treatment with Mansour PT, and chiropractic treatment with Palm Chiropractic on the same date as, and often a few days before, attending an initial medical evaluation by Colin Clarke, M.D.

392.     Ambel Acupuncture, Mansour PT, and Palm Chiropractic do not identify a referring physician in the chiropractic, physical therapy, or acupuncture notes.

393.     Overall, Allstate claimants were subjected to hundreds of separate instances of physical therapy, chiropractic, and acupuncture treatment, which is grossly excessive.

394. During the course of treatment, virtually every patient at the 65th St. Clinic was subjected to periodic evaluations by Hanna, operating through Bay Medical.

395. These periodic physician evaluations were employed as a means to provide instructions and purported justification for continued physical therapy treatment.

396. Indeed, Hanna virtually always recommended physical therapy at a rate of three (3) times per week for six (6) weeks, regardless of the patient's individual symptoms or how long the patient had been undergoing treatment at the facility.

397. Similarly, virtually every patient at the Lafayette Ave. Clinic was subjected to periodic evaluations by Clarke, operating through Clarke PC.

398. These periodic physician evaluations were employed as a means to provide instructions and purported justification for continued physical therapy treatment.

399. Virtually every physical therapy prescription issued by Clarke provided for a rate of three (3) times per week for four to six (4-6) weeks, regardless of the patient's individual symptoms or how long the patient had been undergoing treatment at the facility.

400. Overall, the continued physical therapy, chiropractic care, and acupuncture treatments over extended time intervals is excessive, inappropriate, and not medically necessary for the management of the patients' soft-tissue sprains and strains.

401. To the extent that Allstate paid Bay Medical, Ariel Chiropractic, Belam Acupuncture, Cyrus Chiropractic, C&M Chiropractic, Ambel Acupuncture, Mansour PT, Clarke PC, or Palm Chiropractic in reliance on the documents created and submitted to Allstate by the PC Defendants in connection with any physical therapy treatments and services, chiropractic treatments and services, acupuncture treatments and services, and patient examinations and consultations used to justify the performance of excessive, medically unnecessary, and concurrent

physical therapy, chiropractic care, and/or acupuncture care including, but not limited to, those payments listed in Exhibits 22-29, Allstate is entitled to recover all payments made to Bay Medical, Ariel Chiropractic, Belam Acupuncture, Cyrus Chiropractic, C&M Chiropractic, Ambel Acupuncture, Mansour PT, Clarke PC, and Palm Chiropractic in connection with any such services.

402.    Additionally, to the extent that any of Bay Medical, Ariel Chiropractic, Belam Acupuncture, C&M Chiropractic, Cyrus Chiropractic, Ambel Acupuncture, Mansour PT, Clarke PC, or Palm Chiropractic's charges submitted in connection with these services remain unpaid, Allstate is under no obligation to make any payments in connection with those transactions because those services were excessive, not warranted, and therefore not compensable under New York's No-Fault laws.

### a.    Patient E.S. (claim no. 0522968437)

403.    Patient E.S. (Claim No. 0522968437) was purportedly involved in a motor vehicle accident on November 1, 2018, and presented at Bay Medical on November 8, 2018, for an initial examination with Hanna.

404.    Hanna noted that E.S. purportedly complained of neck, left shoulder, and low back pain, as well as numbness in the fingers of the left hand.

405.    At the initial examination, Hanna referred E.S. for three (3) separate MRI scans (left shoulder, cervical spine, and lumbar spine), ordered an EMG study, ordered three (3) pieces of DME, and placed the patient in a treatment protocol that consisted of parallel courses of physical therapy, chiropractic care, and acupuncture treatment.

406.    Ordering an MRI on the first visit in the absence of certain orthopedic "red flags" (i.e. symptoms indicating concern for a fracture, concern for progressive neurologic compromise,

or concern for an underlying infection or malignancy), is inconsistent with the current standard of care for treatment of soft tissue injuries, and deviates from the guidelines of the American College of Radiology.

407.    As such, Hanna's referral for MRI studies was, at best, premature, given that E.S. was only one week post-trauma and did not present any serious orthopedic concerns.

408.    Additionally, Hanna prescribed Durable Medical Equipment ("DME") to E.S. consisting of lumbar support, an orthopedic pillow, and a thermophore.

409.    This prescription of DME was unnecessary and excessive, as braces and support cushions are rarely indicated in the treatment of soft tissue injuries, and can in fact be counterproductive to patient recovery.

410.    On November 19, 2018, February 4, 2019, and April 11, 2019, Hanna, through Bay Medical, allegedly put E.S. through bogus computerized ROM testing.

411.    During the manual ROM test at the initial exam on November 8, 2018, Hanna documented normal shoulder extension at 150 degrees and documented E.S.'s shoulder extension at 120 degrees.

412.    Normal shoulder extension is in fact 40 degrees, and an extension of 120 degrees is anatomically impossible.

413.    Hanna also documented ROM measurements for E.S. in his November 8, 2018 physical exam that did not match the computerized measurements for E.S. taken on November 19, 2018.

414.    At the November 8, 2018 physical exam, Hanna documented cervical flexion of 40 degrees, cervical extension of 30 degrees, and cervical rotation of 50 degrees.

415. At the November 19, 2018 computerized exam, Hanna documented cervical flexion of 8 degrees, cervical extension of 3 degrees, and cervical rotation of 24 degrees.

416. Indeed, throughout E.S.'s entire course of purported treatment spanning nearly six (6) months, Hanna never interpreted the results of the computerized ROM testing or incorporated these into E.S.'s plan of treatment.

417. Given this information, it appears that these tests were performed to increase the amount billed to Allstate on E.S.'s No-Fault claim, rather than improve her medical outcome.

418. On January 8, 2019, Colarusso, through Ariel Chiropractic, performed an EMG study on E.S.

419. This EMG study of E.S. tested multiple nerves that were otherwise asymptomatic.

420. Ultimately, Colarusso misinterpreted the results of E.S.'s EMG studies, as the findings were virtually impossible in the human body (i.e. F-wave median and ulnar nerve studies producing identical results to the 100th of a millisecond) and were inconsistent with the computerized reports (i.e. finding low amplitudes on the bilateral radial nerves, where computerized images did not reflect the same).

421. E.S.'s course of treatment at the 65th St. Clinic continued for approximately six (6) months and consisted of 65 sessions of physical therapy, 65 sessions of chiropractic treatment, and 60 sessions of acupuncture treatment.

422. During this protocol, certain modalities (i.e. "CPT; spinal 5 reg," CPT Code 98942; "Trigger Point Chiro Therapy," CPT Code 97139; "Cryotherapy or Thermotherapy," CPT Code 97010; "Electrical Stimulation," CPT Code 97014; "Therap. Proc. Massage," CPT Code 97124; "Acupuncture Initial 15 Min," CPT Code 97810; "Acupuncture Reinsertion 15 Min," CPT Code 97811) were found to have been rendered simultaneously on the same dates of service.

423.     On each date of service at Ariel Chiropractic, Bay Medical, and Belam Acupuncture, multiple and some identical modalities were purportedly administered to E.S.

424.     In fact, all 65 of E.S.'s chiropractic and physical therapy visits reportedly rendered by Ariel Chiropractic and Bay Medical, respectively, were performed on the same dates of service.

425.     Additionally, all 60 of E.S.'s acupuncture visits, reportedly rendered by Belam Acupuncture, were performed on dates in which E.S. also received physical therapy and chiropractic.

426.     Over the course of more than 60 dates of service, none of the providers documented significant improvement in E.S.'s symptoms.

427.     Specifically, the medical records from Ariel Chiropractic reflect only minor improvements in E.S.'s pain over the course of nearly six (6) months of treatment (i.e. a decrease from a score of "8" to "6-7").

428.     Only at E.S.'s final appointment, on May 8, 2019, did Ariel Chiropractic document a notable decrease in pain, wherein Ariel Chiropractic documented a subjective pain score of "3," from a reported "5" the week prior.

429.     Belam Acupuncture's initial examination and re-examination records for E.S. note minimal decreases in pain over the course of E.S.'s treatment, wherein Belam Acupuncture documented a subjective pain score of "6," from a reported "8" at the outset of E.S.'s treatment.

430.     Bay Medical's initial examination and re-examination records do not rate E.S.'s pain on a scale.

431.     However, throughout the course of treatment at Bay Medical, E.S.'s reported symptoms never changed and E.S.'s reported prognosis was always listed as "guarded," with the exception of the final exam on May 8, 2019, on which the reported prognosis was "good."

432. A conventional course of treatment for injuries like those reported by E.S. would include *either* physical therapy or chiropractic care for a period four (4) to six (6) weeks, consisting of about fifteen (15) dates of service, before the patient was transitioned to a home exercise program.

433. Consistent with this scheme, however, E.S.'s treatment continued unchanged regardless of E.S.'s reported condition.

434. Ariel Chiropractic, Bay Medical, and Belam Acupuncture repeatedly recommended in their re-evaluations that E.S. continue with this course of treatment at the 65th St. Clinic even though the tests, treatment and modalities allegedly administered were not leading to improvements in terms of E.S.'s symptoms or functionality.

435. Without regard to E.S.'s symptoms, Ariel Chiropractic, Bay Medical, and Belam Acupuncture recommended that E.S. receive physical therapy, chiropractic, and acupuncture treatment two (2) to three (3) times a week for four (4) to six (6) weeks at every examination/re-examination, until E.S.'s treatment was discontinued.

436. In connection with the treatment purportedly rendered to the claimant, the Defendants, through Ariel Chiropractic, Bay Medical, and Belam Acupuncture, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to E.S.

437. The documentation submitted to Allstate by the Defendants demonstrates that E.S. was subjected to excessive, prolonged, and medically unnecessary healthcare services from Ariel Chiropractic, Bay Medical, and Belam Acupuncture during the relevant period.

### b. **Patient R.H. (Claim No. 0537905796)**

438.    Patient R.H. (Claim No. 0537905796) was purportedly involved in a motor vehicle accident on February 15, 2019, and presented at Bay Medical on February 20, 2019, for an initial examination with Hanna.

439.    Hanna noted that R.H. purportedly complained of neck, right knee, right shoulder, and low back pain.

440.    At the initial examination, Hanna referred R.H. for an MRI of the right knee, ordered an EMG study, ordered four (4) pieces of DME, and placed the patient in a treatment protocol that consisted of parallel courses of physical therapy, chiropractic care, and acupuncture treatment.

441.    Ordering an MRI on the first visit in the absence of certain orthopedic "red flags" (i.e. symptoms indicating concern for a fracture, concern for progressive neurologic compromise, or concern for an underlying infection or malignancy), is inconsistent with the current standard of care for treatment of soft tissue injuries, and deviates from the guidelines of the American College of Radiology.

442.    As such, Hanna's referral for MRI studies was, at best, premature, given that R.H. was only five days post-trauma and did not present any serious orthopedic concerns.

443.    Additionally, Hanna prescribed Durable Medical Equipment ("DME") to R.H. consisting of lumbar support, knee support, an orthopedic pillow, and a thermophore.

444.    This prescription of DME was unnecessary and excessive, as braces and support cushions are rarely indicated in the treatment of soft tissue injuries, and can in fact be counterproductive to patient recovery.

445. On February 25, 2019, March 27, 2019, May 13, 2019, and June 17, 2019, Hanna, through Bay Medical, allegedly put R.H. through bogus computerized ROM testing.

446. During the manual ROM test at the initial exam on February 20, 2019, Hanna documented normal shoulder extension at 150 degrees and documented R.H.'s shoulder extension at 90 degrees.

447. Normal shoulder extension is in fact 40 degrees, and an extension of 150 degrees is anatomically impossible.

448. Hanna also documented ROM measurements for R.H. in his February 20, 2019, March 15, 2019, May 10, 2019, and June 28, 2019 physical exams that did not match the computerized measurements for R.H. taken on February 25, 2019, March 27, 2019, May 13, 2019, or June 17, 2019.

449. At the February 20, 2019 physical exam, Hanna documented cervical flexion of 30 degrees, cervical extension of 30 degrees, and cervical rotation of 60 degrees.

450. By contrast, at the February 25, 2019 computerized exam, Hanna documented cervical flexion of 22 degrees, cervical extension of 7 degrees, and cervical rotation of 27 degrees.

451. At the March 15, 2019 physical exam, Hanna documented cervical flexion of 40 degrees, cervical extension of 30 degrees, and cervical rotation of 60 degrees.

452. By contrast, at the March 27, 2019 computerized exam, Hanna documented cervical flexion of 34 degrees, cervical extension of 15 degrees, and cervical rotation of 37-38 degrees.

453. At the May 10, 2019 physical exam, Hanna documented cervical flexion of 40 degrees, cervical extension of 40 degrees, and cervical rotation of 60-70 degrees.

454. By contrast, at the May 13, 2019 computerized exam, Hanna documented cervical flexion of 18 degrees, cervical extension of 7 degrees, and cervical rotation of 35 degrees.

455. At the June 28, 2019 physical exam, Hanna documented cervical flexion of 40 degrees, cervical extension of 40 degrees, and cervical rotation of 60-70 degrees.

456. By contrast, at the June 17, 2019 computerized exam, Hanna documented cervical flexion of 18 degrees, cervical extension of 7 degrees, and cervical rotation of 36-38 degrees.

457. Indeed, throughout R.H.'s entire course of purported treatment spanning about six (6) months, Hanna never interpreted the results of the computerized ROM testing or incorporated these into R.H.'s plan of treatment.

458. Given this information, it appears that these tests were performed to increase the amount billed to Allstate on R.H.'s No-Fault claim, rather than improve his medical outcome.

459. On May 14, 2019, Colarusso, through Ariel Chiropractic, performed an EMG study on R.H.

460. This EMG study of R.H. tested multiple nerves that were otherwise asymptomatic.

461. Ultimately, Colarusso misinterpreted the results of R.H.'s EMG studies, as the findings were virtually impossible in the human body (i.e. motor nerve conduction velocities where the tibial nerve measured at 91.0 ms and 71.0 ms in the lower extremities – an impossible velocity in the human body) and were internally inconsistent (i.e. finding unobtainable responses in the bilateral radial motor nerve, left median F-wave, bilateral radial F-waves, and numerous lower extremity nerves, while simultaneously noting an "impression" of "no abnormalities" within these same nerves).

462. R.H.'s course of treatment at the 65th St. Clinic continued for approximately six (6) months and consisted of 57 sessions of physical therapy, 27 sessions of chiropractic treatment, and 54 sessions of acupuncture treatment.

463. During this protocol, certain modalities (i.e. "CPT; spinal 5 reg," CPT Code 98942; "Trigger Point Chiro Therapy," CPT Code 97139; "Cryotherapy or Thermotherapy," CPT Code 97010; "Electrical Stimulation," CPT Code 97014; "Therap. Proc. Massage," CPT Code 97124; "Acupuncture Initial 15 Min," CPT Code 97810; "Acupuncture Reinsertion 15 Min," CPT Code 97811) were found to have been rendered simultaneously on the same dates of service.

464. On each date of service at Ariel Chiropractic, Bay Medical, and Belam Acupuncture, multiple and some identical modalities were purportedly administered to R.H.

465. In fact, all but one of R.H.'s 61 acupuncture visits at Belam Acupuncture were reportedly performed on the same dates of service as R.H.'s 60 physical therapy visits with Bay Medical.

466. Additionally, all 56 of R.H.'s chiropractic visits, reportedly rendered by Ariel Chiropractic, were performed on dates in which R.H. also received acupuncture.

467. Over the course of about 60 dates of service, none of the providers documented significant improvement in R.H.'s symptoms.

468. Specifically, the medical records from Ariel Chiropractic reflect only minor improvements in R.H.'s pain over the course of about six (6) months of treatment (i.e. a progressive decrease from a score of "9" to "5").

469. Belam Acupuncture's initial examination and re-examination records for R.H. note minimal decreases in pain over the course of R.H.'s treatment, wherein Belam Acupuncture documented a subjective pain score of "6-7," from a reported "9" at the outset of R.H.'s treatment.

470. Bay Medical's initial examination and re-examination records do not rate R.H.'s pain on a scale.

471. However, throughout the course of treatment at Bay Medical, R.H.'s reported symptoms never changed and R.H.'s reported prognosis was always listed as "guarded."

472. A conventional course of treatment for injuries like those reported by R.H. would include *either* physical therapy or chiropractic care for a period four (4) to six (6) weeks, consisting of about fifteen (15) dates of service, before the patient was transitioned to a home exercise program.

473. Consistent with this scheme, however, R.H.'s treatment continued unchanged regardless of R.H.'s reported condition.

474. Ariel Chiropractic, Bay Medical, and Belam Acupuncture repeatedly recommended in their re-evaluations that R.H. continue with this course of treatment at the 65th St. Clinic even though the tests, treatment and modalities allegedly administered were not leading to improvements in terms of R.H.'s symptoms or functionality.

475. Without regard to R.H.'s symptoms, Ariel Chiropractic, Bay Medical, and Belam Acupuncture recommended that R.H. receive physical therapy, chiropractic, and acupuncture treatment two (2) to three (3) times a week for four (4) to six (6) weeks at every examination/re-examination, until R.H.'s treatment was discontinued.

476. In connection with the treatment purportedly rendered to the claimant, the Defendants, through Ariel Chiropractic, Bay Medical, and Belam Acupuncture, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to R.H.

477. The documentation submitted to Allstate by the Defendants demonstrates that R.H. was subjected to excessive, prolonged, and medically unnecessary healthcare services from Ariel Chiropractic, Bay Medical, and Belam Acupuncture during the relevant period.

### c.   **Patient M.D. (Claim No. 0533944583)**

478.    Patient M.D. (Claim No. 0522968437) was purportedly involved in a motor vehicle accident on February 3, 2019, and presented at Bay Medical on February 6, 2019, for an initial examination with Hanna.

479.    Hanna noted that M.D. purportedly complained of upper back, low back, left knee, and left shoulder pain, as well as neck pain radiating down the left arm.

480.    At the initial examination, Hanna ordered an EMG study, ordered five (5) pieces of DME, and placed the patient in a treatment protocol that consisted of parallel courses of physical therapy, chiropractic care, and acupuncture treatment.

481.    Hanna prescribed Durable Medical Equipment ("DME") to M.D. consisting of a cervical collar, lumbar support, knee support, an orthopedic pillow, and a thermophore.

482.    This prescription of DME was unnecessary and excessive, as braces and support cushions are rarely indicated in the treatment of soft tissue injuries, and can in fact be counterproductive to patient recovery.

483.    Additionally, Hanna ordered MRIs, three of which were performed within approximately one (1) month post-trauma.

484.    Ordering an MRI in the absence of certain orthopedic "red flags" (i.e. symptoms indicating concern for a fracture, concern for progressive neurologic compromise, or concern for an underlying infection or malignancy), before a reasonable trial of conservative care, is inconsistent with the current standard of care for treatment of soft tissue injuries, and deviates from the guidelines of the American College of Radiology.

485. As such, Hanna's referral for MRI studies was, at best, premature, given that M.D. was only three (3) days post-trauma at the time of his initial exam and did not present any serious orthopedic concerns.

486. On July 8, 2019 and September 16, 2019, Hanna, through Bay Medical, allegedly put M.D. through bogus computerized ROM testing.

487. Hanna documented ROM measurements for M.D. in his July 22, 2019 physical exam that did not correlate with the computerized measurements for M.D. taken on July 8, 2019, and September 16, 2019.

488. At the July 22, 2019 physical exam, Hanna documented cervical flexion of 50 degrees, cervical extension of 40 degrees, lumbar flexion of 70 degrees, and lumbar extension of 20 degrees.

489. By contrast, at the July 8, 2019 computerized exam, Hanna documented cervical flexion of 30 degrees, cervical extension of 13 degrees, lumbar flexion of 34 degrees, and lumbar extension of 12 degrees.

490. Additionally, at the September 16, 2019 computerized exam, Hanna documented cervical flexion of 24 degrees, cervical extension of 10 degrees, lumbar flexion of 30 degrees, and lumbar extension of 9 degrees.

491. Indeed, throughout M.D.'s entire course of purported treatment spanning nearly nine (9) months, Hanna never interpreted the results of the computerized ROM testing or incorporated these into M.D.'s plan of treatment.

492. Given this information, it appears that these tests were performed to increase the amount billed to Allstate on M.D.'s No-Fault claim, rather than improve her medical outcome.

493.    M.D.'s course of treatment at the 65th St. Clinic continued for approximately nine (9) months and consisted of 79 sessions of physical therapy, 63 sessions of chiropractic treatment, and 65 sessions of acupuncture treatment.

494.    During this protocol, certain modalities (i.e. "CPT; spinal 5 reg," CPT Code 98942; "Trigger Point Chiro Therapy," CPT Code 97139; "Cryotherapy or Thermotherapy," CPT Code 97010; "Electrical Stimulation," CPT Code 97014; "Therap. Proc. Massage," CPT Code 97124; "Acupuncture Initial 15 Min," CPT Code 97810; "Acupuncture Reinsertion 15 Min," CPT Code 97811) were found to have been rendered simultaneously on the same dates of service.

495.    On each date of service at Ariel Chiropractic, Bay Medical, and Belam Acupuncture, multiple and some identical modalities were purportedly administered to M.D.

496.    In fact, from February 6, 2019 to September 9, 2019, there was only one (1) date on which multiple modalities were not rendered simultaneously.

497.    Over the course of more than 60 dates of service, none of the providers documented significant improvement in M.D.'s symptoms.

498.    Specifically, the medical records from Ariel Chiropractic reflect only minor improvements in M.D.'s pain over the course of nearly seven (7) months of treatment (i.e. a decrease from a score of "8" to "6").

499.    Belam Acupuncture's initial examination and re-examination records for M.D. note minimal decreases in pain over the course of M.D.'s treatment, wherein Belam Acupuncture documented a subjective pain score of "6," from a reported "8" at the outset of M.D.'s treatment.

500.    Bay Medical's initial examination and re-examination records do not rate M.D.'s pain on a scale.

501. However, throughout the course of treatment at Bay Medical, M.D.'s reported symptoms never changed and M.D.'s reported prognosis was always listed as "guarded."

502. A conventional course of treatment for injuries like those reported by M.D. would include *either* physical therapy or chiropractic care for a period four (4) to six (6) weeks, consisting of about fifteen (15) dates of service, before the patient was transitioned to a home exercise program.

503. Consistent with this scheme, however, M.D.'s treatment continued unchanged regardless of M.D.'s reported condition.

504. Ariel Chiropractic, Bay Medical, and Belam Acupuncture repeatedly recommended in their re-evaluations that M.D. continue with this course of treatment at the 65th St. Clinic even though the tests, treatment and modalities allegedly administered were not leading to improvements in terms of M.D.'s symptoms or functionality.

505. Without regard to M.D.'s symptoms, Ariel Chiropractic, Bay Medical, and Belam Acupuncture recommended that M.D. receive physical therapy, chiropractic, and acupuncture treatment two (2) to three (3) times a week for four (4) to six (6) weeks at every examination/re-examination, until M.D.'s treatment was discontinued.

506. In connection with the treatment purportedly rendered to the claimant, the Defendants, through Ariel Chiropractic, Bay Medical, and Belam Acupuncture, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to M.D.

507. The documentation submitted to Allstate by the Defendants demonstrates that M.D. was subjected to excessive, prolonged, and medically unnecessary healthcare services from Ariel Chiropractic, Bay Medical, and Belam Acupuncture during the relevant period.

#### d. **Patient C.C. (Claim No. 0546071382)**

508.     Patient C.C. (Claim No. 0546071382) was purportedly involved in a motor vehicle accident on May 20, 2019, and presented at Bay Medical on June 3, 2019, for an initial examination with Hanna.

509.     Hanna noted that C.C. purportedly complained of left shoulder, low back, and left leg pain, as well as neck pain radiating to the left arm.

510.     At the initial examination, Hanna referred C.C. for three (3) separate MRI scans (left shoulder, cervical spine, and lumbar spine), ordered an EMG study, ordered three (3) pieces of DME, and placed the patient in a treatment protocol that consisted of parallel courses of physical therapy and chiropractic care.

511.     Ordering an MRI on the first visit in the absence of certain orthopedic "red flags" (i.e. symptoms indicating concern for a fracture, concern for progressive neurologic compromise, or concern for an underlying infection or malignancy), is inconsistent with the current standard of care for treatment of soft tissue injuries, and deviates from the guidelines of the American College of Radiology.

512.     As such, Hanna's referral for MRI studies was, at best, premature, given that C.C. was only two weeks post-trauma and did not present any serious orthopedic concerns.

513.     Additionally, Hanna prescribed Durable Medical Equipment ("DME") to C.C. consisting of a cervical pillow, lumbosacral orthosis, and an electrical heating pad.

514.     This prescription of DME was unnecessary and excessive, as braces and support cushions are rarely indicated in the treatment of soft tissue injuries, and can in fact be counterproductive to patient recovery.

515. On July 8, 2019 and September 11, 2019, Hanna, through Bay Medical, allegedly put C.C. through bogus computerized ROM testing.

516. Hanna documented ROM measurements for C.C. in his June 3, 2019 and August 22, 2019 physical exams that did not match the computerized measurements for C.C. taken on July 8, 2019 and September 11, 2019.

517. At the June 3, 2019 physical exam, Hanna documented cervical flexion of 40 degrees, cervical extension of 30 degrees, and cervical rotation of 60 degrees.

518. At the July 8, 2019 computerized exam, Hanna documented cervical flexion of 25 degrees, cervical extension of 20 degrees, and cervical rotation of 26-29 degrees.

519. Similarly, the manual measurements taken at the August 22, 2019 physical exam (cervical flexion of 40 degrees, cervical extension of 40 degrees, and cervical rotation of 60 degrees) did not match the September 11, 2019 computerized results (cervical flexion of 22 degrees, cervical extension of 7 degrees, left cervical rotation of 30 degrees, and right cervical rotation of 19 degrees).

520. Indeed, throughout C.C.'s entire course of purported treatment spanning nearly five (5) months, Hanna never interpreted the results of the computerized ROM testing or incorporated these into C.C.'s plan of treatment.

521. Given this information, it appears that these tests were performed to increase the amount billed to Allstate on C.C.'s No-Fault claim, rather than improve her medical outcome.

522. On July 10, 2019, Colarusso, through Cyrus Chiropractic, performed an EMG study on C.C.

523. Colarusso's study produced results that were impossible (i.e. recording a right ulnar sensory nerve at a peak latency of 1.7 ms, when the velocity necessary to obtain this result is

unobtainable in the human body) and internally inconsistent (i.e. an "Impression" noting no abnormalities, while the "Findings" in the same exam noted the left peroneal sensory, left sural sensory, left saphenous sensory, bilateral peroneal F-wave, and left tibal F-wave were all unobtainable).

524. C.C.'s course of treatment at the 65th St. Clinic continued for approximately five (5) months and consisted of 25 sessions of physical therapy and 29 sessions of chiropractic treatment.

525. During this protocol, certain modalities (i.e. "CPT; spinal 5 reg," CPT Code 98942; "Trigger Point Chiro Therapy," CPT Code 97139; "Cryotherapy or Thermotherapy," CPT Code 97010; "Electrical Stimulation," CPT Code 97014; "Therap. Proc. Massage," CPT Code 97124) were found to have been rendered simultaneously on the same dates of service.

526. On each date of service at Ariel Chiropractic and Bay Medical, multiple and some identical modalities were purportedly administered to C.C.

527. In fact, 22 out of the 25 physical therapy sessions and 29 chiropractic sessions were rendered on the exact same dates.

528. Over the course of almost five (5) months, none of the providers documented significant improvement in C.C.'s symptoms.

529. Specifically, the medical records from Ariel Chiropractic reflect only minor improvements in C.C.'s pain over the course of nearly five (5) months of treatment (i.e. a decrease from a score of "8" to "6-7").

530. Bay Medical's initial examination and re-examination records do not rate C.C.'s pain on a scale.

531. However, throughout the course of treatment at Bay Medical, C.C.'s reported symptoms never changed and C.C.'s reported prognosis was always listed as "guarded."

532. A conventional course of treatment for injuries like those reported by C.C. would include *either* physical therapy or chiropractic care for a period four (4) to six (6) weeks, consisting of about fifteen (15) dates of service, before the patient was transitioned to a home exercise program.

533. Consistent with this scheme, however, C.C.'s treatment continued unchanged regardless of C.C.'s reported condition.

534. Ariel Chiropractic and Bay Medical repeatedly recommended in their re-evaluations that C.C. continue with this course of treatment at the 65th St. Clinic even though the tests, treatment and modalities allegedly administered were not leading to improvements in terms of C.C.'s symptoms or functionality.

535. Without regard to C.C.'s symptoms, Ariel Chiropractic and Bay Medical recommended that C.C. receive physical therapy and chiropractic treatment two (2) to three (3) times a week for four (4) to six (6) weeks at every examination/re-examination, until C.C.'s treatment was discontinued.

536. In connection with the treatment purportedly rendered to the claimant, the Defendants, through Ariel Chiropractic, Bay Medical, and Belam Acupuncture, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to C.C.

537. The documentation submitted to Allstate by the Defendants demonstrates that C.C. was subjected to excessive, prolonged, and medically unnecessary healthcare services from Ariel Chiropractic and Bay Medical during the relevant period.

### e.   Patient G.J. (Claim No. 0526342647)

538.    Patient G.J. (Claim No. 0526342647) was purportedly involved in a motor vehicle accident on November 26, 2018, and presented at Bay Medical on November 29, 2019, for an initial examination with Hanna.

539.    Hanna noted that G.J. purportedly complained of left knee pain, and low back pain and stiffness.

540.    At the initial examination, Hanna ordered an EMG study, ordered three (3) pieces of DME, and placed the patient in a treatment protocol that consisted of parallel courses of physical therapy, chiropractic care, and acupuncture treatment.

541.    Hanna prescribed Durable Medical Equipment ("DME") to G.J. consisting of lumbar support, knee support, and a thermophore.

542.    This prescription of DME was unnecessary and excessive, as braces and support cushions are rarely indicated in the treatment of soft tissue injuries, and can in fact be counterproductive to patient recovery.

543.    On December 3, 2018, Hanna, through Bay Medical, allegedly put G.J. through bogus computerized ROM testing.

544.    During the manual ROM test at the initial exam on November 29, 2018, Hanna documented ROM measurements for G.J. that did not correlate with the computerized measurements for G.J. taken on December 3, 2018.

545.    At the November 29, 2018 physical exam, Hanna documented lumbar flexion of 70 degrees, and lumbar extension of 70 degrees.

546.    At the December 3, 2018 computerized exam, Hanna documented lumbar flexion of 38 degrees, and lumbar extension of 13 degrees.

547. Indeed, throughout G.J.'s entire course of purported treatment spanning nearly nine (9) months, Hanna never interpreted the results of the computerized ROM testing or incorporated these into G.J.'s plan of treatment.

548. Given this information, it appears that these tests were performed to increase the amount billed to Allstate on G.J.'s No-Fault claim, rather than improve his medical outcome.

549. On February 19, 2019, Colarusso, through C&M Chiropractic, performed an EMG study on G.J.

550. This EMG study of G.J. tested multiple right lower extremity nerves that were otherwise asymptomatic.

551. The EMG study was therefore excessive.

552. G.J.'s course of treatment at the 65th St. Clinic continued for approximately nine (9) months and consisted of 70 sessions of physical therapy, 66 sessions of chiropractic treatment, and 75 sessions of acupuncture treatment.

553. During this protocol, certain modalities (i.e. "CPT; spinal 5 reg," CPT Code 98942; "Trigger Point Chiro Therapy," CPT Code 97139; "Cryotherapy or Thermotherapy," CPT Code 97010; "Electrical Stimulation," CPT Code 97014; "Therap. Proc. Massage," CPT Code 97124; "Acupuncture Initial 15 Min," CPT Code 97810; "Acupuncture Reinsertion 15 Min," CPT Code 97811) were found to have been rendered simultaneously on the same dates of service.

554. On each date of service at Ariel Chiropractic, Bay Medical, and Belam Acupuncture, multiple and some identical modalities were purportedly administered to G.J.

555. In fact, over the course of more than 65 dates of service, only three (3) total dates did not involve the administration of at least two (2) simultaneous modalities.

556.     Over the course of more than 65 dates of service, none of the providers documented significant improvement in G.J.'s symptoms.

557.     Specifically, the medical records from Ariel Chiropractic reflect only minor improvements in G.J.'s pain over the course of nearly nine (9) months of treatment (i.e. a slow decrease from a score of "8" to "4-5").

558.     Belam Acupuncture's initial examination and re-examination records for G.J. note minimal decreases in pain over the course of G.J.'s treatment, wherein Belam Acupuncture documented a subjective pain score of "7," from a reported "8" at the outset of G.J.'s treatment.

559.     Bay Medical's initial examination and re-examination records do not rate G.J.'s pain on a scale.

560.     However, throughout the course of treatment at Bay Medical, G.J.'s reported symptoms never changed and G.J.'s reported prognosis was always listed as "guarded."

561.     A conventional course of treatment for injuries like those reported by G.J. would include *either* physical therapy or chiropractic care for a period four (4) to six (6) weeks, consisting of about fifteen (15) dates of service, before the patient was transitioned to a home exercise program.

562.     Consistent with this scheme, however, G.J.'s treatment continued unchanged regardless of G.J.'s reported condition.

563.     Ariel Chiropractic, Bay Medical, and Belam Acupuncture repeatedly recommended in their re-evaluations that G.J. continue with this course of treatment at the 65th St. Clinic even though the tests, treatment and modalities allegedly administered were not leading to improvements in terms of G.J.'s symptoms or functionality.

564.    Without regard to G.J.'s symptoms, Ariel Chiropractic, Bay Medical, and Belam Acupuncture recommended that G.J. receive physical therapy, chiropractic, and acupuncture treatment two (2) to three (3) times a week for four (4) to six (6) weeks at every examination/re-examination, until G.J.'s treatment was discontinued.

565.    In connection with the treatment purportedly rendered to the claimant, the Defendants, through Ariel Chiropractic, Bay Medical, and Belam Acupuncture, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to G.J.

566.    The documentation submitted to Allstate by the Defendants demonstrates that G.J. was subjected to excessive, prolonged, and medically unnecessary healthcare services from Ariel Chiropractic, Bay Medical, and Belam Acupuncture during the relevant period.

### f.    Patient D.G. (Claim No. 0414265363)

567.    Patient D.G. (Claim No. 0414265363) was purportedly involved in a motor vehicle accident on May 10, 2016, and presented at Clarke PC on May 16, 2016, for an initial examination with Clarke.

568.    Clarke noted that D.G. purportedly complained of headache, neck pain, mid-back pain, and low back pain.

569.    At the initial examination, Clarke referred D.G. for MRI scans of the cervical and lumbar spine, ordered an EMG study, ordered four (4) pieces of DME, and placed the patient in a treatment protocol that consisted of parallel courses of physical therapy, chiropractic care, and acupuncture treatment.

570.    Ordering an MRI on the first visit in the absence of certain orthopedic "red flags" (i.e. symptoms indicating concern for a fracture, concern for progressive neurologic compromise,

or concern for an underlying infection or malignancy), is inconsistent with the current standard of care for treatment of soft tissue injuries, and deviates from the guidelines of the American College of Radiology.

571. As such, Clarke's referral for MRI studies was, at best, premature, given that D.G. was only six (6) days post-trauma and did not present any serious orthopedic concerns.

572. Additionally, Clarke prescribed Durable Medical Equipment ("DME") to D.G. consisting of a cervical collar, lumbar support, lumbar cushion, and heating pad.

573. This prescription of DME was unnecessary and excessive, as braces and support cushions are rarely indicated in the treatment of soft tissue injuries, and can in fact be counterproductive to patient recovery.

574. At this initial evaluation, and at all but one re-evaluation, Clarke administered trigger point injections ("TPIs") to D.G. using ultrasonic guidance.

575. Altogether, D.G. received TPIs on seven (7) occasions, and for each, Clarke utilized ultrasonic guidance for needle placement.

576. Ultrasonic guidance is not medically necessary in the performance of TPIs.

577. Trigger points are easily located by palpation, and injecting into a vascular structure can be avoided by the provider pulling back on the plunger before administering the injection.

578. Ultrasonic guidance is the most expensive part of Clarke's TPI procedures, adding over $200 to each bill.

579. It appears likely that Clarke uses ultrasonic guidance for each TPI not to enhance patient safety, but to maximize billing for the procedure.

580. On June 21, 2016, Klass, through Palm Chiropractic, performed an EMG study on D.G.

581.    This EMG study of D.G. tested multiple nerves that were otherwise asymptomatic.

582.    Klass also found D.G. to have complete and normal muscle recruitment of the left deltoid and biceps.

583.    This was virtually impossible, as D.G. was only six (6) days post-surgery for a left shoulder arthroscopy.

584.    D.G.'s course of treatment at the Lafayette Ave. Clinic continued for approximately five (5) months for acupuncture and chiropractic service, consisting of 44 sessions of acupuncture treatment and 44 sessions of chiropractic treatment.

585.    D.G. continued attending physical therapy sessions at Mansour Physical Therapy beyond this five (5) month period, amounting to a total of fifteen (15) months of physical therapy services consisting of 79 sessions.

586.    During this protocol, certain modalities (i.e. "CMT; spinal 3-4 regions," CPT Code 98941; "Hot/Cold Pack," CPT Code 97010; "Electrical Stimulation," CPT Code 97014; "Therapeutic Exercises," CPT Code 97110; "Acupuncture Initial 15 Min," CPT Code 97810; "Acupuncture Reinsertion 15 Min," CPT Code 97811) were found to have been rendered simultaneously on the same dates of service.

587.    On each date of service at Ambel Acupuncture, Mansour Physical Therapy, and Palm Chiropractic, multiple and some identical modalities were purportedly administered to D.G.

588.    In fact, all but one (1) out of D.G.'s forty-four (44) chiropractic and acupuncture visits reportedly rendered by Palm Chiropractic and Ambel Acupuncture, respectively, were performed on the same dates of service.

589. Additionally, until October 13, 2016, all but three (3) of D.G.'s physical therapy visits reportedly rendered by Mansour Physical Therapy were performed on the same dates of service as either chiropractic or acupuncture treatment.

590. Throughout this timeframe, none of the providers documented significant improvement in D.G.'s symptoms.

591. Specifically, the medical records from Palm Chiropractic reflect only minor improvements in D.G.'s pain over the course of five (5) months of treatment (i.e. a decrease from a score of "9" to "7-8").

592. Ambel Acupuncture's initial examination and re-examination records for D.G. note minimal decreases in pain over the course of D.G.'s treatment, wherein Ambel Acupuncture documented a subjective pain score of "5-6," from a reported "9" at the outset of D.G.'s treatment.

593. Despite treating D.G. for more than a year, Mansour Physical Therapy's progress notes consistently indicate "no change in symptoms," and only note a decrease in pain from a score of "8-9" to "6."

594. A conventional course of treatment for injuries like those reported by D.G. would include *either* physical therapy or chiropractic care for a period four (4) to six (6) weeks, consisting of about fifteen (15) dates of service, before the patient was transitioned to a home exercise program.

595. Consistent with this scheme, however, D.G.'s treatment continued unchanged regardless of D.G.'s reported condition.

596. Ambel Acupuncture, Mansour Physical Therapy, and Palm Chiropractic repeatedly recommended in their re-evaluations that D.G. continue with this course of treatment at the

Lafayette Ave. Clinic even though the tests, treatment and modalities allegedly administered were not leading to improvements in terms of D.G.'s symptoms or functionality.

597.     Without regard to D.G.'s symptoms, Ambel Acupuncture, Mansour Physical Therapy, and Palm Chiropractic recommended that D.G. receive physical therapy, chiropractic, and acupuncture treatment two (2) to three (3) times a week for four (4) to six (6) weeks at virtually every examination/re-examination, until D.G.'s treatment was discontinued.

598.     In connection with the treatment purportedly rendered to the claimant, the Defendants, through Ambel Acupuncture, Clarke PC, Mansour Physical Therapy, and Palm Chiropractic, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to D.G.

599.     The documentation submitted to Allstate by the Defendants demonstrates that D.G. was subjected to excessive, prolonged, and medically unnecessary healthcare services from Ambel Acupuncture, Clarke PC, Mansour Physical Therapy, and Palm Chiropractic during the relevant period.

### g.   Patient J.J. (Claim No. 0572994051)

600.     Patient J.J. (Claim No. 0416205262) was purportedly involved in a motor vehicle accident on June 15, 2017, and presented at Clarke PC on June 19, 2017, for an initial examination with Clarke.

601.     Clarke noted that J.J. purportedly complained of neck pain, mid-back pain, and low back pain.

602.     At the initial examination, Clarke referred J.J. for three (3) MRI scans (cervical spine, lumbar spine, and thoracic spine), ordered an EMG study, ordered six (6) pieces of DME,

and placed the patient in a treatment protocol that consisted of parallel courses of physical therapy, chiropractic care, and acupuncture treatment.

603.     Ordering an MRI on the first visit in the absence of certain orthopedic "red flags" (i.e. symptoms indicating concern for a fracture, concern for progressive neurologic compromise, or concern for an underlying infection or malignancy), is inconsistent with the current standard of care for treatment of soft tissue injuries, and deviates from the guidelines of the American College of Radiology.

604.     As such, Clarke's referral for MRI studies was, at best, premature, given that J.J. was only four (4) days post-trauma and did not present any serious orthopedic concerns.

605.     Additionally, Clarke prescribed Durable Medical Equipment ("DME") to J.J. consisting of an orthopedic car seat, two-piece cervical collar, lumbar support, lumbar cushion, orthopedic pillow, and moist heating pad.

606.     This prescription of DME was unnecessary and excessive, as braces and support cushions are rarely indicated in the treatment of soft tissue injuries, and can in fact be counterproductive to patient recovery.

607.     At this initial evaluation, and each re-evaluation, Clarke administered trigger point injections ("TPIs") to J.J. using ultrasonic guidance.

608.     Altogether, J.J. received TPIs on five (5) occasions, and for each, Clarke utilized ultrasonic guidance for needle placement.

609.     Ultrasonic guidance is not medically necessary in the performance of TPIs.

610.     Trigger points are easily located by palpation, and injecting into a vascular structure can be avoided by the provider pulling back on the plunger before administering the injection.

611. Ultrasonic guidance is the most expensive part of Clarke's TPI procedures, adding over $200 to each bill.

612. It appears likely that Clarke uses ultrasonic guidance for each TPI not to enhance patient safety, but to maximize billing for the procedure.

613. J.J.'s course of treatment at the Lafayette Ave. Clinic continued for approximately nine (9) months and consisted of 53 sessions of acupuncture treatment, 55 sessions of physical therapy treatment, and 56 sessions of chiropractic treatment.

614. During this protocol, certain modalities (i.e. "CMT; spinal 3-4 regions," CPT Code 98941; "Hot/Cold Pack," CPT Code 97010; "Electrical Stimulation," CPT Code 97014; "Therapeutic Exercises," CPT Code 97110; "Acupuncture Initial 15 Min," CPT Code 97810; "Acupuncture Reinsertion 15 Min," CPT Code 97811) were found to have been rendered simultaneously on the same dates of service.

615. On each date of service at Ambel Acupuncture, Mansour Physical Therapy, and Palm Chiropractic, multiple and some identical modalities were purportedly administered to J.J.

616. In fact, every acupuncture session at Ambel Acupuncture was purportedly rendered on the same date of service as either chiropractic or physical therapy services.

617. Of over 50 dates of service at both Mansour Physical Therapy and Palm Chiropractic, only five (5) dates reflect the administration of only one modality; the remainder each involve service by at least one other provider on the same dates of service.

618. Throughout this timeframe, none of the providers documented significant improvement in J.J.'s symptoms.

619.     Specifically, the medical records from Palm Chiropractic reflect only minor improvements in J.J.'s pain over the course of nine (9) months of treatment (i.e. a slow decrease from a score of "5-9" to "2-5").

620.     Ambel Acupuncture's initial examination and re-examination records for J.J. note minimal decreases in pain over the course of J.J.'s treatment, wherein Ambel Acupuncture documented a subjective pain score of "5," from a reported "8" at the outset of J.J.'s treatment.

621.     Mansour Physical Therapy's progress notes consistently indicate "no change in symptoms," and "no change in physical exam findings," without any indication of improvement.

622.     A conventional course of treatment for injuries like those reported by J.J. would include *either* physical therapy or chiropractic care for a period four (4) to six (6) weeks, consisting of about fifteen (15) dates of service, before the patient was transitioned to a home exercise program.

623.     Consistent with this scheme, however, J.J.'s treatment continued unchanged regardless of J.J.'s reported condition.

624.     Ambel Acupuncture, Mansour Physical Therapy, and Palm Chiropractic repeatedly recommended in their re-evaluations that J.J. continue with this course of treatment at the Lafayette Ave. Clinic even though the tests, treatment and modalities allegedly administered were not leading to improvements in terms of J.J.'s symptoms or functionality.

625.     Without regard to J.J.'s symptoms, Ambel Acupuncture, Mansour Physical Therapy, and Palm Chiropractic recommended that J.J. receive physical therapy, chiropractic, and acupuncture treatment two (2) to three (3) times a week for four (4) to six (6) weeks at virtually every examination/re-examination, until J.J.'s treatment was discontinued.

626. In connection with the treatment purportedly rendered to the claimant, the Defendants, through Ambel Acupuncture, Clarke PC, Mansour Physical Therapy, and Palm Chiropractic, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to J.J.

627. The documentation submitted to Allstate by the Defendants demonstrates that J.J. was subjected to excessive, prolonged, and medically unnecessary healthcare services from Ambel Acupuncture, Clarke PC, Mansour Physical Therapy, and Palm Chiropractic during the relevant period.

### h. Patient C.H. (Claim No. 0437276694)

628. Patient C.H. (Claim No. 0429720187) was purportedly involved in a motor vehicle accident on November 23, 2016, and presented at Clarke PC on December 9, 2016, for an initial examination with Clarke.

629. Clarke noted that C.H. purportedly complained of headache, neck pain, mid-back pain, and left shoulder pain.

630. At the initial examination, Clarke referred C.H. for MRI scans of the left shoulder, cervical spine, and thoracic spine, ordered an EMG study, ordered three (3) pieces of DME, and placed the patient in a treatment protocol that consisted of parallel courses of physical therapy, chiropractic care, and acupuncture treatment.

631. Ordering an MRI on the first visit in the absence of certain orthopedic "red flags" (i.e. symptoms indicating concern for a fracture, concern for progressive neurologic compromise, or concern for an underlying infection or malignancy), is inconsistent with the current standard of care for treatment of soft tissue injuries, and deviates from the guidelines of the American College of Radiology.

632. As such, Clarke's referral for MRI studies was, at best, premature, given that C.H. was only sixteen (16) days post-trauma and did not present any serious orthopedic concerns.

633. Additionally, Clarke prescribed Durable Medical Equipment ("DME") to C.H. consisting of a cervical collar, orthopedic pillow, and moist heating pad.

634. This prescription of DME was unnecessary and excessive, as braces and support cushions are rarely indicated in the treatment of soft tissue injuries, and can in fact be counterproductive to patient recovery.

635. At this initial evaluation, and at each re-evaluation, Clarke administered trigger point injections ("TPIs") to C.H. using ultrasonic guidance.

636. Altogether, C.H. received TPIs on seven (7) occasions, and for each, Clarke utilized ultrasonic guidance for needle placement.

637. Ultrasonic guidance is not medically necessary in the performance of TPIs.

638. Trigger points are easily located by palpation, and injecting into a vascular structure can be avoided by the provider pulling back on the plunger before administering the injection.

639. Ultrasonic guidance is the most expensive part of Clarke's TPI procedures, adding over $200 to each bill.

640. It appears likely that Clarke uses ultrasonic guidance for each TPI not to enhance patient safety, but to maximize billing for the procedure.

641. On January 24, 2017, Klass, through Palm Chiropractic, performed an EMG study on C.H.

642. This EMG study of C.H. tested multiple nerves that were otherwise asymptomatic.

643. The EMG study was therefore excessive.

644. C.H.'s course of treatment at the Lafayette Ave. Clinic continued for approximately six (6) months, and consisted of 40 sessions of acupuncture treatment, 43 sessions of physical therapy treatment, and 48 sessions of chiropractic treatment.

645. During this protocol, certain modalities (i.e. "CMT; spinal 3-4 regions," CPT Code 98941; "Hot/Cold Pack," CPT Code 97010; "Electrical Stimulation," CPT Code 97014; "Therapeutic Exercises," CPT Code 97110; "Acupuncture Initial 15 Min," CPT Code 97810; "Acupuncture Reinsertion 15 Min," CPT Code 97811) were found to have been rendered simultaneously on the same dates of service.

646. On each date of service at Ambel Acupuncture, Mansour Physical Therapy, and Palm Chiropractic, multiple and some identical modalities were purportedly administered to C.H.

647. In fact, all but two (2) out of C.H.'s forty (40) or more acupuncture, physical therapy, and chiropractic sessions were performed on the same dates of service.

648. Throughout this timeframe, none of the providers documented significant improvement in C.H.'s symptoms.

649. Specifically, the medical records from Palm Chiropractic reflect only minor improvements in C.H.'s pain over the course of six (6) months of treatment (i.e. a decrease from a score of "8" to "6-7").

650. Ambel Acupuncture's initial examination and re-examination records for C.H. note minimal decreases in pain over the course of C.H.'s treatment, wherein Ambel Acupuncture documented a subjective pain score of "7" at the outset of treatment, and reported a "4" at the final re-evaluation – a score that is inconsistent with Mansour Physical Therapy and Palm Chiropractic's records.

651. Mansour Physical Therapy's progress notes consistently indicate "no change in symptoms," and note no decrease in C.H.'s pain, which is consistently rated at an "8."

652. A conventional course of treatment for injuries like those reported by C.H. would include *either* physical therapy or chiropractic care for a period four (4) to six (6) weeks, consisting of about fifteen (15) dates of service, before the patient was transitioned to a home exercise program.

653. Consistent with this scheme, however, C.H.'s treatment continued unchanged regardless of C.H.'s reported condition.

654. Ambel Acupuncture, Mansour Physical Therapy, and Palm Chiropractic repeatedly recommended in their re-evaluations that C.H. continue with this course of treatment at the Lafayette Ave. Clinic even though the tests, treatment and modalities allegedly administered were not leading to improvements in terms of C.H.'s symptoms or functionality.

655. Without regard to C.H.'s symptoms, Ambel Acupuncture, Mansour Physical Therapy, and Palm Chiropractic recommended that C.H. receive physical therapy, chiropractic, and acupuncture treatment two (2) to three (3) times a week for four (4) to six (6) weeks at virtually every examination/re-examination, until C.H.'s treatment was discontinued.

656. In connection with the treatment purportedly rendered to the claimant, the Defendants, through Ambel Acupuncture, Clarke PC, Mansour Physical Therapy, and Palm Chiropractic, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to C.H.

657. The documentation submitted to Allstate by the Defendants demonstrates that C.H. was subjected to excessive, prolonged, and medically unnecessary healthcare services from Ambel

Acupuncture, Clarke PC, Mansour Physical Therapy, and Palm Chiropractic during the relevant period.

### i. Patient D.W. (Claim No. 0484754560)

658.    Patient D.W. (Claim No. 0414265363) was purportedly involved in a motor vehicle accident on December 9, 2017, and presented at Clarke PC on January 29, 2018, for an initial examination with Clarke.

659.    Clarke noted that D.W. purportedly complained of neck, mid-back, low back, right hip, left groin, and left knee pain.

660.    At the initial examination, Clarke ordered an EMG study and recommended the patient continue a treatment protocol consisting of parallel courses of physical therapy, chiropractic care, and acupuncture treatment.

661.    At this initial evaluation, and at each re-evaluation, Clarke administered trigger point injections ("TPIs") to D.W. using ultrasonic guidance.

662.    Altogether, D.W. received TPIs on five (5) occasions, and for each, Clarke utilized ultrasonic guidance for needle placement.

663.    Ultrasonic guidance is not medically necessary in the performance of TPIs.

664.    Trigger points are easily located by palpation, and injecting into a vascular structure can be avoided by the provider pulling back on the plunger before administering the injection.

665.    Ultrasonic guidance is the most expensive part of Clarke's TPI procedures, adding over $200 to each bill.

666.    It appears likely that Clarke uses ultrasonic guidance for each TPI not to enhance patient safety, but to maximize billing for the procedure.

667.    On February 2, 2018, Klass, through Palm Chiropractic, performed an EMG study on D.W.

668.    While this EMG study produced normal results, it was performed while D.W. was still under weight-bearing restrictions due to a pelvic fracture.

669.    In fact, the entirety of D.W.'s rigorous course of physical therapy, acupuncture, and chiropractic treatment commenced while D.W. was still under weight-bearing restrictions due to multiple pelvic fractures.

670.    D.W.'s course of treatment at the Lafayette Ave. Clinic continued for approximately five (5) months, consisting of 55 sessions of acupuncture treatment, 48 sessions of physical therapy treatment and 48 sessions of chiropractic treatment.

671.    During this protocol, certain modalities (i.e. "CMT; spinal 3-4 regions," CPT Code 98941; "Hot/Cold Pack," CPT Code 97010; "Electrical Stimulation," CPT Code 97014; "Therapeutic Exercises," CPT Code 97110; "Acupuncture Initial 15 Min," CPT Code 97810; "Acupuncture Reinsertion 15 Min," CPT Code 97811) were found to have been rendered simultaneously on the same dates of service.

672.    On each date of service at Ambel Acupuncture, Mansour Physical Therapy, and Palm Chiropractic, multiple and some identical modalities were purportedly administered to D.W.

673.    In fact, out of 48 or more dates of service, only seven (7) did not involve service by multiple providers on the exact same date.

674.    Throughout this timeframe, none of the providers documented significant improvement in D.W.'s symptoms.

675. Specifically, the medical records from Palm Chiropractic reflect only minor improvements in D.W.'s pain over the course of five (5) months of treatment (i.e. a decrease from a score of "6-10" to "4-7").

676. Ambel Acupuncture's initial examination and re-examination records for D.W. note minimal decreases in pain over the course of D.W.'s treatment, wherein Ambel Acupuncture documented a subjective pain score of "5-6," from a reported "8" at the outset of D.W.'s treatment.

677. Mansour Physical Therapy's progress notes consistently indicate "no change in symptoms" for the entire course of D.W.'s purported treatment.

678. A conventional course of treatment for injuries like those reported by D.W. would include *either* physical therapy or chiropractic care for a period four (4) to six (6) weeks, consisting of about fifteen (15) dates of service, before the patient was transitioned to a home exercise program.

679. Consistent with this scheme, however, D.W.'s treatment continued unchanged regardless of D.W.'s reported condition.

680. Ambel Acupuncture, Mansour Physical Therapy, and Palm Chiropractic repeatedly recommended in their re-evaluations that D.W. continue with this course of treatment at the Lafayette Ave. Clinic even though the tests, treatment and modalities allegedly administered were not leading to improvements in terms of D.W.'s symptoms or functionality.

681. Without regard to D.W.'s symptoms, Ambel Acupuncture, Mansour Physical Therapy, and Palm Chiropractic recommended that D.W. receive physical therapy, chiropractic, and acupuncture treatment two (2) to three (3) times a week for four (4) to six (6) weeks at virtually every examination/re-examination, until D.W.'s treatment was discontinued.

682.     In connection with the treatment purportedly rendered to the claimant, the Defendants, through Ambel Acupuncture, Clarke PC, Mansour Physical Therapy, and Palm Chiropractic, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to D.W.

683.     The documentation submitted to Allstate by the Defendants demonstrates that D.W. was subjected to excessive, prolonged, and medically unnecessary healthcare services from Ambel Acupuncture, Clarke PC, Mansour Physical Therapy, and Palm Chiropractic during the relevant period.

### j.     Patient R.N. (Claim No. 0469035959)

684.     Patient R.N. (Claim No. 0469035959) was purportedly involved in a motor vehicle accident on June 19, 2017, and presented at Clarke PC on July 3, 2017, for an initial examination with Clarke.

685.     Clarke noted that R.N. purportedly complained of neck pain, mid-back pain, low back pain, and bilateral shoulder pain.

686.     At the initial examination, Clarke referred R.N. for MRI scans of the cervical, thoracic, and lumbar spine, ordered an EMG study, ordered four (4) pieces of DME, and placed the patient in a treatment protocol that consisted of parallel courses of physical therapy, chiropractic care, and acupuncture treatment.

687.     Ordering an MRI on the first visit in the absence of certain orthopedic "red flags" (i.e. symptoms indicating concern for a fracture, concern for progressive neurologic compromise, or concern for an underlying infection or malignancy), is inconsistent with the current standard of care for treatment of soft tissue injuries, and deviates from the guidelines of the American College of Radiology.

688. As such, Clarke's referral for MRI studies was, at best, premature, given that R.N. was only two weeks post-trauma and did not present any serious orthopedic concerns.

689. Additionally, Clarke prescribed Durable Medical Equipment ("DME") to R.N. consisting of a cervical collar, lumbar support, lumbar cushion, and heating pad.

690. This prescription of DME was unnecessary and excessive, as braces and support cushions are rarely indicated in the treatment of soft tissue injuries, and can in fact be counterproductive to patient recovery.

691. At this initial evaluation, and at each re-evaluation, Clarke administered trigger point injections ("TPIs") to R.N. using ultrasonic guidance.

692. Altogether, R.N. received TPIs on seven (7) occasions, and for each, Clarke utilized ultrasonic guidance for needle placement.

693. Ultrasonic guidance is not medically necessary in the performance of TPIs.

694. Trigger points are easily located by palpation, and injecting into a vascular structure can be avoided by the provider pulling back on the plunger before administering the injection.

695. Ultrasonic guidance is the most expensive part of Clarke's TPI procedures, adding over $200 to each bill.

696. It appears likely that Clarke uses ultrasonic guidance for each TPI not to enhance patient safety, but to maximize billing for the procedure.

697. On August 17, 2017, Klass, through Ariel Chiropractic, performed an EMG study on R.N.

698. This EMG study of R.N. tested multiple nerves that were otherwise asymptomatic.

699. The EMG Study of R.N. was therefore excessive.

700. R.N. received treatment at both the 65th St. Clinic and the Lafayette Ave. Clinic.

701. R.N.'s course of treatment at the 65th St. Clinic and the Lafayette Ave. Clinic continued for approximately seven (7) months, and consisted of 56 sessions of acupuncture treatment, 53 sessions of physical therapy treatment, and 58 sessions of chiropractic treatment.

702. The first two (2) months of R.N.'s treatment were with Ariel Chiropractic, Bay Medical, and Belam Acupuncture at the 65th St. Clinic, and the final five (5) months of treatment were with Ambel Acupuncture, Mansour Physical Therapy, and Palm Chiropractic at the Lafayette Ave. Clinic.

703. During this protocol, certain modalities (i.e. "CMT; spinal 5 regions," CPT Code 98942; "Trigger Point Therapy," CPT Code 97139; "Hot/Cold Pack," CPT Code 97010; "Electrical Stimulation," CPT Code 97014; "Therapeutic Exercises," CPT Code 97110; "Therapeutic Massage," CPT Code 97124; "Acupuncture Initial 15 Min," CPT Code 97810; "Acupuncture Reinsertion 15 Min," CPT Code 97811) were found to have been rendered simultaneously on the same dates of service.

704. On each date of service at Ambel Acupuncture, Ariel Chiropractic, Bay Medical, Belam Acupuncture, Mansour Physical Therapy, and Palm Chiropractic, multiple and some identical modalities were purportedly administered to R.N.

705. In fact, all but one (1) out of R.N.'s more than fifty (50) acupuncture, physical therapy, and chiropractic visits were performed on the same dates of service as at least one (1) other modality.

706. Throughout this timeframe, none of the providers documented significant improvement in R.N.'s symptoms.

707. Specifically, the medical records from Palm Chiropractic reflect only minor improvements in R.N.'s pain over the course of five (5) months of treatment (i.e. a decrease from a score of "7-8" to "7").

708. Ambel Acupuncture's initial examination and re-examination records for R.N. note minimal decreases in pain over the course of R.N.'s treatment, wherein Ambel Acupuncture documented a subjective pain score of "7," from a reported "8" at the outset of R.N.'s treatment.

709. Mansour Physical Therapy's progress notes consistently indicate "no change in symptoms" following the initial evaluation, at which time R.N.'s pain was rated at a score of "8."

710. Ariel Chiropractic and Belam Acupuncture both note R.N.'s pain at a score of "8" at the initial examinations on July 26, 2017, and note only minor improvements (i.e. a decrease in pain from a score of "8" to "7.")

711. A conventional course of treatment for injuries like those reported by R.N. would include *either* physical therapy or chiropractic care for a period four (4) to six (6) weeks, consisting of about fifteen (15) dates of service, before the patient was transitioned to a home exercise program.

712. Consistent with this scheme, however, R.N.'s treatment continued unchanged regardless of R.N.'s reported condition.

713. Ambel Acupuncture, Ariel Chiropractic, Bay Medical, Belam Acupuncture, Mansour Physical Therapy, and Palm Chiropractic repeatedly recommended in their re-evaluations that R.N. continue with this course of treatment at the 65th St. Clinic or the Lafayette Ave. Clinic even though the tests, treatment and modalities allegedly administered were not leading to improvements in terms of R.N.'s symptoms or functionality.

714. Without regard to R.N.'s symptoms, Ambel Acupuncture, Ariel Chiropractic, Bay Medical, Belam Acupuncture, Mansour Physical Therapy, and Palm Chiropractic recommended that R.N. receive physical therapy, chiropractic, and acupuncture treatment two (2) to three (3) times a week for four (4) to six (6) weeks at virtually every examination/re-examination, until R.N.'s treatment was discontinued.

715. In connection with the treatment purportedly rendered to the claimant, the Defendants, through Ambel Acupuncture, Ariel Chiropractic, Bay Medical, Belam Acupuncture, Clarke PC, Mansour Physical Therapy, and Palm Chiropractic, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to R.N.

716. The documentation submitted to Allstate by the Defendants demonstrates that R.N. was subjected to excessive, prolonged, and medically unnecessary healthcare services from Ambel Acupuncture, Ariel Chiropractic, Bay Medical, Belam Acupuncture, Clarke PC, Mansour Physical Therapy, and Palm Chiropractic during the relevant period.

## 2. *Excessive and Medically Unnecessary Electrodiagnostic Testing*

717. As part of their protocol, the PC Defendants incorporated electrodiagnostic ("EDX") testing services, such as electromyography ("EMG") studies and nerve conduction velocity ("NCV") studies.

718. Patients were routinely subjected to these services regardless of whether they were necessary.

719. The provision of EDX testing services to patients was of great benefit to the defendants' scheme to defraud Allstate because (a) the studies are expensive, and (b) the results of

the studies could be used to justify the prescription and provision of further unnecessary medical services.

720.    Specifically, the EDX testing purportedly provided to the 65th St. Clinic patients and Lafayette Ave. Clinic patients included NCV studies and needle EMG studies.

721.    NCV studies are non-invasive studies in which peripheral nerves are stimulated with electrical current.

722.    NCV studies include "F-Wave" and "H-Reflex" studies.

723.    EMG tests measure the electrical activity of muscles, and are often performed in connection with NCV studies.

724.    An EMG test involves the insertion of a needle into various muscles in the spinal area ("paraspinal muscles"), and in the arms and/or legs to measure electrical activity in each muscle.

725.    EDX testing must never follow a predetermined protocol.  The decision of which nerves and muscles to test in each limb should be tailored to each patient's unique circumstances, and to their unique EDX findings.

726.    In a legitimate clinical setting, the decision of which nerves to study for each patient is based on (a) an evaluation of the patient's history, (b) a detailed neurologic examination of the patient, and (c) the "real time" results obtained during the actual tests.

727.    For example, if an abnormality is found during the tests, further investigation should be undertaken to determine the exact nature of the abnormality and the scope of the problem in terms of the number of nerves involved.

728.    Moreover, the nerves and muscles chosen for EDX testing must depend on each patient's specific complaints, physical examination findings, and prior EDX findings.

729.     In other words, the nature and extent of EDX testing should never be the same for every patient.

730.     During the relevant treatment period, a significant portion of 65th St. Clinic patients received EDX testing from Ariel Chiropractic, Cyrus Chiropractic, or C&M Chiropractic, which was, without exception, performed by David Colarusso.

731.     Colarusso regularly produced highly flawed and misinterpreted EMG exams, including repeatedly failing to obtain results for the exact same sets of nerves across patients, misinterpreting the amplitudes of NCV studies, and reporting internally inconsistent findings.

732.     For example, in multiple instances, Colarusso recorded a "Finding" of "no abnormalities," while his "Impression" in the same report reflected that he was unable to obtain several nerves.

733.     In a properly-conducted EMG study, the inability to obtain several nerves could indicate the patient is suffering from a neurologic disease, such as peripheral neuropathy.

734.     Additionally, in at least one instance, Colarusso diagnosed a patient with "cervical neuropathy," which is not a known medical condition—the proper term is "cervical radiculopathy."

735.     On several occasions, Colarusso's NCV exams produced results which were unobtainable in the human body, or which were statistically impossible.

736.     In virtually every instance, Colarusso regularly tested asymptomatic limbs and nerves.

737.     This resulted in excessive and misinterpreted testing in virtually every exam.

738.     The results of Colarusso's EMG and NCV tests were never incorporated into patients' treatment plans or referenced in any follow up examinations.

739.    The high reimbursement value associated with EDX testing supports that the exams performed by Colarusso were not intended to benefit the individual patients in their recovery, but instead were performed pursuant to a predetermined treatment protocol intended to maximize billing.

740.    During the relevant treatment period, a significant portion of the Lafayette Ave. Clinic patients received EDX testing from Palm Chiropractic and Ariel Chiropractic, all of which was, without exception, performed by Robert Klass.

741.    Like Colarusso, Klass regularly tested asymptomatic limbs and nerves.

742.    This resulted in excessive testing in each exam.

743.    Additionally, in at least one instance, Klass reported complete and normal muscle recruitment of the left shoulder and left deltoid in a patient that had received extensive left shoulder surgery only six days before.

744.    This result is virtually impossible and indicates such testing likely never occurred.

745.    In fact, in several instances, Klass' studies produced results that were virtually impossible in the human body.

746.    As was the case with Colarusso, the results of Klass's EDX studies were never incorporated into patient treatment plans or referenced in follow up examinations.

747.    The chiropractors working at Ariel Chiropractic, Cyrus Chiropractic, C&M Chiropractic, and Palm Chiropractic recommended and performed EDX testing (a) as a matter of routine rather than in response to each patient's unique exam findings, and (b) for the purpose of justifying further excessive and unnecessary physical therapy, chiropractic, and acupuncture treatment—treatment that would generate additional revenue for the defendants.

748. Throughout the course of this scheme, Ariel Chiropractic, Cyrus Chiropractic, C&M Chiropractic, and/or Palm Chiropractic deployed EDX testing without any basis in evidence-based guidelines and contrary to the standard of care.

749. Deploying EDX testing in this manner suggests that the test results were never utilized to evaluate and assess each patient's condition.

750. Such testing was therefore medically unnecessary.

751. Not only was such EDX testing unnecessary, but it also (a) inflated the charges submitted to Allstate, and (b) placed the patients at additional and unwarranted physical risk of injury and infection.

752. This clinically unnecessary EDX testing was fraudulent because the testing was utilized for the defendants' financial gain rather than for the individualized needs of the patients.

753. Moreover, even if the EDX testing was warranted, the testing was still fraudulent because the results were misinterpreted and/or falsely utilized as support to justify the provision of additional, unnecessary treatment.

754. Accordingly, because the EDX tests provided to the patients were excessive and not warranted by the condition of the patient, all of the charges submitted by Ariel Chiropractic, Cyrus Chiropractic, C&M Chiropractic, and Palm Chiropractic in connection with these tests are not compensable under New York's No-Fault Laws.

755. Moreover, to the extent any of the charges submitted in connection with these EDX tests remain unpaid, Allstate is under no obligation to make any further payments to Ariel Chiropractic, Cyrus Chiropractic, C&M Chiropractic, or Palm Chiropractic in connection with those tests because these studies were excessive and not warranted by the condition of the patient, and thus are not compensable under New York's No-Fault Laws.

### 3. *Excessive and Unnecessary ROM and Strength Testing*

756.    Both Hanna and Clarke periodically subjected patients to computerized range of motion (ROM) and strength tests.

757.    Traditionally, ROM is measured by hand, and is performed as part of an office visit's physical evaluation.

758.    Virtually all patients treated by Hanna were subjected to periodic computerized ROM testing which was billed separately from the physical evaluation.

759.    These computerized ROM tests were technically flawed, in that the measurements varied wildly between Hanna's physical examination notes and the computerized measurements.

760.    For example, in the case of Patient E.S. (Claim No. 0522968437), Hanna's physical ROM examination on November 8, 2018, found cervical flexion of 40 degrees, cervical extension of 30 degrees, and cervical rotation of 50 degrees.

761.    Meanwhile, at E.S.'s computerized ROM exam on November 19, 2018, found cervical flexion of 8 degrees, cervical extension of 3 degrees, and cervical rotation of 24 degrees.

762.    Hanna never referenced the results of this ROM testing in follow-up notes, and did not incorporate the results into the patient's subsequent treatment.

763.    This rendered the exams medically useless.

764.    Several patients treated by Clarke were, likewise, subjected to periodic computerized ROM testing.

765.    Clarke, too, never referred to the computerized results in his follow-up examination notes, and never incorporated the results into his patients' treatment.

766.    The continued use of computerized ROM testing was both technically flawed and was not medically necessary for the management of the patients' soft-tissue sprains and strains.

767.    This periodic computerized ROM testing was routinely performed not for the benefit of patients, but to add a $600 charge to the bill for each office exam.

768.    To the extent that Allstate paid Bay Medical, Ariel Chiropractic, Belam Acupuncture, Cyrus Chiropractic, C&M Chiropractic, Ambel Acupuncture, Mansour PT, Clarke PC, or Palm Chiropractic in reliance on the documents created and submitted to Allstate by the PC Defendants in connection with any ROM or strength testing, and patient examinations and consultations used to justify the performance of medically unnecessary ROM or strength testing, including, but not limited to, those payments listed in Exhibits 22-29, Allstate is entitled to recover all payments made to Bay Medical, Ariel Chiropractic, Belam Acupuncture, Cyrus Chiropractic, C&M Chiropractic, Ambel Acupuncture, Mansour PT, Clarke PC, and Palm Chiropractic in connection with any such services.

769.    Additionally, to the extent that any of Bay Medical, Ariel Chiropractic, Belam Acupuncture, C&M Chiropractic, Cyrus Chiropractic, Ambel Acupuncture, Mansour PT, Clarke PC, or Palm Chiropractic's charges submitted in connection with these services remain unpaid, Allstate is under no obligation to make any payments in connection with those transactions because those services were excessive, not warranted, and therefore not compensable under New York's No-Fault Law.

### 4.  *Excessive and Unnecessary Trigger Point Injections*

770.    Trigger point injections (TPIs) are intramuscular injections in which a provider injects a combination of corticosteroid and local anesthetic into an area of soreness.

771.    Virtually all patients subject to Clarke's care received TPIs with ultrasonic guidance at almost every office visit.

772.     Traditionally, a provider locates the area in which to perform an injection through palpation of the muscle in the upper back or paraspinal region.

773.     TPIs ordinarily do not require radiographic guidance, since trigger points can be easily located through palpation and vascular structures can be easily avoided by drawing back on the syringe.

774.     However, without exception, Clarke used ultrasonic guidance for every injection under the pretense that it made TPIs "safer" and "more accurate" in some capacity.

775.     Clarke attached a letter of medical necessity explaining the need for ultrasound guidance in each exam in which he performed TPIs.

776.     However, these letters failed to identify precisely how ultrasound guidance enhances patient safety.

777.     In truth, Clarke's consistent use of ultrasonic guidance for each TPI was not employed to promote accuracy or patient safety, but instead was a means of inflating billing, netting an additional $200 per injection.

778.     Clarke's use of ultrasonic guidance in the performance of TPIs was not medically necessary, and was implemented strictly as a means of expanding billing opportunities.

779.     To the extent that Allstate paid Bay Medical, Ariel Chiropractic, Belam Acupuncture, Cyrus Chiropractic, C&M Chiropractic, Ambel Acupuncture, Mansour PT, Clarke PC, or Palm Chiropractic in reliance on the documents created and submitted to Allstate by the PC Defendants in connection with any TPIs under ultrasonic guidance, and patient examinations and consultations used to justify the performance of medically unnecessary TPIs under ultrasonic guidance, including, but not limited to, those payments listed in Exhibits 22-29, Allstate is entitled to recover all payments made to Bay Medical, Ariel Chiropractic, Belam Acupuncture, Cyrus

Chiropractic, C&M Chiropractic, Ambel Acupuncture, Mansour PT, Clarke PC, and Palm Chiropractic in connection with any such services.

780.    Additionally, to the extent that any of Bay Medical, Ariel Chiropractic, Belam Acupuncture, C&M Chiropractic, Cyrus Chiropractic, Ambel Acupuncture, Mansour PT, Clarke PC, or Palm Chiropractic's charges submitted in connection with these services remain unpaid, Allstate is under no obligation to make any payments in connection with those transactions because those services were excessive, not warranted, and therefore not compensable under New York's No-Fault Law.

**5.    *Excessive and Premature Imaging Studies and DME Prescriptions***

781.    Both Hanna and Clarke ordered premature and excessive diagnostic imaging studies and durable medical equipment (DME) for their patients at initial evaluations.

782.    Ordering an MRI at an initial evaluation is only clinically indicated if certain serious orthopedic red flags are present, such as concern for a fracture, concern for progressive neurologic compromise, or concern for an underlying infection or malignancy.

783.    With none of these symptoms present, ordering an MRI on the patient's first visit is inconsistent with the guidelines of the American College of Radiology.

784.    Virtually all claimants did not present these "red flag" symptoms, and none had undergone a reasonable trial of conservative care.

785.    As a result, these MRI studies were ordered prematurely and were medically unnecessary.

786.    Additionally, at the initial evaluation for the majority of their patients, Clarke and Hanna prescribed several pieces of DME.

787. At the initial evaluation, Clarke and Hanna consistently ordered stabilizing equipment, such as lumbar supports, cervical pillows, cervical collars, and knee braces.

788. This equipment is rarely indicated in soft tissue injuries, and can in fact be counterproductive to recovery.

789. For example, in a typical cervical sprain injury, use of a cervical collar would restrict the patient's range of motion, limiting the ability to strengthen the surrounding muscles and potentially compromising recovery.

790. At the first follow-up appointment, Clarke and Hanna regularly ordered additional DME, which always consisted of a heat lamp, massager, and stimulation unit.

791. In several instances, Clarke and Hanna ordered DME at subsequent follow-up appointments.

792. This amounted to staggering costs for DME that was often redundant and not indicated.

793. Ordering multiple pieces of DME for a patient with a soft tissue injury prior to that patient undergoing a reasonable trial of conservative care is both excessive and medically unnecessary.

794. Hanna and Clarke's prescription of excessive imaging studies and DME at initial patient evaluations was premature, potentially counterproductive to patient recovery, and was not medically necessary.

795. To the extent that Allstate paid Bay Medical, Ariel Chiropractic, Belam Acupuncture, Cyrus Chiropractic, C&M Chiropractic, Ambel Acupuncture, Mansour PT, Clarke PC, or Palm Chiropractic in reliance on the documents created and submitted to Allstate by the PC Defendants in connection with any premature imaging studies, excessive DME, and patient

examinations and consultations used to justify the prescription of medically unnecessary imaging or excessive DME, including, but not limited to, those payments listed in Exhibits 22-29, Allstate is entitled to recover all payments made to Bay Medical, Ariel Chiropractic, Belam Acupuncture, Cyrus Chiropractic, C&M Chiropractic, Ambel Acupuncture, Mansour PT, Clarke PC, and Palm Chiropractic in connection with any such services.

796. Additionally, to the extent that any of Bay Medical, Ariel Chiropractic, Belam Acupuncture, C&M Chiropractic, Cyrus Chiropractic, Ambel Acupuncture, Mansour PT, Clarke PC, or Palm Chiropractic's charges submitted in connection with these services remain unpaid, Allstate is under no obligation to make any payments in connection with those transactions because those services were excessive, not warranted, and therefore not compensable under New York's No-Fault Law.

### iii.  **Fraudulent Billing Conduct**

797. The defendants' scheme to defraud Allstate and other No-Fault insurance providers involved several methods designed to extract the greatest amount of benefits possible from insurers without regard to the patients individualized needs.

798. In addition to recruiting a variety of healthcare providers to subject every patient to a battery of excessive and unnecessary treatments and to generate as many bills as possible for submission to Allstate, the defendants also engaged in a series of deceptive billing practices designed to maximize their profits.

### 1.  *Fraudulent Billing for Initial and Follow-Up Exams*

799. The PC Defendants relied on initial and follow-up examinations as a vehicle to prescribe unnecessary physical therapy, acupuncture, and chiropractic treatment, DME, imaging studies, and EDX studies.

800. In several instances, these initial and follow-up examinations were billed at high-level CPT codes, despite lacking the necessary record support to do so.

801. Generally, the Fee Schedule's reimbursement rates are determined by considering (a) the physician work associated with the procedure, (b) the practice expense associated with providing the service, and (c) the malpractice expense.

802. Reimbursement for medical services is directly proportionate to the level of the CPT code billed (i.e., the higher the level of the CPT code billed, the greater amount of reimbursement).

803. Billing a service at a higher level CPT code than actually performed, for the purpose of receiving greater reimbursement, is an example of a fraudulent billing practice and such charges are not compensable.

804. In several instances, Clarke billed his office visits under the "Consultation" code – CPT code 99244 – despite the fact that no documentation supports that these visits were a consultation rather than an initial office visit.

805. The more appropriate code for these visits would have been CPT code 99204, which would have resulted in a lower reimbursement.

806. Because the nature and extent of the "consultations" purportedly provided to the patients were misrepresented, Clarke is not entitled to collect payment for such services under New York's No-Fault laws.

807. To the extent that Allstate paid Clarke in reliance on the documents created and submitted in connection with these "consultations," Allstate is entitled to recover payments made to Clarke in connection with the "consultations."

808.    Moreover, to the extent that any of the charges remain unpaid or have been denied, Allstate is under no obligation to make any payments in connection with those transactions because the charges submitted by Clarke in connection with these services are not compensable under New York's No-Fault laws for the reasons set forth above.

### 2. *Unbundling of CPT Codes*

809.    "Unbundling" of CPT codes is an example of a fraudulent and abusive billing tactic.

810.    Unbundling occurs when multiple CPT codes are billed for the component parts of a procedure when there is a single code available that includes the complete procedure.

811.    With respect to certain procedures purportedly performed by the PC Defendants, the PC Defendants wrongfully unbundled the charges associated with the procedures to obtain payments that exceeded the amounts permissible under the Fee Schedule.

812.    In connection with manual muscle testing (MMT), Bay Medical submitted several charges to Allstate under CPT code 95831.

813.    Bay Medical's charges for these procedures are fraudulent and therefore not compensable because the charges were grossly in excess of the permissible charges under the New York Worker's Compensation Fee Schedule.

814.    Rather than submitting five (5) to six (6) discrete charges per claim under CPT code 95831, the services performed would be fully encompassed by CPT code 95834, reflecting a total evaluation of the body.

815.    By submitting multiple charges under CPT code 95831 rather than a single charge under CPT code 95834, Bay Medical sought to be paid multiple times for the same procedure.

816.    Bay Medical purposely misrepresented the nature and extent of the services provided as a means to obtain payments that Allstate had no obligation to make.

817.    By routinely including multiple charges under CPT code 95831 in one or more bill submitted to Allstate seeking reimbursement for medically unnecessary MMT procedures, Bay Medical improperly inflated its bills.

### 3.  *Improper Billing at the Highest Regional Conversion Factor*

818.    Reimbursement under the Fee Schedule is a function of the relative value units ("RVU") assigned to the CPT code. The RVU depends on (a) the physician work associated with the procedure, (b) the practice expense associated with providing the service, and (c) the malpractice expense.

819.    The amount of the maximum charge permissible under the Fee Schedule is calculated by multiplying the listed RVU by the applicable conversion factor.

820.    There are four (4) categories of conversion factors corresponding to four (4) regions in the State of New York as identified by zip code.

821.    For each of the four (4) regional categories, there is a corresponding conversion factor for certain sections of the Fee Schedule.

822.    The PC Defendants consistently billed using the higher conversion factor under the Fee Schedule.

823.    Because the PC Defendants' charges relating to physical therapy, chiropractic, and acupuncture procedures purportedly provided to Allstate claimants were charged in excess of the amounts permitted under the Fee Schedule and were purposely misrepresented, the charges submitted to Allstate in connection with these services are not compensable under New York's No-Fault Laws.

824.    To the extent that Allstate paid the PC Defendants in reliance on the documents created and submitted to Allstate by the PC Defendants in connection with such unlawfully

charged procedures, Allstate is entitled to recover all payments made to the PC Defendants in connection with any such procedures.

825. Moreover, to the extent that any of the charges submitted by the PC Defendants to Allstate in connection with these procedures remains unpaid, Allstate is under no obligation to make any payments to the PC Defendants in connection with those transactions because the underlying services and charges are not compensable under New York's No-Fault Laws.

## VI.  SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

826. Throughout the course of this scheme, Rose, Belotserkovskiy, Hanna, Gorelik, Colarusso, Minick, Mansour, and Clarke created, prepared, and submitted (or caused to be created, prepared, and submitted) false medical documentation and intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representation, and by placing (or causing to be placed) in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Services, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

827. Unless otherwise pled to the contrary, all documents, treatment notes, testing reports, health insurance claim forms, NF-3 claim forms, narrative reports, referrals, prescriptions, letters, and requests for payments in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

828. Every automobile insurance claim detailed herein involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claims settlement checks, and the return of the cancelled settlement drafts to

the financial institution(s) from which the draft(s) were drawn, as well as the return of settlement draft duplicates to the insurance carrier's home office for filing.

## A. BAY MEDICAL, P.C. ("BAY MEDICAL") ENTERPRISE

829.    Rose, Belotserkovskiy, Hanna, Gorelik, Minick, Colarusso, Belam Acupuncture, Ariel Chiropractic, Cyrus Chiropractic, and C&M Chiropractic, personally used the U.S. Mail (or caused the U.S. Mail to be used) to further their fraudulent scheme by causing medical bills and records from Bay Medical to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

830.    Rose, Belotserkovskiy, Hanna, Gorelik, Minick, Colarusso, Belam Acupuncture, Ariel Chiropractic, Cyrus Chiropractic, and C&M Chiropractic caused Bay Medical to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Bay Medical mailed a demand for payment (i.e., invoice) to Allstate.

831.    Hanna's (and/or his agents') provision of excessive and medically unnecessary services to patients of Bay Medical rendered Bay Medical completely ineligible for No-Fault reimbursement under New York law.

832.    Rose and Belotserkovskiy's control over the operation of Bay Medical where Rose and Belotserkosvkiy were not lawfully authorized to administer, control, or profit from the operation of a medical facility also rendered Bay Medical completely ineligible for No-Fault reimbursement under New York law.

833.    Because Bay Medical was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault Laws, Rose, Belotserkovskiy, Hanna, Gorelik, Minick, Colarusso, Belam Acupuncture, Ariel Chiropractic, Cyrus Chiropractic, and C&M Chiropractic

purposely caused Bay Medical to make a misrepresentation each and every time that Bay Medical mailed a document to Allstate claiming eligibility for No-Fault reimbursement.

834.     Moreover, because (a) Bay Medical was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Rose, Belotserkovskiy, Hanna, Gorelik, Minick, Colarusso, Belam Acupuncture, Ariel Chiropractic, Cyrus Chiropractic, and C&M Chiropractic caused Bay Medical to seek No-Fault reimbursement from Allstate (even though Bay Medical was not entitled to such reimbursement), and (c) Bay Medical used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Rose, Belotserkovskiy, Hanna, Gorelik, Minick, Colarusso, Belam Acupuncture, Ariel Chiropractic, Cyrus Chiropractic, and C&M Chiropractic committed mail fraud.

835.     At all relevant times, Rose, Belotserkovskiy, Hanna, Gorelik, Minick, Colarusso, Belam Acupuncture, Ariel Chiropractic, Cyrus Chiropractic, and C&M Chiropractic knew that Bay Medical (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Bay Medical.

836.     Allstate estimates that the unlawful operation of the Bay Medical enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance off this scheme is annexed at Exhibit 14 and incorporated by reference as if set forth in its entirety.

**B.  A**RIEL **C**HIROPRACTIC, **P.C. ("A**RIEL **C**HIROPRACTIC**") E**NTERPRISE

837.     Rose, Belotserkovskiy, Gorelik, Hanna, Minick, Colarusso, Bay Medical, Belam Acupucnture, Cyrus Chiropractic, and C&M Chiropractic, personally used the U.S. Mail (or

caused the U.S. Mail to be used) to further their fraudulent scheme by causing medical bills and records from Ariel Chiropractic to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

838. Rose, Belotserkovskiy, Gorelik, Hanna, Minick, Colarusso, Bay Medical, Belam Acupucnture, Cyrus Chiropractic, and C&M Chiropractic caused Ariel Chiropractic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Ariel Chiropractic mailed a demand for payment (i.e., invoice) to Allstate.

839. Gorelik's (and/or his agents') provision of excessive and medically unnecessary services to patients of Ariel Chiropractic rendered Ariel Chiropractic completely ineligible for No-Fault reimbursement under New York law.

840. Rose and Belotserkovskiy's control over the operation of Ariel Chiropractic where Rose and Belotserkovskiy were not lawfully authorized to administer, control, or profit from the operation of a chiropractic facility also rendered Ariel Chiropractic completely ineligible for No-Fault reimbursement under New York law.

841. Because Ariel Chiropractic was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault Laws, Rose, Belotserkovskiy, Gorelik, Hanna, Minick, Colarusso, Bay Medical, Belam Acupucnture, Cyrus Chiropractic, and C&M Chiropractic purposely caused Ariel Chiropractic to make a misrepresentation each and every time that Ariel Chiropractic mailed a document to Allstate claiming eligibility for No-Fault reimbursement.

842. Moreover, because (a) Ariel Chiropractic was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Rose, Belotserkovskiy, Gorelik, Hanna, Minick, Colarusso, Bay Medical, Belam Acupucnture, Cyrus Chiropractic, and C&M Chiropractic caused Ariel Chiropractic to seek No-Fault reimbursement from Allstate (even though Ariel Chiropractic was

not entitled to such reimbursement), and (c) Ariel Chiropractic used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Rose, Belotserkovskiy, Gorelik, Hanna, Minick, Colarusso, Bay Medical, Belam Acupucnture, Cyrus Chiropractic, and C&M Chiropractic committed mail fraud.

843.    At all relevant times, Rose, Belotserkovskiy, Gorelik, Hanna, Minick, Colarusso, Bay Medical, Belam Acupucnture, Cyrus Chiropractic, and C&M Chiropractic knew that Ariel Chiropractic (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Ariel Chiropractic.

844.    Allstate estimates that the unlawful operation of the Ariel Chiropractic enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance off this scheme is annexed at Exhibit 15 and incorporated by reference as if set forth in its entirety.

### C. BELAM ACUPUNCTURE, P.C. ("BELAM ACUPUNCTURE") ENTERPRISE

845.    Rose, Belotserkovskiy, Hanna, Gorelik, Minick, Colarusso, Bay Medical, Ariel Chiropractic, Cyrus Chiropractic, and C&M Chiropractic, personally used the U.S. Mail (or caused the U.S. Mail to be used) to further their fraudulent scheme by causing medical bills and records from Belam Acupuncture to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

846.    Rose, Belotserkovskiy, Hanna, Gorelik, Minick, Colarusso, Bay Medical, Ariel Chiropractic, Cyrus Chiropractic, and C&M Chiropractic caused Belam Acupuncture to falsely

certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Belam Acupuncture mailed a demand for payment (i.e., invoice) to Allstate.

847.    Belotserkovskiy's (and/or his agents') provision of excessive and medically unnecessary services to patients of Belam Acupuncture rendered Belam Acupuncture completely ineligible for No-Fault reimbursement under New York law.

848.    Rose's control over the operation of Belam Acupuncture where Rose was not lawfully authorized to administer, control, or profit from the operation of an acupuncture facility also rendered Belam Acupuncture completely ineligible for No-Fault reimbursement under New York law.

849.    Because Belam Acupuncture was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault Laws, Rose, Belotserkovskiy, Hanna, Gorelik, Minick, Colarusso, Bay Medical, Ariel Chiropractic, Cyrus Chiropractic, and C&M Chiropractic purposely caused Belam Acupuncture to make a misrepresentation each and every time that Belam Acupuncture mailed a document to Allstate claiming eligibility for No-Fault reimbursement.

850.    Moreover, because (a) Belam Acupuncture was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Rose, Belotserkovskiy, Hanna, Gorelik, Minick, Colarusso, Bay Medical, Ariel Chiropractic, Cyrus Chiropractic, and C&M Chiropractic caused Belam Acupuncture to seek No-Fault reimbursement from Allstate (even though Belam Acupuncture was not entitled to such reimbursement), and (c) Belam Acupuncture used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Rose, Belotserkovskiy, Hanna, Gorelik, Minick, Colarusso, Bay Medical, Ariel Chiropractic, Cyrus Chiropractic, and C&M Chiropractic committed mail fraud.

851. At all relevant times, Rose, Belotserkovskiy, Hanna, Gorelik, Minick, Colarusso, Bay Medical, Ariel Chiropractic, Cyrus Chiropractic, and C&M Chiropractic knew that Belam Acupuncture (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Belam Acupuncture.

852. Allstate estimates that the unlawful operation of the Belam Acupuncture enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance off this scheme is annexed at Exhibit 16 and incorporated by reference as if set forth in its entirety.

### D. CYRUS CHIROPRACTIC, P.C. ("CYRUS CHIROPRACTIC") ENTERPRISE

853. Rose, Belotserkovskiy, Gorelik, Hanna, Minick, Colarusso, Bay Medical, Belam Acupuncture, Ariel Chiropractic, and C&M Chiropractic, personally used the U.S. Mail (or caused the U.S. Mail to be used) to further their fraudulent scheme by causing medical bills and records from Cyrus Chiropractic to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

854. Rose, Belotserkovskiy, Gorelik, Hanna, Minick, Colarusso, Bay Medical, Belam Acupuncture, Ariel Chiropractic, and C&M Chiropractic caused Cyrus Chiropractic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Cyrus Chiropractic mailed a demand for payment (i.e., invoice) to Allstate.

855. Gorelik's (and/or his agents') provision of excessive and medically unnecessary services to patients of Cyrus Chiropractic rendered Cyrus Chiropractic completely ineligible for No-Fault reimbursement under New York law.

856. Rose and Belotserkovskiy's control over the operation of Cyrus Chiropractic where Rose and Belotserkovskiy were not lawfully authorized to administer, control, or profit from the operation of a chiropractic facility also rendered Cyrus Chiropractic completely ineligible for No-Fault reimbursement under New York law.

857. Because Cyrus Chiropractic was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault Laws, Rose, Belotserkovskiy, Gorelik, Hanna, Minick, Colarusso, Bay Medical, Belam Acupuncture, Ariel Chiropractic, and C&M Chiropractic purposely caused Cyrus Chiropractic to make a misrepresentation each and every time that Cyrus Chiropractic mailed a document to Allstate claiming eligibility for No-Fault reimbursement.

858. Moreover, because (a) Cyrus Chiropractic was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Rose, Belotserkovskiy, Gorelik, Hanna, Minick, Colarusso, Bay Medical, Belam Acupuncture, Ariel Chiropractic, and C&M Chiropractic caused Cyrus Chiropractic to seek No-Fault reimbursement from Allstate (even though Cyrus Chiropractic was not entitled to such reimbursement), and (c) Cyrus Chiropractic used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Rose, Belotserkovskiy, Gorelik, Hanna, Minick, Colarusso, Bay Medical, Belam Acupuncture, Ariel Chiropractic, and C&M Chiropractic committed mail fraud.

859. At all relevant times, Rose, Belotserkovskiy, Gorelik, Hanna, Minick, Colarusso, Bay Medical, Belam Acupuncture, Ariel Chiropractic, and C&M Chiropractic knew that Cyrus Chiropractic (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Cyrus Chiropractic.

860. The unlawful operation of the Cyrus Chiropractic enterprise generated numerous mailings. A table highlighting selected examples of mailings made in furtherance off this scheme is annexed at Exhibit 17 and incorporated by reference as if set forth in its entirety.

E. **AMBEL ACUPUNCTURE, P.C. ("AMBEL ACUPUNCTURE") ENTERPRISE**

861. Rose, Belotserkovskiy, Clarke, Gorelik, Mansour, Clarke PC, Ariel Chiropractic, Palm Chiropractic, and Mansour PT, personally used the U.S. Mail (or caused the U.S. Mail to be used) to further their fraudulent scheme by causing medical bills and records from Ambel Acupuncture to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

862. Rose, Belotserkovskiy, Clarke, Gorelik, Mansour, Clark PC, Ariel Chiropractic, Palm Chiropractic, and Mansour PT caused Ambel Acupuncture to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Ambel Acupuncture mailed a demand for payment (i.e., invoice) to Allstate.

863. Belotserkovskiy's (and/or his agents') provision of excessive and medically unnecessary services to patients of Ambel Acupuncture rendered Ambel Acupuncture completely ineligible for No-Fault reimbursement under New York law.

864. Rose's control over the operation of Ambel Acupuncture where Rose was not lawfully authorized to administer, control, or profit from the operation of an acupuncture facility also rendered Ambel Acupuncture completely ineligible for No-Fault reimbursement under New York law.

865. Because Ambel Acupuncture was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault Laws, Rose, Belotserkovskiy, Clarke, Gorelik, Mansour, Colin Clark PC, Ariel Chiropractic, Palm Chiropractic, and Mansour PT purposely

caused Ambel Acupuncture to make a misrepresentation each and every time that Ambel Acupuncture mailed a document to Allstate claiming eligibility for No-Fault reimbursement.

866.     Moreover, because (a) Ambel Acupuncture was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Rose, Belotserkovskiy, Clarke, Gorelik, Mansour, Clarke PC, Ariel Chiropractic, Palm Chiropractic, and Mansour PT caused Ambel Acupuncture to seek No-Fault reimbursement from Allstate (even though Ambel Acupuncture was not entitled to such reimbursement), and (c) Ambel Acupuncture used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Rose, Belotserkovskiy, Clarke, Gorelik, Mansour, Clarke PC, Ariel Chiropractic, Palm Chiropractic, and Mansour PT committed mail fraud.

867.     At all relevant times, Rose, Belotserkovskiy, Clarke, Gorelik, Mansour, Clarke PC, Ariel Chiropractic, Palm Chiropractic, and Mansour PT knew that Ambel Acupuncture (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Ambel Acupuncture.

868.     Allstate estimates that the unlawful operation of the Ambel Acupuncture enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance off this scheme is annexed at Exhibit 18 and incorporated by reference as if set forth in its entirety.

F.     **BASEM MANSOUR, P.T., P.C. ("MANSOUR PT") ENTERPRISE**

869.     Rose, Belotserkovskiy, Mansour, Clarke, Gorelik, Clark PC, Ambel Acupuncture, Ariel Chiropractic, Palm Chiropractic, and Mansour PT, personally used the U.S. Mail (or caused the U.S. Mail to be used) to further their fraudulent scheme by causing medical bills and records

from Mansour PT to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

870.    Rose, Belotserkovskiy, Mansour, Clarke, Gorelik, Clark PC, Ambel Acupuncture, Ariel Chiropractic, Palm Chiropractic, and Mansour PT caused Mansour PT to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Mansour PT mailed a demand for payment (i.e., invoice) to Allstate.

871.    Mansour (and/or his agents') provision of excessive and medically unnecessary services to patients of Mansour PT rendered Mansour PT completely ineligible for No-Fault reimbursement under New York law.

872.    Rose and Belotserkovskiy's control over the operation of Mansour PT where Rose and Belotserkovskiy were not lawfully authorized to administer, control, or profit from the operation of a physical therapy facility also rendered Mansour PT completely ineligible for No-Fault reimbursement under New York law.

873.    Because Mansour PT was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault Laws, Rose, Belotserkovskiy, Mansour, Clarke, Gorelik, Clark PC, Ambel Acupuncture, Ariel Chiropractic, Palm Chiropractic, and Mansour PT purposely caused Mansour PT to make a misrepresentation each and every time that Mansour PT mailed a document to Allstate claiming eligibility for No-Fault reimbursement.

874.    Moreover, because (a) Mansour PT was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Rose, Belotserkovskiy, Mansour, Clarke, Gorelik, Clark PC, Ambel Acupuncture, Ariel Chiropractic, Palm Chiropractic, and Mansour PT caused Mansour PT to seek No-Fault reimbursement from Allstate (even though Mansour PT was not entitled to such reimbursement), and (c) Mansour PT used (or was caused to use) the U.S. Mail to seek

reimbursement, it is clear that Rose, Belotserkovskiy, Mansour, Clarke, Gorelik, Clark PC, Ambel Acupuncture, Ariel Chiropractic, Palm Chiropractic, and Mansour PT committed mail fraud.

875. At all relevant times, Rose, Belotserkovskiy, Mansour, Clarke, Gorelik, Clark PC, Ambel Acupuncture, Ariel Chiropractic, Palm Chiropractic, and Mansour PT knew that Mansour PT (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Mansour PT.

876. Allstate estimates that the unlawful operation of the Mansour PT enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance off this scheme is annexed at Exhibit 19 and incorporated by reference as if set forth in its entirety.

## G.  COLIN CLARKE, M.D., P.C. ("CLARKE PC") ENTERPRISE

877. Rose, Belotserkovskiy, Clarke, Gorelik, Mansour, Ambel Acupuncture, Ariel Chiropractic, Palm Chiropractic, Mansour PT, personally used the U.S. Mail (or caused the U.S. Mail to be used) to further their fraudulent scheme by causing medical bills and records from Clarke PC to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

878. Rose, Belotserkovskiy, Clarke, Gorelik, Mansour, Ambel Acupuncture, Ariel Chiropractic, Palm Chiropractic, Mansour PT caused Clarke PC to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Clarke PC mailed a demand for payment (i.e., invoice) to Allstate.

879.    Clarke's (and/or his agents') provision of excessive and medically unnecessary services to patients of Clarke PC rendered Clarke PC completely ineligible for No-Fault reimbursement under New York law.

880.    Rose and Belotserkovskiy's control over the operation of Clarke PC where Rose and Belotserkovskiy were not lawfully authorized to administer, control, or profit from the operation of an medical facility also rendered Clarke PC completely ineligible for No-Fault reimbursement under New York law.

881.    Because Clarke PC was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault Laws, Rose, Belotserkovskiy, Clarke, Gorelik, Mansour, Ambel Acupuncture, Ariel Chiropractic, Palm Chiropractic, Mansour PT purposely caused Clarke PC to make a misrepresentation each and every time that Clarke PC mailed a document to Allstate claiming eligibility for No-Fault reimbursement.

882.    Moreover, because (a) Clarke PC was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Rose, Belotserkovskiy, Clarke, Gorelik, Mansour, Ambel Acupuncture, Ariel Chiropractic, Palm Chiropractic, Mansour PT to seek No-Fault reimbursement from Allstate (even though Clarke PC was not entitled to such reimbursement), and (c) Clarke PC used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Rose, Belotserkovskiy, Clarke, Gorelik, Mansour, Ambel Acupuncture, Ariel Chiropractic, Palm Chiropractic, Mansour PT committed mail fraud.

883.    At all relevant times, Rose, Belotserkovskiy, Clarke, Gorelik, Mansour, Ambel Acupuncture, Ariel Chiropractic, Palm Chiropractic, Mansour PT knew that Clarke PC (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the

U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Clarke PC.

884. Allstate estimates that the unlawful operation of the Clarke PC enterprise generated numerous mailings. A table highlighting selected examples of mailings made in furtherance off this scheme is annexed at Exhibit 20 and incorporated by reference as if set forth in its entirety.

## H. PALM CHIROPRACTIC, P.C. ("PALM CHIROPRACTIC") ENTERPRISE

885. Rose, Belotserkovskiy, Gorelik, Clarke, Mansour, Clark PC, Ambel Acupuncture, Ariel Chiropractic, and Mansour PT, personally used the U.S. Mail (or caused the U.S. Mail to be used) to further their fraudulent scheme by causing medical bills and records from Palm Chiropractic to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

886. Rose, Belotserkovskiy, Gorelik, Clarke, Mansour, Clark PC, Ambel Acupuncture, Ariel Chiropractic, and Mansour PT caused Palm Chiropractic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Palm Chiropractic mailed a demand for payment (i.e., invoice) to Allstate.

887. Gorelik's (and/or his agents') provision of excessive and medically unnecessary services to patients of Palm Chiropractic rendered Palm Chiropractic completely ineligible for No-Fault reimbursement under New York law.

888. Rose and Belotserkovskiy's control over the operation of Palm Chiropractic where Rose and Belotserkovskiy were not lawfully authorized to administer, control, or profit from the operation of a chiropractic facility also rendered Palm Chiropractic completely ineligible for No-Fault reimbursement under New York law.

889.     Because Palm Chiropractic was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault Laws, Rose, Rose, Belotserkovskiy, Gorelik, Clarke, Mansour, Clark PC., Ambel Acupuncture, Ariel Chiropractic, and Mansour PT purposely caused Palm Chiropractic to make a misrepresentation each and every time that Palm Chiropractic mailed a document to Allstate claiming eligibility for No-Fault reimbursement.

890.     Moreover, because (a) Palm Chiropractic was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Rose, Belotserkovskiy, Gorelik, Clarke, Mansour, Clark PC., Ambel Acupuncture, Ariel Chiropractic, and Mansour PT caused Palm Chiropractic to seek No-Fault reimbursement from Allstate (even though Palm Chiropractic was not entitled to such reimbursement), and (c) Palm Chiropractic used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Rose, Belotserkovskiy, Gorelik, Clarke, Mansour, Clark PC., Ambel Acupuncture, Ariel Chiropractic, and Mansour PT committed mail fraud.

891.     At all relevant times, Rose, Belotserkovskiy, Gorelik, Clarke, Mansour, Clark PC., Ambel Acupuncture, Ariel Chiropractic, and Mansour PT knew that Palm Chiropractic (including its employees, owner(s), contractors and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Palm Chiropractic.

892.     Allstate estimates that the unlawful operation of the Palm Chiropractic enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance off this scheme is annexed at Exhibit 21 and incorporated by reference as if set forth in its entirety.

# VII. SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MATERIAL MISREPRESENTATIONS MADE TO AND RELIED UPON BY ALLSTATE

## A. FRAUDULENT CONCEALMENT – BAY MEDICAL ENTERPRISE

### i. Fraudulent Concealment of Rose and Belotserkovskiy's Participation in the Operation and Management of Bay Medical

893. In furtherance of this scheme, Hanna was induced to register himself with the State of New York as Bay Medical's sole officer, director, and shareholder.

894. The documents created and filed with the State of New York related to Bay Medical deliberately omitted any reference to the Management Defendants' involvement with or control over Hanna and Bay Medical.

895. The documents created and filed with the State of New York related to Bay Medical gave no indication to Allstate or to the general public that Rose or Belotserkovskiy in any way maintained a controlling interest in Bay Medical, or in any way participated in the operation, management, and control of Bay Medical.

896. Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of Bay Medical, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of the Management Defendants' control over Hanna and Bay Medical.

897. The Management Defendants' purposeful concealment of their controlling interest in Bay Medical allowed Rose and Belotserkovskiy to unlawfully control Bay Medical undetected.

898. At all relevant times during the operation of the Bay Medical enterprise, to induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through Bay Medical, Hanna, Belotserkovskiy, and Rose caused Bay Medical

to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

899. At all relevant times, Hanna, as a duly licensed medical doctor, was legally and ethically obligated to act honestly and with integrity, and also was legally and ethically obligated to act in accordance with all other aspects of his oath as a licensed medical professional.

900. At all relevant times, Hanna, Belotserkovskiy, and Rose actively concealed from Allstate facts regarding Bay Medical's true ownership and control to prevent Allstate from discovering that Bay Medical was unlawfully incorporated, operated, and controlled by a layperson, and therefore ineligible to seek or collect No-Fault benefit payments.

901. Many of these facts—particularly (a) the Management Defendants' involvement in the direction and control of the treatment and testing of Bay Medical's patients, and (b) Bay Medical's unlawful sharing of professional fees and profits with the Management Defendants— are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

902. Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

903. Thus, every time that Hanna, Belotserkovskiy, and Rose (along with those individuals working under their control) caused Bay Medical to submit No-Fault reimbursement demands to Allstate, Hanna, Belotserkovskiy, and Rose (and those individuals working under their control) necessarily certified that Bay Medical was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

904.    The full extent of Hanna, Belotserkovskiy, and Rose's fraudulent and unlawful acts relative to their control over the Bay Medical enterprise—including (a) the Management Defendants' participation in the operation and control of Bay Medical, and (b) the unlawful channeling of Bay Medical's professional fees and profits to the Management Defendants—was not, and could not have been, known to Allstate until shortly before it filed this Complaint.

### ii.    Fraudulent Concealment of Bay Medical's Submission of False and Fraudulent Claims for No-Fault Reimbursement

905.    At all relevant times during the operation of the Bay Medical enterprise, Hanna, Belotserkovskiy, and Rose purposely caused Bay Medical to certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary physician and physical therapy treatment and services purportedly provided to Allstate Claimants.

906.    Hanna, Belotserkovskiy, and Rose (along with those individuals working under their control) purposely concealed the lack of medical necessity for the physician treatments and services purportedly provided and charged for by Bay Medical.

907.    Hanna, Belotserkovskiy, and Rose (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the physician treatments and services purportedly provided by Bay Medical to Allstate Claimants.

908.    Because Hanna, Belotserkovskiy, and Rose were responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate Claimants through Bay Medical, (b) creating, altering, and/or fabricating treatment records submitted to Allstate in support of services purportedly rendered to Allstate Claimants, (c) billing Allstate for excessive and medically unnecessary physical therapy and physician

treatments, tests, and services purportedly rendered to Allstate Claimants through Bay Medical, (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault Laws, and (e) billing Allstate for treatments, tests, and services that were, in certain instances, never actually provided, Bay Medical was caused to falsely claim eligibility each and every time that Bay Medical sought No-Fault reimbursement from Allstate.

909. As alleged above, Hanna, Belotserkovskiy, and Rose (or those persons working under their control) caused Bay Medical to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) completely unnecessary, (c) excessive, and/or (d) not provided as reported.

910. Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault Laws.

911. Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

912. Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York State licensing requirements.

913. Thus, every time that Hanna, Belotserkovskiy, and Rose (along with those individuals working under their control) caused Bay Medical to submit No-Fault reimbursement demands to Allstate, Hanna, Belotserkovskiy, and Rose (and those individuals working under their

control) necessarily certified that Bay Medical was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

914. The full extent of Hanna, Belotserkovskiy, and Rose's fraudulent and unlawful acts relative to the Bay Medical enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

## B. FRAUDULENT CONCEALMENT – ARIEL CHIROPRACTIC ENTERPRISE

### i. Fraudulent Concealment of the Management Defendants' Participation in the Operation and Management of Ariel Chiropractic

915. In furtherance of this scheme, Gorelik was induced to register himself with the State of New York as Ariel Chiropractic's sole officer, director, and shareholder.

916. The documents created and filed with the State of New York related to Ariel Chiropractic deliberately omitted any reference to the Management Defendants' involvement with or control over Gorelik and Ariel Chiropractic.

917. The documents created and filed with the State of New York related to Ariel Chiropractic gave no indication to Allstate or to the general public that the Management Defendants in any way maintained a controlling interest in Ariel Chiropractic, or in any way participated in the operation, management, and control of Ariel Chiropractic.

918. Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of Ariel Chiropractic, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of the Management Defendants' control over Gorelik and Ariel Chiropractic.

919. The Management Defendants' purposeful concealment of their controlling interest in Ariel Chiropractic allowed the Management Defendants to unlawfully control Ariel Chiropractic undetected.

920. At all relevant times during the operation of the Ariel Chiropractic enterprise, to induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through Ariel Chiropractic, Gorelik, Belotserkovskiy, and Rose caused Ariel Chiropractic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

921. At all relevant times, Gorelik, as a duly licensed physical chiropractor, was legally and ethically obligated to act honestly and with integrity, and also was legally and ethically obligated to act in accordance with all other aspects of his oath as a licensed medical professional.

922. At all relevant times, Gorelik, Belotserkovskiy, and Rose actively concealed from Allstate facts regarding Ariel Chiropractic's true ownership and control to prevent Allstate from discovering that Ariel Chiropractic was unlawfully incorporated, operated, and controlled by a layperson, and therefore ineligible to seek or collect No-Fault benefit payments.

923. Many of these facts—particularly (a) the Management Defendants' involvement in the direction and control of the treatment and testing of Ariel Chiropractic's patients, and (b) Ariel Chiropractic's unlawful sharing of professional fees and profits with the Management Defendants—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

924. Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

925. Thus, every time that Gorelik, Belotserkovskiy, and Rose (along with those individuals working under their control) caused Ariel Chiropractic to submit No-Fault

reimbursement demands to Allstate, Gorelik, Belotserkovskiy, and Rose (and those individuals working under their control) necessarily certified that Ariel Chiropractic was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

926. The full extent of Gorelik, Belotserkovskiy, and Rose's fraudulent and unlawful acts relative to their control over the Ariel Chiropractic enterprise—including (a) the Management Defendants' participation in the operation and control of Ariel Chiropractic, and (b) the unlawful channeling of Ariel Chiropractic's professional fees and profits to the Management Defendants— was not, and could not have been, known to Allstate until shortly before it filed this Complaint.

### ii. Fraudulent Concealment of Ariel Chiropractic's Submission of False and Fraudulent Claims for No-Fault Reimbursement

927. At all relevant times during the operation of the Ariel Chiropractic enterprise, Gorelik, Belotserkovskiy, and Rose purposely caused Ariel Chiropractic to certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary chiropractic treatment and services purportedly provided to Allstate Claimants.

928. Gorelik, Belotserkovskiy, and Rose (along with those individuals working under their control) purposely concealed the lack of medical necessity for the chiropractic treatments and services purportedly provided and charged for by Ariel Chiropractic.

929. Gorelik, Belotserkovskiy, and Rose (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the chiropractic treatments and services purportedly provided by Ariel Chiropractic to Allstate Claimants.

930. Because Gorelik, Belotserkovskiy, and Rose were responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to

Allstate Claimants through Ariel Chiropractic, (b) creating, altering, and/or fabricating treatment records submitted to Allstate in support of services purportedly rendered to Allstate Claimants, (c) billing Allstate for excessive and medically unnecessary chiropractic treatments, tests, and services purportedly rendered to Allstate Claimants through Ariel Chiropractic, (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault Laws, and (e) billing Allstate for treatments, tests, and services that were, in certain instances, never actually provided, Ariel Chiropractic was caused to falsely claim eligibility each and every time that Ariel Chiropractic sought No-Fault reimbursement from Allstate.

931.    As alleged above, Gorelik, Belotserkovskiy, and Rose (or those persons working under their control) caused Ariel Chiropractic to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) completely unnecessary, (c) excessive, and/or (d) not provided as reported.

932.    Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault Laws.

933.    Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

934.    Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York State licensing requirements.

935.     Thus, every time that Gorelik, Belotserkovskiy, and Rose (along with those individuals working under their control) caused Ariel Chiropractic to submit No-Fault reimbursement demands to Allstate, Gorelik, Belotserkovskiy, and Rose (and those individuals working under their control) necessarily certified that Ariel Chiropractic was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

936.     The full extent of Gorelik, Belotserkovskiy, and Rose's fraudulent and unlawful acts relative to the Ariel Chiropractic enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### C.  FRAUDULENT CONCEALMENT – BELAM ACUPUNCTURE ENTERPRISE

#### i.  Fraudulent Concealment of Rose's Participation in the Operation and Management of Belam Acupuncture

937.     In furtherance of this scheme, Belotserkovskiy was induced to register himself with the State of New York as Belam Acupuncture's sole officer, director, and shareholder.

938.     The documents created and filed with the State of New York related to Belam Acupuncture deliberately omitted any reference to Rose's involvement with or control over Belotserkovskiy and Belam Acupuncture.

939.     The documents created and filed with the State of New York related to Belam Acupuncture gave no indication to Allstate or to the general public that Rose in any way maintained a controlling interest in Belam Acupuncture, or in any way participated in the operation, management, and control of Belam Acupuncture.

940.     Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of Belam Acupuncture, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Rose's control over Belotserkovskiy and Belam Acupuncture.

941. Rose's purposeful concealment of his controlling interest in Belam Acupuncture allowed Rose to unlawfully control Belam Acupuncture undetected.

942. At all relevant times during the operation of the Belam Acupuncture enterprise, to induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through Belam Acupuncture, Belotserkovskiy and Rose caused Belam Acupuncture to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

943. At all relevant times, Belotserkovskiy, as a duly licensed acupuncturist, was legally and ethically obligated to act honestly and with integrity, and also was legally and ethically obligated to act in accordance with all other aspects of his oath as a licensed medical professional.

944. At all relevant times, Belotserkovskiy and Rose actively concealed from Allstate facts regarding Belam Acupuncture's true ownership and control to prevent Allstate from discovering that Belam Acupuncture was unlawfully incorporated, operated, and controlled by a layperson, and therefore ineligible to seek or collect No-Fault benefit payments.

945. Many of these facts—particularly (a) Rose's involvement in the direction and control of the treatment and testing of Belam Acupuncture's patients, and (b) Belam Acupuncture's unlawful sharing of professional fees and profits with Rose—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

946. Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

947.     Thus, every time that Belotserkovskiy and Rose (along with those individuals working under their control) caused Belam Acupuncture to submit No-Fault reimbursement demands to Allstate, Belotserkovskiy and Rose (and those individuals working under their control) necessarily certified that Belam Acupuncture was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

948.     The full extent of Belotserkovskiy's and Rose's fraudulent and unlawful acts relative to their control over the Belam Acupuncture enterprise—including (a) Rose's participation in the operation and control of Belam Acupuncture, and (b) the unlawful channeling of Belam Acupuncture's professional fees and profits to Rose—was not, and could not have been, known to Allstate until shortly before it filed this Complaint.

### ii.   Fraudulent Concealment of Belam Acupuncture's Submission of False and Fraudulent Claims for No-Fault Reimbursement

949.     At all relevant times during the operation of the Belam Acupuncture enterprise, Belotserkovskiy and Rose purposely caused Belam Acupuncture to certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary acupuncture treatment and services purportedly provided to Allstate Claimants.

950.     Belotserkovskiy and Rose (along with those individuals working under their control) purposely concealed the lack of medical necessity for the acupuncture treatments and services purportedly provided and charged for by Belam Acupuncture.

951.     Belotserkovskiy and Rose (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the acupuncture treatments and services purportedly provided by Belam Acupuncture to Allstate Claimants.

952. Because Belotserkovskiy and Rose were responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate Claimants through Belam Acupuncture, (b) creating, altering, and/or fabricating treatment records submitted to Allstate in support of services purportedly rendered to Allstate Claimants, (c) billing Allstate for excessive and medically unnecessary acupuncture treatments, tests, and services purportedly rendered to Allstate Claimants through Belam Acupuncture, (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault Laws, and (e) billing Allstate for treatments, tests, and services that were, in certain instances, never actually provided, Belam Acupuncture was caused to falsely claim eligibility each and every time that Belam Acupuncture sought No-Fault reimbursement from Allstate.

953. As alleged above, Belotserkovskiy and Rose (or those persons working under their control) caused Belam Acupuncture to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) completely unnecessary, (c) excessive, and/or (d) not provided as reported.

954. Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault Laws.

955. Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

956. Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York State licensing requirements.

957. Thus, every time that Belotserkovskiy and Rose (along with those individuals working under their control) caused Belam Acupuncture to submit No-Fault reimbursement demands to Allstate, Belotserkovskiy and Rose (and those individuals working under their control) necessarily certified that Belam Acupuncture was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

958. The full extent of Belotserkovskiy and Rose's fraudulent and unlawful acts relative to the Belam Acupuncture enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### D. FRAUDULENT CONCEALMENT – C&M CHIROPRACTIC ENTERPRISE

#### i. Fraudulent Concealment of The Management Defendants' Participation in the Operation and Management of C&M Chiropractic

959. In furtherance of this scheme, Colarusso and Minick were induced to register themselves with the State of New York as C&M Chiropractic's sole officers, directors, and shareholders.

960. The documents created and filed with the State of New York related to C&M Chiropractic deliberately omitted any reference to the Management Defendants' involvement with or control over Colarusso, Minick, and C&M Chiropractic.

961. The documents created and filed with the State of New York related to C&M Chiropractic gave no indication to Allstate or to the general public that the Management

Defendants in any way maintained a controlling interest in C&M Chiropractic, or in any way participated in the operation, management, and control of C&M Chiropractic.

962.    Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of C&M Chiropractic, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of the Management Defendants' control over Colarusso, Minick, and C&M Chiropractic.

963.    The Management Defendants' purposeful concealment of their controlling interest in C&M Chiropractic allowed the Management Defendants to unlawfully control C&M Chiropractic undetected.

964.    At all relevant times during the operation of the C&M Chiropractic enterprise, to induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through C&M Chiropractic, Colarusso, Minick, Belotserkovskiy, and Rose caused C&M Chiropractic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

965.    At all relevant times, Colarusso and Minick, as duly licensed chiropractors, were legally and ethically obligated to act honestly and with integrity, and also were legally and ethically obligated to act in accordance with all other aspects of their oaths as licensed medical professionals.

966.    At all relevant times, Colarusso, Minick, Belotserkovskiy, and Rose actively concealed from Allstate facts regarding C&M Chiropractic's true ownership and control to prevent Allstate from discovering that C&M Chiropractic was unlawfully incorporated, operated, and controlled by a layperson, and therefore ineligible to seek or collect No-Fault benefit payments.

967.     Many of these facts—particularly (a) the Management Defendants' involvement in the direction and control of the treatment and testing of C&M Chiropractic's patients, and (b) C&M Chiropractic's unlawful sharing of professional fees and profits with the Management Defendants—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

968.     Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

969.     Thus, every time that Colarusso, Minick, Belotserkovskiy, and Rose (along with those individuals working under their control) caused C&M Chiropractic to submit No-Fault reimbursement demands to Allstate, Colarusso, Minick, Belotserkovskiy, and Rose (and those individuals working under their control) necessarily certified that C&M Chiropractic was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

970.     The full extent of Colarusso, Minick, Belotserkovskiy, and Rose's fraudulent and unlawful acts relative to their control over the C&M Chiropractic enterprise—including (a) the Management Defendants' participation in the operation and control of C&M Chiropractic, and (b) the unlawful channeling of C&M Chiropractic's professional fees and profits to the Management Defendants—was not, and could not have been, known to Allstate until shortly before it filed this Complaint.

## ii.    Fraudulent Concealment of C&M Chiropractic's Submission of False and Fraudulent Claims for No-Fault Reimbursement

971.     At all relevant times during the operation of the C&M Chiropractic enterprise, Colarusso, Minick, Belotserkovskiy, and Rose purposely caused C&M Chiropractic to certify that

it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary chiropractic treatment and services purportedly provided to Allstate Claimants.

972.     Colarusso, Minick, Belotserkovskiy, and Rose (along with those individuals working under their control) purposely concealed the lack of medical necessity for the chiropractic treatments and services purportedly provided and charged for by C&M Chiropractic.

973.     Colarusso, Minick, Belotserkovskiy, and Rose (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the chiropractic treatments and services purportedly provided by C&M Chiropractic to Allstate Claimants.

974.     Because Colarusso, Minick, Belotserkovskiy, and Rose were responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate Claimants through C&M Chiropractic, (b) creating, altering, and/or fabricating treatment records submitted to Allstate in support of services purportedly rendered to Allstate Claimants, (c) billing Allstate for excessive and medically unnecessary chiropractic treatments, tests, and services purportedly rendered to Allstate Claimants through C&M Chiropractic, (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault Laws, and (e) billing Allstate for treatments, tests, and services that were, in certain instances, never actually provided, C&M Chiropractic was caused to falsely claim eligibility each and every time that C&M Chiropractic sought No-Fault reimbursement from Allstate.

975.     As alleged above, Colarusso, Minick, Belotserkovskiy, and Rose (or those persons working under their control) caused C&M Chiropractic to create and submit to Allstate No-Fault

claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) completely unnecessary, (c) excessive, and/or (d) not provided as reported.

976.    Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault Laws.

977.    Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

978.    Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York State licensing requirements.

979.    Thus, every time that Colarusso, Minick, Belotserkovskiy, and Rose (along with those individuals working under their control) caused C&M Chiropractic to submit No-Fault reimbursement demands to Allstate, Colarusso, Minick, Belotserkovskiy, and Rose (and those individuals working under their control) necessarily certified that C&M Chiropractic was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

980.    The full extent of Colarusso, Minick, Belotserkovskiy, and Rose's fraudulent and unlawful acts relative to the C&M Chiropractic enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### E. FRAUDULENT CONCEALMENT – CYRUS CHIROPRACTIC ENTERPRISE

#### i. Fraudulent Concealment of the Management Defendants' Participation in the Operation and Management of Cyrus Chiropractic

981. In furtherance of this scheme, Gorelik was induced to register himself with the State of New York as Cyrus Chiropractic's sole officer, director, and shareholder.

982. The documents created and filed with the State of New York related to Cyrus Chiropractic deliberately omitted any reference to the Management Defendants' involvement with or control over Gorelik and Cyrus Chiropractic.

983. The documents created and filed with the State of New York related to Cyrus Chiropractic gave no indication to Allstate or to the general public that the Management Defendants in any way maintained a controlling interest in Cyrus Chiropractic, or in any way participated in the operation, management, and control Cyrus Ariel Chiropractic.

984. Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of Cyrus Chiropractic, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of the Management Defendants' control over Gorelik and Cyrus Chiropractic.

985. The Management Defendants' purposeful concealment of their controlling interest in Cyrus Chiropractic allowed the Management Defendants to unlawfully control Cyrus Chiropractic undetected.

986. At all relevant times during the operation of the Cyrus Chiropractic enterprise, to induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through Cyrus Chiropractic, Gorelik, Belotserkovskiy, and Rose caused

Cyrus Chiropractic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

987. At all relevant times, Gorelik, as a duly licensed physical chiropractor, was legally and ethically obligated to act honestly and with integrity, and also was legally and ethically obligated to act in accordance with all other aspects of his oath as a licensed medical professional.

988. At all relevant times, Gorelik, Belotserkovskiy, and Rose actively concealed from Allstate facts regarding Cyrus Chiropractic's true ownership and control to prevent Allstate from discovering that Cyrus Chiropractic was unlawfully incorporated, operated, and controlled by a layperson, and therefore ineligible to seek or collect No-Fault benefit payments.

989. Many of these facts—particularly (a) the Management Defendants' involvement in the direction and control of the treatment and testing of Cyrus Chiropractic's patients, and (b) Cyrus Chiropractic's unlawful sharing of professional fees and profits with the Management Defendants—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

990. Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

991. Thus, every time that Gorelik, Belotserkovskiy, and Rose (along with those individuals working under their control) caused Cyrus Chiropractic to submit No-Fault reimbursement demands to Allstate, Gorelik, Belotserkovskiy, and Rose (and those individuals working under their control) necessarily certified that Cyrus Chiropractic was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

992. The full extent of Gorelik, Belotserkovskiy, and Rose's fraudulent and unlawful acts relative to their control over the Cyrus Chiropractic enterprise—including (a) the Management Defendants' participation in the operation and control of Cyrus Chiropractic, and (b) the unlawful channeling of Cyrus Chiropractic's professional fees and profits to the Management Defendants— was not, and could not have been, known to Allstate until shortly before it filed this Complaint.

### ii. Fraudulent Concealment of Cyrus Chiropractic's Submission of False and Fraudulent Claims for No-Fault Reimbursement

993. At all relevant times during the operation of the Cyrus Chiropractic enterprise, Gorelik, Belotserkovskiy, and Rose purposely caused Cyrus Chiropractic to certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary chiropractic treatment and services purportedly provided to Allstate Claimants.

994. Gorelik, Belotserkovskiy, and Rose (along with those individuals working under their control) purposely concealed the lack of medical necessity for the chiropractic treatments and services purportedly provided and charged for by Cyrus Chiropractic.

995. Gorelik, Belotserkovskiy, and Rose (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the chiropractic treatments and services purportedly provided by Cyrus Chiropractic to Allstate Claimants.

996. Because Gorelik, Belotserkovskiy, and Rose were responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate Claimants through Cyrus Chiropractic, (b) creating, altering, and/or fabricating treatment records submitted to Allstate in support of services purportedly rendered to Allstate Claimants, (c) billing Allstate for excessive and medically unnecessary chiropractic treatments, tests, and services

purportedly rendered to Allstate Claimants through Cyrus Chiropractic, (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault Laws, and (e) billing Allstate for treatments, tests, and services that were, in certain instances, never actually provided, Cyrus Chiropractic was caused to falsely claim eligibility each and every time that Cyrus Chiropractic sought No-Fault reimbursement from Allstate.

997.    As alleged above, Gorelik, Belotserkovskiy, and Rose (or those persons working under their control) caused Cyrus Chiropractic to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) completely unnecessary, (c) excessive, and/or (d) not provided as reported.

998.    Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault Laws.

999.    Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

1000.   Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York State licensing requirements.

1001.   Thus, every time that Gorelik, Belotserkovskiy, and Rose (along with those individuals working under their control) caused Cyrus Chiropractic to submit No-Fault reimbursement demands to Allstate, Gorelik, Belotserkovskiy, and Rose (and those individuals

working under their control) necessarily certified that Cyrus Chiropractic was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1002. The full extent of Gorelik, Belotserkovskiy, and Rose's fraudulent and unlawful acts relative to the Cyrus Chiropractic enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### F. FRAUDULENT CONCEALMENT – AMBEL ACUPUNCTURE ENTERPRISE

#### i. Fraudulent Concealment of Rose's Participation in the Operation and Management of Ambel Acupuncture

1003. In furtherance of this scheme, Belotserkovskiy was induced to register himself with the State of New York as Ambel Acupuncture's sole officer, director, and shareholder

1004. The documents created and filed with the State of New York related to Ambel Acupuncture deliberately omitted any reference to Rose's involvement with or control over Belotserkovskiy and Ambel Acupuncture.

1005. The documents created and filed with the State of New York related to Ambel Acupuncture gave no indication to Allstate or to the general public that Rose in any way maintained a controlling interest in Ambel Acupuncture, or in any way participated in the operation, management, and control of Ambel Acupuncture.

1006. Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of Ambel Acupuncture, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Rose's control over Belotserkovskiy and Ambel Acupuncture.

1007. Rose's purposeful concealment of his controlling interest in Ambel Acupuncture allowed Rose to unlawfully control Ambel Acupuncture undetected.

1008.   At all relevant times during the operation of the Ambel Acupuncture enterprise, to induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through Ambel Acupuncture, Belotserkovskiy and Rose caused Ambel Acupuncture to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1009.   At all relevant times, Belotserkovskiy, as a duly licensed acupuncturist, was legally and ethically obligated to act honestly and with integrity, and also was legally and ethically obligated to act in accordance with all other aspects of his oath as a licensed medical professional.

1010.   At all relevant times, Belotserkovskiy and Rose actively concealed from Allstate facts regarding Ambel Acupuncture's true ownership and control to prevent Allstate from discovering that Ambel Acupuncture was unlawfully incorporated, operated, and controlled by a layperson, and therefore ineligible to seek or collect No-Fault benefit payments.

1011.   Many of these facts—particularly (a) Rose's involvement in the direction and control of the treatment and testing of Ambel Acupuncture's patients, and (b) Ambel Acupuncture's unlawful sharing of professional fees and profits with Rose—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

1012.   Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

1013.   Thus, every time that Belotserkovskiy and Rose (along with those individuals working under their control) caused Ambel Acupuncture to submit No-Fault reimbursement

demands to Allstate, Belotserkovskiy and Rose (and those individuals working under their control) necessarily certified that Ambel Acupuncture was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1014. The full extent of Belotserkovskiy's and Rose's fraudulent and unlawful acts relative to their control over the Ambel Acupuncture enterprise—including (a) Rose's participation in the operation and control of Ambel Acupuncture, and (b) the unlawful channeling of Ambel Acupuncture's professional fees and profits to Rose—was not, and could not have been, known to Allstate until shortly before it filed this Complaint.

### ii. Fraudulent Concealment of Ambel Acupuncture's Submission of False and Fraudulent Claims for No-Fault Reimbursement

1015. At all relevant times during the operation of the Ambel Acupuncture enterprise, Belotserkovskiy and Rose purposely caused Ambel Acupuncture to certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary acupuncture treatment and services purportedly provided to Allstate Claimants.

1016. Belotserkovskiy and Rose (along with those individuals working under their control) purposely concealed the lack of medical necessity for the acupuncture treatments and services purportedly provided and charged for by Ambel Acupuncture.

1017. Belotserkovskiy and Rose (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the acupuncture treatments and services purportedly provided by Ambel Acupuncture to Allstate Claimants.

1018. Because Belotserkovskiy and Rose were responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate

Claimants through Ambel Acupuncture, (b) creating, altering, and/or fabricating treatment records submitted to Allstate in support of services purportedly rendered to Allstate Claimants, (c) billing Allstate for excessive and medically unnecessary acupuncture treatments, tests, and services purportedly rendered to Allstate Claimants through Ambel Acupuncture, (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault Laws, and (e) billing Allstate for treatments, tests, and services that were, in certain instances, never actually provided, Ambel Acupuncture was caused to falsely claim eligibility each and every time that Ambel Acupuncture sought No-Fault reimbursement from Allstate.

1019.   As alleged above, Belotserkovskiy and Rose (or those persons working under their control) caused Ambel Acupuncture to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) completely unnecessary, (c) excessive, and/or (d) not provided as reported.

1020.   Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault Laws.

1021.   Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

1022.   Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York State licensing requirements.

1023. Thus, every time that Belotserkovskiy and Rose (along with those individuals working under their control) caused Ambel Acupuncture to submit No-Fault reimbursement demands to Allstate, Belotserkovskiy and Rose (and those individuals working under their control) necessarily certified that Ambel Acupuncture was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1024. The full extent of Belotserkovskiy and Rose's fraudulent and unlawful acts relative to the Ambel Acupuncture enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### G. FRAUDULENT CONCEALMENT – MANSOUR PT ENTERPRISE

#### i. Fraudulent Concealment of The Management Defendants' Participation in the Operation and Management of Mansour PT

1025. In furtherance of this scheme, Mansour was induced to register himself with the State of New York as Mansour PT's sole officer, director, and shareholder.

1026. The documents created and filed with the State of New York related to Mansour PT deliberately omitted any reference to the Management Defendants' involvement with or control over Mansour and Mansour PT.

1027. The documents created and filed with the State of New York related to Mansour PT gave no indication to Allstate or to the general public that the Management Defendants in any way maintained a controlling interest in Mansour PT, or in any way participated in the operation, management, and control of Mansour PT.

1028. Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of Mansour PT, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of the Management Defendants' control over Mansour and Mansour PT.

1029.   The Management Defendants' purposeful concealment of his controlling interest in Mansour PT allowed the Management Defendants to unlawfully control Mansour PT undetected.

1030.   At all relevant times during the operation of the Mansour PT enterprise, to induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through Mansour PT, Mansour, Belotserkovskiy, and Rose caused Mansour PT to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1031.   At all relevant times, Mansour, as a duly licensed physical therapist, was legally and ethically obligated to act honestly and with integrity, and also was legally and ethically obligated to act in accordance with all other aspects of his oath as a licensed medical professional.

1032.   At all relevant times, Mansour, Belotserkovskiy, and Rose actively concealed from Allstate facts regarding Mansour PT's true ownership and control to prevent Allstate from discovering that Mansour PT was unlawfully incorporated, operated, and controlled by a layperson, and therefore ineligible to seek or collect No-Fault benefit payments.

1033.   Many of these facts—particularly (a) the Management Defendants' involvement in the direction and control of the treatment and testing of Mansour PT's patients, and (b) Mansour PT's unlawful sharing of professional fees and profits with the Management Defendants—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

1034.   Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

1035.    Thus, every time that Mansour, Belotserkovskiy, and Rose (along with those individuals working under their control) caused Mansour PT to submit No-Fault reimbursement demands to Allstate, Mansour, Belotserkovskiy, and Rose (and those individuals working under their control) necessarily certified that Mansour PT was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1036.    The full extent of Mansour, Belotserkovskiy, and Rose's fraudulent and unlawful acts relative to their control over the Mansour PT enterprise—including (a) the Management Defendants' participation in the operation and control of Mansour PT, and (b) the unlawful channeling of Mansour PT's professional fees and profits to the Management Defendants—was not, and could not have been, known to Allstate until shortly before it filed this Complaint.

## ii.   **Fraudulent Concealment of Mansour PT's Submission of False and Fraudulent Claims for No-Fault Reimbursement**

1037.    At all relevant times during the operation of the Mansour PT enterprise, Mansour, Belotserkovskiy, and Rose purposely caused Mansour PT to certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary physical therapy treatment and services purportedly provided to Allstate Claimants.

1038.    Mansour, Belotserkovskiy, and Rose (along with those individuals working under their control) purposely concealed the lack of medical necessity for the physical therapy treatments and services purportedly provided and charged for by Mansour PT.

1039.    Mansour, Belotserkovskiy, and Rose (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the physical therapy treatments and services purportedly provided by Mansour PT to Allstate Claimants.

1040. Because Mansour, Belotserkovskiy, and Rose were responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate Claimants through Mansour PT, (b) creating, altering, and/or fabricating treatment records submitted to Allstate in support of services purportedly rendered to Allstate Claimants, (c) billing Allstate for excessive and medically unnecessary physical therapy treatments, tests, and services purportedly rendered to Allstate Claimants through Mansour PT, (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault Laws, and (e) billing Allstate for treatments, tests, and services that were, in certain instances, never actually provided, Mansour PT was caused to falsely claim eligibility each and every time that Mansour PT sought No-Fault reimbursement from Allstate.

1041. As alleged above, Mansour, Belotserkovskiy, and Rose (or those persons working under their control) caused Mansour PT to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) completely unnecessary, (c) excessive, and/or (d) not provided as reported.

1042. Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault Laws.

1043. Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

1044. Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York State licensing requirements.

1045. Thus, every time that Mansour, Belotserkovskiy, and Rose (along with those individuals working under their control) caused Mansour PT to submit No-Fault reimbursement demands to Allstate, Mansour, Belotserkovskiy, and Rose (and those individuals working under their control) necessarily certified that Mansour PT was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1046. The full extent of Mansour, Belotserkovskiy, and Rose's fraudulent and unlawful acts relative to the Mansour PT enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

## H. FRAUDULENT CONCEALMENT – CLARKE PC ENTERPRISE

### i. Fraudulent Concealment of the Management Defendants' Participation in the Operation and Management of Clarke PC

1047. In furtherance of this scheme, Clarke was induced to register himself with the State of New York as Clarke PC's sole officer, director, and shareholder.

1048. The documents created and filed with the State of New York related to Clarke PC deliberately omitted any reference to the Management Defendants' involvement with or control over Clarke and Clarke PC.

1049. The documents created and filed with the State of New York related to Clarke PC gave no indication to Allstate or to the general public that the Management Defendants in any way maintained a controlling interest in Clarke PC, or in any way participated in the operation, management, and control of Clarke PC.

1050. Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of Clarke PC, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of the Management Defendants' control over Clarke and Clarke PC.

1051. The Management Defendants' purposeful concealment of their controlling interest in Clarke PC allowed the Management Defendants to unlawfully control Clarke PC undetected.

1052. At all relevant times during the operation of the Clarke PC enterprise, to induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through Clarke PC, Clarke, Belotserkovskiy, and Rose caused Clarke PC to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1053. At all relevant times, Clarke, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity, and also was legally and ethically obligated to act in accordance with all other aspects of his oath as a licensed medical professional.

1054. At all relevant times, Clarke, Belotserkovskiy, and Rose actively concealed from Allstate facts regarding Clarke PC's true ownership and control to prevent Allstate from discovering that Clarke PC was unlawfully operated by a layperson, and therefore ineligible to seek or collect No-Fault benefit payments.

1055. Many of these facts—particularly (a) the Management Defendants' involvement in the direction and control of the treatment and testing of Clarke PC's patients, and (b) Clarke PC's unlawful sharing of professional fees and profits with the Management Defendants—are not readily evident within the four corners of the documents submitted to Allstate by these defendants

and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

1056. Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

1057. Thus, every time that Clarke, Belotserkovskiy, and Rose (along with those individuals working under their control) caused Clarke PC to submit No-Fault reimbursement demands to Allstate, Clarke, Belotserkovskiy, and Rose (and those individuals working under their control) necessarily certified that Clarke PC was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1058. The full extent of Clarke, Belotserkovskiy, and Rose's fraudulent and unlawful acts relative to their control over the Clarke PC enterprise—including (a) the Management Defendants' participation in the operation and control of Clarke PC, and (b) the unlawful channeling of Clarke PC's professional fees and profits to the Management Defendants—was not, and could not have been, known to Allstate until shortly before it filed this Complaint.

### ii. Fraudulent Concealment of Clarke PC's Submission of False and Fraudulent Claims for No-Fault Reimbursement

1059. At all relevant times during the operation of the Clarke PC enterprise, Clarke, Belotserkovskiy, and Rose purposely caused Clarke PC to certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary physician treatment and services purportedly provided to Allstate Claimants.

1060.   Clarke, Belotserkovskiy, and Rose (along with those individuals working under their control) purposely concealed the lack of medical necessity for the physician treatments and services purportedly provided and charged for by Clarke PC.

1061.   Clarke, Belotserkovskiy, and Rose (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the physician treatments and services purportedly provided by Clarke PC to Allstate Claimants.

1062.   Because Clarke, Belotserkovskiy, and Rose were responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate Claimants through Clarke PC, (b) creating, altering, and/or fabricating treatment records submitted to Allstate in support of services purportedly rendered to Allstate Claimants, (c) billing Allstate for excessive and medically unnecessary physician treatments, tests, and services purportedly rendered to Allstate Claimants through Clarke PC, (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault Laws, and (e) billing Allstate for treatments, tests, and services that were, in certain instances, never actually provided, Clarke PC was caused to falsely claim eligibility each and every time that Clarke PC sought No-Fault reimbursement from Allstate.

1063.   As alleged above, Clarke, Belotserkovskiy and Rose (or those persons working under their control) caused Clarke PC to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) completely unnecessary, (c) excessive, and/or (d) not provided as reported.

1064. Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault Laws.

1065. Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

1066. Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York State licensing requirements.

1067. Thus, every time that Clarke, Belotserkovskiy, and Rose (along with those individuals working under their control) caused Clarke PC to submit No-Fault reimbursement demands to Allstate, Clarke, Belotserkovskiy, and Rose (and those individuals working under their control) necessarily certified that Clarke PC was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1068. The full extent of Clarke, Belotserkovskiy, and Rose's fraudulent and unlawful acts relative to the Clarke PC enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

## I. FRAUDULENT CONCEALMENT – PALM CHIROPRACTIC ENTERPRISE

### i. Fraudulent Concealment of the Management Defendants' Participation in the Operation and Management of Palm Chiropractic

1069. In furtherance of this scheme, Gorelik was induced to register himself with the State of New York as Palm Chiropractic's sole officer, director, and shareholder.

1070. The documents created and filed with the State of New York related to Palm Chiropractic deliberately omitted any reference to the Management Defendants' involvement with or control over Gorelik and Palm Chiropractic.

1071. The documents created and filed with the State of New York related to Palm Chiropractic gave no indication to Allstate or to the general public that Rose in any way maintained a controlling interest in Palm Chiropractic, or in any way participated in the operation, management, and control of Palm Chiropractic.

1072. Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of Palm Chiropractic, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of the Rose's control over Gorelik and Palm Chiropractic.

1073. Rose's purposeful concealment of his controlling interest in Palm Chiropractic allowed Rose to unlawfully control Palm Chiropractic undetected.

1074. At all relevant times during the operation of the Palm Chiropractic enterprise, to induce Allstate to pay promptly charges for healthcare services purportedly provided to patients who received treatment through Palm Chiropractic, Gorelik and Rose caused Palm Chiropractic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1075. At all relevant times, Gorelik, as a duly licensed chiropractor, was legally and ethically obligated to act honestly and with integrity, and also was legally and ethically obligated to act in accordance with all other aspects of his oath as a licensed medical professional.

1076. At all relevant times, Gorelik and Rose actively concealed from Allstate facts regarding Palm Chiropractic's true ownership and control to prevent Allstate from discovering that

Palm Chiropractic was unlawfully incorporated, operated, and controlled by a layperson, and therefore ineligible to seek or collect No-Fault benefit payments.

1077.   Many of these facts—particularly (a) the Management Defendants' involvement in the direction and control of the treatment and testing of Palm Chiropractic's patients, and (b) Palm Chiropractic's unlawful sharing of professional fees and profits with the Management Defendants—are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

1078.   Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

1079.   Thus, every time that Gorelik, Belotserkovskiy, and Rose (along with those individuals working under their control) caused Palm Chiropractic to submit No-Fault reimbursement demands to Allstate, Gorelik, Belotserkovskiy, and Rose (and those individuals working under their control) necessarily certified that Palm Chiropractic was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1080.   The full extent of Gorelik, Belotserkovskiy, and Rose's fraudulent and unlawful acts relative to their control over the Palm Chiropractic enterprise—including (a) the Management Defendants' participation in the operation and control of Palm Chiropractic, and (b) the unlawful channeling of Palm Chiropractic's professional fees and profits to the Management Defendants—was not, and could not have been, known to Allstate until shortly before it filed this Complaint.

## ii. Fraudulent Concealment of Palm Chiropractic's Submission of False and Fraudulent Claims for No-Fault Reimbursement

1081.   At all relevant times during the operation of the Palm Chiropractic enterprise, Gorelik, Belotserkovskiy, and Rose purposely caused Palm Chiropractic to certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary chiropractic treatment and services purportedly provided to Allstate Claimants.

1082.   Gorelik, Belotserkovskiy, and Rose (along with those individuals working under their control) purposely concealed the lack of medical necessity for the chiropractic treatments and diagnostic services purportedly provided and charged for by Palm Chiropractic.

1083.   Gorelik, Belotserkovskiy, and Rose (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the chiropractic treatments and diagnostic services purportedly provided by Palm Chiropractic to Allstate Claimants.

1084.   Because Gorelik, Belotserkovskiy, and Rose were responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate Claimants through Palm Chiropractic, (b) creating, altering, and/or fabricating treatment records submitted to Allstate in support of services purportedly rendered to Allstate Claimants, (c) billing Allstate for excessive and medically unnecessary chiropractic treatments, tests, and services purportedly rendered to Allstate Claimants through Palm Chiropractic, (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault Laws, and (e) billing Allstate for treatments, tests, and services that were, in certain instances, never actually provided, Palm

Chiropractic was caused to falsely claim eligibility each and every time that Palm Chiropractic sought No-Fault reimbursement from Allstate.

1085.   As alleged above, Gorelik, Belotserkovskiy, and Rose (or those persons working under their control) caused Palm Chiropractic to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) completely unnecessary, (c) excessive, and/or (d) not provided as reported.

1086.   Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault Laws.

1087.   Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

1088.   Claims under New York's No-Fault Laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York State licensing requirements.

1089.   Thus, every time that Gorelik, Belotserkovskiy, and Rose (along with those individuals working under their control) caused Palm Chiropractic to submit No-Fault reimbursement demands to Allstate, Gorelik, Belotserkovskiy, and Rose (and those individuals working under their control) necessarily certified that Palm Chiropractic was, in all respects, eligible to be reimbursed under New York's No-Fault Laws.

1090. The full extent of Gorelik, Belotserkovskiy, and Rose's fraudulent and unlawful acts relative to the Palm Chiropractic enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

**VIII.  ALLSTATE'S JUSTIFIABLE RELIANCE**

1091. Each claim submitted to Allstate by (or on behalf of) Bay Medical, Ariel Chiropractic, Belam Acupuncture, C&M Chiropractic, Cyrus Chiropractic, Ambel Acupuncture, Mansour PT, Clarke PC, and/or Palm Acupuncture was verified pursuant to Insurance Law § 403.

1092. At all relevant times, Hanna, Gorelik, Belotserkovskiy, Colarusso, Minick, Mansour, and Clarke, as licensed healthcare providers, were legally and ethically obligated to act with honesty and integrity in connection with their provision of, and billing for, healthcare services.

1093. To induce Allstate to promptly pay Bay Medical's, Ariel Chiropractic's, Belam Acupuncture's, C&M Chiropractic's, Cyrus Chiropractic's, Ambel Acupuncture's, Mansour PT's, Clarke PC's, and Palm Chiropractic's invoices, the defendants submitted (or caused to be submitted) to Allstate NF-3 forms or CMS-1500 forms certifying that Bay Medical, Ariel Chiropractic, Belam Acupuncture, C&M Chiropractic, Cyrus Chiropractic, Ambel Acupuncture, Mansour PT, Clarke PC, and Palm Chiropractic were eligible to be reimbursed under New York's No-Fault Laws.

1094. Further, to induce Allstate to promptly pay the non-compensable charges for the professional healthcare services purportedly provided to patients of Bay Medical, Ariel Chiropractic, Belam Acupuncture, C&M Chiropractic, Cyrus Chiropractic, Ambel Acupuncture, Mansour PT, Clarke PC, and Palm Chiropractic, the defendants hired attorneys and law firms to pursue collection of the fraudulent and/or otherwise non-compensable charges from Allstate.

These attorneys and law firms routinely file time-consuming and expensive lawsuits and arbitration matters against Allstate in the event that Bay Medical, Ariel Chiropractic, Belam Acupuncture, C&M Chiropractic, Cyrus Chiropractic, Ambel Acupuncture, Mansour PT, Clarke PC, and Palm Chiropractic's invoices are not promptly paid in full.

1095.  Allstate is under a statutory and contractual obligation to promptly and fairly process claims within thirty (30) days.  The facially valid documents submitted to Allstate in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to, and did, cause Allstate to justifiably rely on them.

1096.  At all relevant times, as alleged above, the defendants concealed from Allstate the truth regarding Bay Medical, Ariel Chiropractic, Belam Acupuncture, C&M Chiropractic, Cyrus Chiropractic, Ambel Acupuncture, Mansour PT, Clarke PC, and Palm Chiropractic's reimbursement eligibility under New York law.

1097.  Acting in reasonable reliance on these misrepresentations, Allstate paid money to Bay Medical, Ariel Chiropractic, Belam Acupuncture, C&M Chiropractic, Cyrus Chiropractic, Ambel Acupuncture, Mansour PT, Clarke PC, and Palm Chiropractic to its detriment.

1098.  Allstate would not have made any of these payments to these entities had the defendants provided true and accurate information about Bay Medical, Ariel Chiropractic, Belam Acupuncture, C&M Chiropractic, Cyrus Chiropractic, Ambel Acupuncture, Mansour PT, Clarke PC, and Palm Chiropractic's reimbursement eligibility under New York law, including the operation of these entities and the fact and necessity of the services provided.

1099.  As a result of the defendants' conduct, Allstate has been forced to make substantial payments in reasonable reliance on the defendants' false healthcare documentation and false

representations regarding the defendants' eligibility for reimbursement under New York's No-Fault Laws.

1100. Because the defendants actively concealed their fraudulent conduct from Allstate, Allstate did not discover, and could not have reasonably discovered, that it had been damaged by the defendants' fraudulent conduct until shortly before it filed this Complaint.

## IX.  DAMAGES

1101. The defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law.

1102. Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for payments wrongfully made by Allstate to Bay Medical, Ariel Chiropractic, Belam Acupuncture, Cyrus Chiropractic, Ambel Acupuncture, Clarke PC, and Palm Chiropractic in connection with claims made under New York's No-Fault Laws, the exact amount to be determined at trial, including:

(a) Payments made to Bay Medical, P.C. totaling at least $709,146.81, the exact amount to be determined at trial. The chart at Exhibit 22 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Bay Medical, P.C., in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(b) Payments made to Ariel Chiropractic, P.C. totaling at least $465,072.61, the exact amount to be determined at trial. The chart at Exhibit 23 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Ariel Chiropractic, P.C. in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(c) Payments made to Belam Acupuncture, P.C. totaling at least $398,115.37, the exact amount to be determined at trial. The chart at Exhibit 24 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Belam Acupuncture, P.C. in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(d) Payments made to Cyrus Chiropractic, P.C. totaling at least $15,349.40, the exact amount to be determined at trial. The chart at Exhibit 25 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Cyrus Chiropractic, P.C. in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(e) Payments made to Ambel Acupuncture, P.C. totaling at least $87,415.00, the exact amount to be determined at trial. The chart at Exhibit 26 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Ambel Acupuncture, P.C. in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(f) Payments made to Basem Mansour, P.T., P.C. totaling at least $203,613.36, the exact amount to be determined at trial. The chart at Exhibit 27 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Basem Mansour, P.T., P.C. in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(g) Payments made to Colin Clarke, M.D., P.C. totaling at least $295,116.94, the exact amount to be determined at trial. The chart at Exhibit 28 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Colin Clarke, M.D., P.C. in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(h) Payments made to Palm Chiropractic, P.C. totaling at least $118,616.29, the exact amount to be determined at trial. The chart at Exhibit 29 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Palm Chiropractic, P.C. in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

## X.    CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### BAY MEDICAL, P.C. ENTERPRISE
**(Against Belam Acupuncture, P.C., Ariel Chiropractic, P.C., Cyrus Chiropractic, P.C., C& M Chiropractic, P.C., Ramy Hanna, M.D., Michael Gorelik, D.C., Michael S. Minick, D.C., David Colarussso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1103.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1104.    Bay Medical, P.C. ("Bay Medical") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1105. In connection with the operation and management of the Bay Medical enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Belam Acupuncture, P.C., Ariel Chiropractic, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Ramy Hanna, M.D., Michael Gorelik, D.C., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, "Count I Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Bay Medical's business, or should have reasonably foreseen that the mailing of such false medical documentation by Bay Medical would occur, in furtherance of their scheme to defraud.

1106. The Count I Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart as Exhibit 14.

1107. Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1108. Policies of insurance were also delivered to insureds through the U.S. Mail.

1109. Payments made by Allstate to Bay Medical traveled through the U.S. Mail.

1110. As documented above, the Count I Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Bay Medical—payments that the Count I Defendants intended to be funded using the No-Fault insurance benefits

that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

1111.   As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Bay Medical for the benefit of the Count I Defendants that would not otherwise have been made.

1112.   The Count I Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count I Defendants to continue this unlawful scheme without being detected.

1113.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1114.   By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1115.   The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Bay Medical for the benefit of the Count I Defendants.

1116.   The Count I Defendants participated in the conduct of the Bay Medical enterprise through a pattern of racketeering activities.

1117.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I Defendants' conduct.

1118.   The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1119.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1120.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1121.   By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by him, and others acting in concert with him, together with the costs of suit, including reasonable attorney's fees.

### COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### BAY MEDICAL, P.C. ENTERPRISE
**(Against Belam Acupuncture, P.C., Ariel Chiropractic, P.C., Cyrus Chiropractic, P.C., C& M Chiropractic, P.C., Ramy Hanna, M.D., Michael Gorelik, D.C., Michael S. Minick, D.C., David Colarussso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1122.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1123.   Defendants Belam Acupuncture, P.C., Ariel Chiropractic, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Ramy Hanna, M.D., Michael Gorelik, D.C., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, the "Count II Defendants") willfully conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Bay Medical, P.C. ("Bay Medical").

1124.   The Count II Defendants agreed to further, facilitate, support, and operate the Bay Medical enterprise.

1125.   As such, the Count II Defendants conspired to violate 18 U.S.C. § 1962(c).

1126.   The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Bay Medical even

though Bay Medical was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count II Defendants.

1127. The Count II Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Bay Medical, the provision of false, fraudulent, and unnecessary healthcare services to Bay Medical patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3s), bills, invoices, and other claim-related documents that materially misrepresented Bay Medical's No-Fault reimbursement eligibility.

1128. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Bay Medical as a result of the Count II Defendants' unlawful conduct described herein.

1129. By virtue of the Count II Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### ARIEL CHIROPRACTIC, P.C. ENTERPRISE
**(Against Bay Medical, P.C., Belam Acupuncture, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Michael Gorelik, D.C., Ramy Hanna, M.D., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1130. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1131. Ariel Chiropractic, P.C. ("Ariel Chiropractic") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1132. In connection with the operation and management of the Ariel Chiropractic enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Bay Medical, P.C., Belam Acupuncture, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Michael Gorelik, D.C., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, the "Count III Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Ariel Chiropractic's business, or should have reasonably foreseen that the mailing of such false medical documentation by Ariel Chiropractic would occur, in furtherance of their scheme to defraud.

1133. The Count III Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart as Exhibit 15.

1134. Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1135. Policies of insurance were also delivered to insureds through the U.S. Mail.

1136. Payments made by Allstate to Ariel Chiropractic traveled through the U.S. Mail.

1137. As documented above, the Count III Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Ariel Chiropractic—payments that the Count III Defendants intended to be funded using the No-Fault

insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

1138.   As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Ariel Chiropractic for the benefit of the Count III Defendants that would not otherwise have been made.

1139.   The Count III Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count III Defendants to continue this unlawful scheme without being detected.

1140.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1141.   By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1142.   The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Ariel Chiropractic for the benefit of the Count III Defendants.

1143.   The Count III Defendants participated in the conduct of the Ariel Chiropractic enterprise through a pattern of racketeering activities.

1144.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III Defendants' conduct.

1145.   The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1146.  Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1147.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1148.  By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from him three times the damages sustained by reason of the claims submitted by him, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### ARIEL CHIROPRACTIC, P.C. ENTERPRISE
**(Against Bay Medical, P.C., Belam Acupuncture, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Michael Gorelik, D.C., Ramy Hanna, M.D., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1149.  Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1150.  Defendants Bay Medical, P.C., Belam Acupuncture, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Michael Gorelik, D.C., Ramy Hanna, M.D., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, and Anthony Rose, Sr. (collectively, the "Count IV Defendants") willfully conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Ariel Chiropractic, P.C. ("Ariel Chiropractic").

1151.  The Count IV Defendants agreed to further, facilitate, support, and operate the Ariel Chiropractic enterprise.

1152.  As such, the Count IV Defendants conspired to violate 18 U.S.C. § 1962(c).

1153.  The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Ariel Chiropractic

even though Ariel Chiropractic was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count IV Defendants.

1154. The Count IV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Ariel Chiropractic, the provision of false, fraudulent, and unnecessary healthcare services to Ariel Chiropractic patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3s), bills, invoices, and other claim-related documents that materially misrepresented Ariel Chiropractic's No-Fault reimbursement eligibility.

1155. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Ariel Chiropractic as a result of the Count IV Defendants' unlawful conduct described herein.

1156. By virtue of the Count IV Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

**COUNT V**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**BELAM ACUPUNCTURE, P.C. ENTERPRISE**
**(Against Bay Medical, P.C., Ariel Chiropractic, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Ramy Hanna, M.D., Michael Gorelik, D.C., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1157. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1158. Belam Acupuncture, P.C. ("Belam Acupuncture") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1159.   In connection with the operation and management of the Belam Acupuncture enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Bay Medical, P.C., Ariel Chiropractic, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Ramy Hanna, M.D., Michael Gorelik, D.C., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, the "Count V Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Belam Acupuncture's business, or should have reasonably foreseen that the mailing of such false medical documentation by Belam Acupuncture would occur, in furtherance of their scheme to defraud.

1160.   The Count V Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart as Exhibit 16.

1161.   Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1162.   Policies of insurance were also delivered to insureds through the U.S. Mail.

1163.   Payments made by Allstate to Belam Acupuncture traveled through the U.S. Mail.

1164.   As documented above, the Count V Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Belam Acupuncture—payments that the Count V Defendants intended to be funded using the No-Fault

insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

1165. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Belam Acupuncture for the benefit of the Count V Defendants that would not otherwise have been made.

1166. The Count V Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count V Defendants to continue this unlawful scheme without being detected.

1167. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1168. By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count V Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1169. The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Belam Acupuncture for the benefit of the Count V Defendants.

1170. The Count V Defendants participated in the conduct of the Belam Acupuncture enterprise through a pattern of racketeering activities.

1171. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V Defendants' conduct.

1172. The Count V Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1173.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1174.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1175.   By virtue of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by him, and others acting in concert with him, together with the costs of suit, including reasonable attorney's fees.

## COUNT VI
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### BELAM ACUPUNCTURE, P.C ENTERPRISE
**(Against Bay Medical, P.C., Ariel Chiropractic, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Ramy Hanna, M.D., Michael Gorelik, D.C., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1176.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1177.   Defendants Bay Medical, P.C., Belam Acupuncture, P.C., Ariel Chiropractic, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Ramy Hanna, M.D., Michael Gorelik, D.C., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, the "Count VI Defendants") willfully conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Belam Acupuncture, P.C. ("Belam Acupuncture").

1178.   The Count VI Defendants agreed to further, facilitate, support, and operate the Belam Acupuncture enterprise.

1179.   As such, the Count VI Defendants conspired to violate 18 U.S.C. § 1962(c).

1180. The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Belam Acupuncture even though Belam Acupuncture was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count VI Defendants.

1181. The Count VI Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Belam Acupuncture, the provision of false, fraudulent, and unnecessary healthcare services to Belam Acupuncture patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3s), bills, invoices, and other claim-related documents that materially misrepresented Belam Acupuncture's No-Fault reimbursement eligibility.

1182. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Belam Acupuncture as a result of the Count VI Defendants' unlawful conduct described herein.

1183. By virtue of the Count VI Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

### COUNT VII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### CYRUS CHIROPRACTIC, P.C. ENTERPRISE
### (Against Bay Medical, P.C., Belam Acupuncture, P.C., Ariel Chiropractic, P.C., C&M Chiropractic, P.C., Michael Gorelik, D.C., Ramy Hanna, M.D., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)

1184. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1185. Cyrus Chiropractic, P.C. ("Cyrus Chiropractic") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1186. In connection with the operation and management of the Cyrus Chiropractic enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Bay Medial, P.C., Belam Acupuncture, P.C., Ariel Chiropractic, P.C., C&M Chiropractic, P.C., Michael Gorelik, D.C., Ramy Hanna, M.D., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, "Count VII Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Cyrus Chiropractic's business, or should have reasonably foreseen that the mailing of such false medical documentation by Cyrus Chiropractic would occur, in furtherance of their scheme to defraud.

1187. The Count VII Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart as Exhibit 17.

1188. Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1189. Policies of insurance were also delivered to insureds through the U.S. Mail.

1190. Payments made by Allstate to Cyrus Chiropractic traveled through the U.S. Mail.

1191. As documented above, the Count VII Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Cyrus

Chiropractic—payments that the Count VII Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

1192.   As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Cyrus Chiropractic for the benefit of the Count VII Defendants that would not otherwise have been made.

1193.   The Count VII Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count VII Defendants to continue this unlawful scheme without being detected.

1194.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1195.   By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count VII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1196.   The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Cyrus Chiropractic for the benefit of the Count VII Defendants.

1197.   The Count VII Defendants participated in the conduct of the Cyrus Chiropractic enterprise through a pattern of racketeering activities.

1198.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII Defendants' conduct.

1199. The Count VII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1200. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1201. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1202. By virtue of the Count VII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from each of the Count VII Defendants' three times the damages sustained by reason of the claims submitted by the Count VII Defendants, and others acting in concert with him, together with the costs of suit, including reasonable attorney's fees.

**COUNT VIII**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**CYRUS CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Bay Medical, P.C., Belam Acupuncture, P.C., Ariel Chiropractic, P.C., C&M Chiropractic, P.C., Michael Gorelik, D.C., Ramy Hanna, M.D., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1203. Allstate re-alleges, re-pleads, and incorporates by reference all the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1204. Defendants Bay Medical, P.C., Belam Acupuncture, P.C., Ariel Chiropractic, P.C., C&M Chiropractic, P.C., Michael Gorelik, D.C., Ramy Hanna, M.D., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, "Count VIII Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Cyrus Chiropractic, P.C. ("Cyrus Chiropractic").

1205. The Count VIII Defendants agreed to further, facilitate, support, and operate the Cyrus Chiropractic enterprise.

1206. As such, the Count VIII Defendants conspired to violate 18 U.S.C. § 1962(c).

1207.   The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Cyrus Chiropractic even though Cyrus Chiropractic was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count VIII Defendants.

1208.   The Count VIII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Cyrus Chiropractic, the provision of false, fraudulent, and unnecessary healthcare services to Cyrus Chiropractic patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3s), bills, invoices, and other claim-related documents that materially misrepresented Cyrus Chiropractic's No-Fault reimbursement eligibility.

1209.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Cyrus Chiropractic as a result of the Count VIII Defendants' unlawful conduct described herein.

1210.   By virtue of the Count VIII Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

### COUNT IX
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### AMBEL ACUPUNCTURE, P.C. ENTERPRISE
**(Against Colin Clarke M.D. P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Mansour, P.T. P.C., Colin Clarke, M.D., Michael Gorelik, D.C., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac. and Anthony Rose, Sr.)**

1211.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1212. Ambel Acupuncture, P.C. ("Ambel Acupuncture") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1213. In connection with the operation and management of the Ambel Acupuncture enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Colin Clarke M.D. P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Mansour P.T. P.C., Colin Clarke, M.D., Michael Gorelik, D.C., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac, and Anthony Rose, Sr. (collectively, "Count IX Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Ambel Acupuncture's business, or should have reasonably foreseen that the mailing of such false medical documentation by Ambel Acupuncture would occur, in furtherance of their scheme to defraud.

1214. The Count IX Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart as Exhibit 18.

1215. Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1216. Policies of insurance were also delivered to insureds through the U.S. Mail.

1217. Payments made by Allstate to Ambel Acupuncture traveled through the U.S. Mail.

1218. As documented above, the Count IX Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Ambel

Acupuncture—payments that the Count IX Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

1219.   As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Ambel Acupuncture for the benefit of the Count IX Defendants that would not otherwise have been made.

1220.   The Count IX Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count IX Defendants to continue their unlawful scheme without being detected.

1221.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1222.   By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count IX Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1223.   The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Ambel Acupuncture for the benefit of the Count IX Defendants.

1224.   The Count IX Defendants participated in the conduct of the Ambel Acupuncture enterprise through a pattern of racketeering activities.

1225.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IX Defendants' conduct.

1226. The Count IX Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1227. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1228. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1229. By virtue of the Count IX Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT X
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### AMBEL ACUPUNCTURE, P.C. ENTERPRISE
**(Against Colin Clarke M.D. P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Mansour P.T. P.C., Colin Clarke, M.D., Michael Gorelik, D.C., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac. and Anthony Rose, Sr.)**

1230. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1231. Defendants Colin Clarke M.D. P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Mansour P.T. P.C., Colin Clark, MD., Michael Gorelik, D.C., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy and Anthony Rose, Sr. (collectively, "Count X Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Ambel Acupuncture, P.C. ("Ambel Acupuncture").

1232. The Count X Defendants each agreed to further, facilitate, support, and operate the Ambel Acupuncture enterprise.

1233. As such, the Count X Defendants conspired to violate 18 U.S.C. § 1962(c).

1234. The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Ambel Acupuncture even though Ambel Acupuncture was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count X Defendants.

1235. The Count X Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Ambel Acupuncture, the provision of false, fraudulent, and unnecessary healthcare services to Ariel Chiropractic patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3s), bills, invoices, and other claim-related documents that materially misrepresented Ariel Chiropractic's No-Fault reimbursement eligibility.

1236. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Ambel Acupuncture as a result of the Count X Defendants' unlawful conduct described herein.

1237. By virtue of the Count X Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

## COUNT XI
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### BASEM MANSOUR, P.T., P.C. ENTERPRISE
**(Against Colin Clarke M.D. P.C., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Salah El-Din Mansour, P.T., Colin Clarke, M.D., Michael Gorelik, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1238. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1239. Basem Mansour, P.T., P.C. ("Mansour PT") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1240. In connection with the operation and management of the Mansour PT enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Colin Clarke M.D. P.C., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Salah El-Din Mansour, P.T., Colin Clarke, M.D., Michael Gorelik, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, "Count XI Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Mansour PT's business, or should have reasonably foreseen that the mailing of such false medical documentation by Mansour PT would occur, in furtherance of their scheme to defraud.

1241. The Count XI Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart as Exhibit 19.

1242. Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1243. Policies of insurance were also delivered to insureds through the U.S. Mail.

1244. Payments made by Allstate to Mansour PT traveled through the U.S. Mail.

1245. As documented above, the Count XI Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Mansour PT— payments that the Count XI Defendants intended to be funded using the No-Fault insurance

benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

1246. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Mansour PT for the benefit of the Count XI Defendants that would not otherwise have been made.

1247. The Count XI Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XI Defendants to continue their unlawful scheme without being detected.

1248. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1249. By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XI Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1250. The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Mansour PT for the benefit of the Count XI Defendants.

1251. The Count XI Defendants participated in the conduct of the Mansour PT enterprise through a pattern of racketeering activities.

1252. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XI Defendants' conduct.

1253. The Count XI Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1254.  Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1255.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1256.  By virtue of the Count XI Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### BASEM MANSOUR, P.T., P.C. ENTERPRISE
**(Against Colin Clarke M.D. P.C., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Salah El-Din Mansour, P.T., Colin Clarke, M.D., Michael Gorelik, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1257.  Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1258.  Defendants Colin Clarke M.D. P.C., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Salah El-Din Mansour, P.T., Colin Clarke, M.D., Michael Gorelik, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, "Count XII Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Basem Mansour, P.T., P.C. ("Mansour PT").

1259.  The Count XII Defendants each agreed to further, facilitate, support, and operate the Mansour PT enterprise.

1260.  As such, the Count XII Defendants conspired to violate 18 U.S.C. § 1962(c).

1261.  The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Mansour PT even

though Mansour PT was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count XII Defendants.

1262.   The Count XII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Mansour PT, the provision of false, fraudulent, and unnecessary healthcare services to Mansour PT's patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3s), bills, invoices, and other claim-related documents that materially misrepresented Mansour PT's No-Fault reimbursement eligibility.

1263.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Mansour PT as a result of the Count XII Defendants' unlawful conduct described herein.

1264.   By virtue of the Count XII Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

## COUNT XIII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### COLIN CLARKE, M.D., P.C. ENTERPRISE
**(Against Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Mansour P.T. P.C., Colin Clarke, M.D., Michael Gorelik, D.C., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1265.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1266.   Colin Clarke, M.D., P.C. ("Clarke PC") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1267. In connection with the operation and management of the Clarke PC enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Ambel Acupuncture, PC., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Mansour P.T. P.C., Colin Clarke, M.D., Michael Gorelik, D.C., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, "Count XIII Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Clarke PC's business, or should have reasonably foreseen that the mailing of such false medical documentation by Clarke PC would occur, in furtherance of their scheme to defraud.

1268. The Count XIII Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart as Exhibit 20.

1269. Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1270. Policies of insurance were also delivered to insureds through the U.S. Mail.

1271. Payments made by Allstate to Clarke PC traveled through the U.S. Mail.

1272. As documented above, the Count XIII Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Clarke PC— payments that the Count XIII Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

1273.   As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Clarke PC for the benefit of the Count XIII Defendants that would not otherwise have been made.

1274.   The Count XIII Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XIII Defendants to continue their unlawful scheme without being detected.

1275.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1276.   By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XIII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1277.   The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Clarke PC for the benefit of the Count XIII Defendants.

1278.   The Count XIII Defendants participated in the conduct of the Clarke PC enterprise through a pattern of racketeering activities.

1279.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XIII Defendants' conduct.

1280.   The Count XIII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1281.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1282.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1283.   By virtue of the Count XIII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XIV**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**COLIN CLARKE, M.D., P.C. ENTERPRISE**
**(Against Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Mansour P.T. P.C., Colin Clarke, M.D., Michael Gorelik, D.C., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1284.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1285.   Defendants Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Mansour P.T. P.C., Colin Clarke, M.D., Michael Gorelik, D.C., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, "Count XIV Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Colin Clarke, M.D., P.C. ("Clarke PC").

1286.   The Count XIV Defendants each agreed to further, facilitate, support, and operate the Clarke PC enterprise.

1287.   As such, the Count XIV Defendants conspired to violate 18 U.S.C. § 1962(c).

1288.   The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Clarke PC even though Clarke PC was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count XIV Defendants.

1289. The Count XIV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Clarke PC, the provision of false, fraudulent, and unnecessary healthcare services to Clarke PC patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3s), bills, invoices, and other claim-related documents that materially misrepresented Clarke PC's No-Fault reimbursement eligibility.

1290. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Clarke PC as a result of the Count XIV Defendants' unlawful conduct described herein.

1291. By virtue of the Count XIV Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

## COUNT XV
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## PALM CHIROPRACTIC, P.C. ENTERPRISE
**(Against Colin Clarke M.D. P.C., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Basem Mansour P.T. P.C., Michael Gorelik, D.C., Colin Clarke, M.D., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac. and Anthony Rose, Sr.)**

1292. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1293. Palm Chiropractic, P.C. ("Palm Chiropractic") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1294. In connection with the operation and management of the Palm Chiropractic enterprise and with each of the claims identified in the plaintiffs' Complaint, Defendants Colin Clarke M.D. P.C., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Basem Mansour P.T. P.C.,

Michael Gorelik, D.C., Colin Clarke, M.D., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, "Count XV Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Palm Chiropractic's business, or should have reasonably foreseen that the mailing of such false medical documentation by Palm Chiropractic would occur, in furtherance of their scheme to defraud.

1295. The Count XV Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart as Exhibit 21.

1296. Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1297. Policies of insurance were also delivered to insureds through the U.S. Mail.

1298. Payments made by Allstate to Palm Chiropractic traveled through the U.S. Mail.

1299. As documented above, the Count XV Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Palm Chiropractic—payments that the Count XV Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

1300.   As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Palm Chiropractic for the benefit of the Count XV Defendants that would not otherwise have been made.

1301.   The Count XV Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XV Defendants to continue their unlawful scheme without being detected.

1302.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1303.   By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XV Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1304.   The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Palm Chiropractic for the benefit of the Count XV Defendants.

1305.   The Count XV Defendants participated in the conduct of the Palm Chiropractic enterprise through a pattern of racketeering activities.

1306.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XV Defendants' conduct.

1307.   The Count XV Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1308.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1309.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1310.  By virtue of the Count XV Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XVI**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**PALM CHIROPRACTIC, P.C. ENTERPRISE**
**(Against Colin Clarke M.D. P.C., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Basem Mansour P.T. P.C., Michael Gorelik, D.C., Colin Clarke, M.D., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac. and Anthony Rose, Sr.)**

1311.  Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1312.  Defendants Colin Clarke M.D. P.C., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Basem Mansour P.T. P.C., Michael Gorelik, D.C., Colin Clarke, M.D., Basem Salah El-Din Mansour, P.T., Alexsandr Belotserkovskiy, L.Ac. and Anthony Rose, Sr. (collectively, "Count XVI Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Palm Chiropractic, P.C. ("Palm Chiropractic").

1313.  The Count XVI Defendants each agreed to further, facilitate, support, and operate the Palm Chiropractic enterprise.

1314.  As such, the Count XVI Defendants conspired to violate 18 U.S.C. § 1962(c).

1315.  The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Palm Chiropractic even though Palm Chiropractic was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count XVI Defendants.

1316.   The Count XVI Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Palm Chiropractic, the provision of false, fraudulent, and unnecessary healthcare services to Palm Chiropractic patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3s), bills, invoices, and other claim-related documents that materially misrepresented Palm Chiropractic's No-Fault reimbursement eligibility.

1317.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Palm Chiropractic as a result of the Count XVI Defendants' unlawful conduct described herein.

1318.   By virtue of the Count XVI Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

## COUNT XVII
## COMMON LAW FRAUD
**(Against Bay Medical, P.C., Ramy Hanna, M.D., Belam Acupuncture, P.C., Ariel Chiropractic, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Michael Gorelik, D.C., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1319.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1320.   Defendants Bay Medial, P.C. ("Bay Medical"), Ramy Hanna, M.D., Belam Acupuncture, P.C., Ariel Chiropractic, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Micael Gorelik, D.C., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr

Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, "Count XVII Defendants") conspired to defraud Allstate through their unlawful management and control of Bay Medical.

1321. The Count XVII Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Bay Medical was entitled to receive No-Fault reimbursement under New York law.

1322. The misrepresentations of fact by the Count XVII Defendants included, but were not limited to, the material misrepresentations of fact made in Bay Medical's NF-3 claim forms, reports, invoices, and other claim-related documentation concerning the legitimacy of the healthcare services purportedly provided to patients and the actual ownership and control of Bay Medical.

1323. The Count XVII Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

1324. The misrepresentations were intentionally made by the Count XVII Defendants in furtherance of their scheme to defraud Allstate by submitting claims from Bay Medical—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

1325. The Count XVII Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1326. Allstate reasonably relied, to its detriment, upon the Count XVII Defendants' material misrepresentations concerning Bay Medical's eligibility to receive No-Fault reimbursement when making payments for healthcare service purportedly provided to patients through Bay Medical.

1327. Allstate's damages include, but are not necessarily limited to, all No-Fault benefit payments made by Allstate to Bay Medical—in excess of $709,146.81—for healthcare services purportedly provided to patients through Bay Medical, even though Bay Medical was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

<u>**COUNT XVIII**</u>
**COMMON LAW FRAUD**
**(Against Ariel Chiropractic, P.C., Michael Gorelik, D.C., Bay Medical, P.C., Belam Acupuncture, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Ramy Hanna, M.D., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1328. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1329. Defendants Ariel Chiropractic, P.C. ("Ariel Chiropractic"), Michael Gorelik, D.C., Bay Medical, P.C., Belam Acupuncture, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Ramy Hanna, M.D., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, "Count XVIII Defendants") conspired to defraud Allstate through their unlawful management and control of Ariel Chiropractic.

1330. The Count XVIII Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Ariel Chiropractic was entitled to receive No-Fault reimbursement under New York law.

1331. The misrepresentations of fact by the Count XVIII Defendants included, but were not limited to, the material misrepresentations of fact made in Ariel Chiropractic's NF-3 claim forms, reports, invoices, and other claim-related documentation concerning the legitimacy of the healthcare services purportedly provided to patients and the actual ownership and control of Ariel Chiropractic.

1332.   The Count XVIII Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

1333.   The misrepresentations were intentionally made by the Count XVIII Defendants in furtherance of their scheme to defraud Allstate by submitting claims from Ariel Chiropractic—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

1334.   The Count XVIII Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1335.   Allstate reasonably relied, to its detriment, upon the Count XVIII Defendants' material misrepresentations concerning Ariel Chiropractic's eligibility to receive No-Fault reimbursement when making payments for healthcare service purportedly provided to patients through Ariel Chiropractic.

1336.   Allstate's damages include, but are not necessarily limited to, all No-Fault benefit payments made by Allstate to Ariel Chiropractic—in excess of $465,072.61—for healthcare services purportedly provided to patients through Ariel Chiropractic, even though Ariel Chiropractic was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

<u>**COUNT XIX**</u>
**COMMON LAW FRAUD**
**(Against Belam Acupuncture, P.C., Bay Medical, P.C., Ariel Chiropractic, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Ramy Hanna, M.D., Michael Gorelik, D.C., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1337.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1338. Defendants Belam Acupuncture, P.C. ("Belam Acupuncture"), Bay Medical, P.C., Ariel Chiropractic, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Ramy Hanna M.D., Michael Gorelik, D.C., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, "Count XIX Defendants") conspired to defraud Allstate through their unlawful management and control of Belam Acupuncture.

1339. The Count XIX Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Belam Acupuncture was entitled to receive No-Fault reimbursement under New York law.

1340. The misrepresentations of fact by the Count XIX Defendants included, but were not limited to, the material misrepresentations of fact made in Belam Acupuncture's NF-3 claim forms, reports, invoices, and other claim-related documentation concerning the legitimacy of the healthcare services purportedly provided to patients and the actual ownership and control of Belam Acupuncture.

1341. The Count XIX Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

1342. The misrepresentations were intentionally made by the Count XIX Defendants in furtherance of their scheme to defraud Allstate by submitting claims from Belam Acupuncture— an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

1343. The Count XIX Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1344. Allstate reasonably relied, to its detriment, upon the Count XIX Defendants' material misrepresentations concerning Belam Acupuncture's eligibility to receive No-Fault

reimbursement when making payments for healthcare service purportedly provided to patients through Belam Acupuncture.

1345.   Allstate's damages include, but are not necessarily limited to, all No-Fault benefit payments made by Allstate to Belam Acupuncture—in excess of $398,115.37—for healthcare services purportedly provided to patients through Belam Acupuncture, even though Belam Acupuncture was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT XX**
**COMMON LAW FRAUD**
**(Against Cyrus Chiropractic, P.C., Michael Gorelik, D.C., Bay Medical, P.C., Belam Acupuncture, P.C., Ariel Chiropractic, P.C., C&M Chiropractic, P.C., Ramy Hanna, M.D., Michael S. Minick, D.C., David Colarusso, D.C. Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1346.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1347.   Defendants Cyrus Chiropractic, P.C. ("Cyrus Chiropractic"), Michael Gorelik, D.C., Bay Medical, P.C., Belam Acupuncture, P.C., Ariel Chiropractic, P.C., C&M Chiropractic, P.C., Ramy Hanna, M.D., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, "Count XX Defendants") conspired to defraud Allstate through their unlawful management and control of Cyrus Chiropractic.

1348.   The Count XX Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Cyrus Chiropractic was entitled to receive No-Fault reimbursement under New York law.

1349.   The misrepresentations of fact by the Count XX Defendants included, but were not limited to, the material misrepresentations of fact made in Cyrus Chiropractic's NF-3 claim forms, reports, invoices, and other claim-related documentation concerning the legitimacy of the

healthcare services purportedly provided to patients and the actual ownership and control of Cyrus Chiropractic.

1350. The Count XX Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

1351. The misrepresentations were intentionally made by the Count XX Defendants in furtherance of their scheme to defraud Allstate by submitting claims from Cyrus Chiropractic—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

1352. The Count XX Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1353. Allstate reasonably relied, to its detriment, upon the Count XX Defendants' material misrepresentations concerning Cyrus Chiropractic's eligibility to receive No-Fault reimbursement when making payments for healthcare service purportedly provided to patients through Cyrus Chiropractic.

1354. Allstate's damages include, but are not necessarily limited to, all No-Fault benefit payments made by Allstate to Cyrus Chiropractic—in excess of $15,349.40—for healthcare services purportedly provided to patients through Cyrus Chiropractic, even though Cyrus Chiropractic was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT XXI
## COMMON LAW FRAUD
**(Against Ambel Acupuncture, P.C., Colin Clarke M.D. P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Mansour P.T. P.C., Colin Clarke, M.D., Michael Gorelik, D.C., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1355.  Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1356.  Defendants Ambel Acupuncture, P.C. ("Ambel Acupuncture"), Colin Clarke M.D. P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Mansour P.T. P.C., Colin Clarke, M.D., Michael Gorelik, D.C., Basem Salah El-Din Mansour, P.T. Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, "Count XXI Defendants") conspired to defraud Allstate through their unlawful management and control of Ambel Acupuncture.

1357.  The Count XXI Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Ambel Acupuncture was entitled to receive No-Fault reimbursement under New York law.

1358.  The misrepresentations of fact by the Count XXI Defendants included, but were not limited to, the material misrepresentations of fact made in Ambel Acupuncture's NF-3 claim forms, reports, invoices, and other claim-related documentation concerning the legitimacy of the healthcare services purportedly provided to patients and the actual ownership and control of Ambel Acupuncture.

1359.  The Count XXI Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

1360.  The misrepresentations were intentionally made by the Count XXI Defendants in furtherance of their scheme to defraud Allstate by submitting claims from Ambel Acupuncture—

an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

1361. The Count XXI representations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1362. Allstate reasonably relied, to its detriment, upon the Count XXI Defendants' material misrepresentations concerning Ambel Acupuncture's eligibility to receive No-Fault reimbursement when making payments for healthcare service purportedly provided to patients through Ambel Acupuncture.

1363. Allstate's damages include, but are not necessarily limited to, all No-Fault benefit payments made by Allstate to Ambel Acupuncture—in excess of $87,415.00—for healthcare services purportedly provided to patients through Ambel Acupuncture, even though Ambel Acupuncture was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT XXII**
**COMMON LAW FRAUD**
**(Against Basem Mansour, P.T., P.C., Basem Salah El-Din Mansour, P.T., Colin Clarke M.D. P.C., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Colin Clarke, M.D., Michael Gorelik, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1364. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1365. Defendants Basem Mansour, P.T., P.C. ("Mansour PT"), Basem Salah El-Din Mansour, P.T., Colin Clarke M.D. P.C., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Colin Clarke, M.D., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, "Count XXII Defendants") conspired to defraud Allstate through their unlawful management and control of Mansour PT.

1366. The Count XXII Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Mansour PT was entitled to receive No-Fault reimbursement under New York law.

1367. The misrepresentations of fact by the Count XXII Defendants included, but were not limited to, the material misrepresentations of fact made in Mansour PT's NF-3 claim forms, reports, invoices, and other claim-related documentation concerning the legitimacy of the healthcare services purportedly provided to patients and the actual ownership and control of Mansour PT.

1368. The Count XXII Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

1369. The misrepresentations were intentionally made by the Count XXII Defendants in furtherance of their scheme to defraud Allstate by submitting claims from Mansour PT—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

1370. The Count XXII Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1371. Allstate reasonably relied, to its detriment, upon the Count XXII Defendants' material misrepresentations concerning Mansour PT's eligibility to receive No-Fault reimbursement when making payments for healthcare service purportedly provided to patients through Mansour PT.

1372. Allstate's damages include, but are not necessarily limited to, all No-Fault benefit payments made by Allstate to Mansour PT—in excess of $203,613.36—for healthcare services

purportedly provided to patients through Mansour PT, even though Mansour PT was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT XXIII**
**COMMON LAW FRAUD**
**(Against Colin Clarke, M.D., P.C., Colin Clarke, M.D., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Mansour P.T. P.C., Michael Gorelik, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1373.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1374.    Defendants Colin Clarke, M.D., P.C. ("Clarke PC"), Colin Clarke, M.D., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Mansour P.T. P.C., Michael Gorelik, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, "Count XXIII Defendants") conspired to defraud Allstate through their unlawful management and control of Clarke PC.

1375.    The Count XXIII Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Clarke PC was entitled to receive No-Fault reimbursement under New York law.

1376.    The misrepresentations of fact by the Count XXIII Defendants included, but were not limited to, the material misrepresentations of fact made in Clarke PC's NF-3 claim forms, reports, invoices, and other claim-related documentation concerning the legitimacy of the healthcare services purportedly provided to patients and the actual ownership and control of Clarke PC.

1377.    The Count XXIII Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

1378.    The misrepresentations were intentionally made by the Count XXIII Defendants in furtherance of their scheme to defraud Allstate by submitting claims from Clarke PC—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

1379.    The Count XXIII Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1380.    Allstate reasonably relied, to its detriment, upon the Count XXIII Defendants' material misrepresentations concerning Clarke PC's eligibility to receive No-Fault reimbursement when making payments for healthcare service purportedly provided to patients through Clarke PC.

1381.    Allstate's damages include, but are not necessarily limited to, all No-Fault benefit payments made by Allstate to Clarke PC—in excess of $295,116.94—for healthcare services purportedly provided to patients through Clarke PC, even though Clarke PC was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT XXIV
## COMMON LAW FRAUD
**(Against Palm Chiropractic, P.C., Michael Gorelik, D.C., Colin Clarke, M.D., P.C., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Basem Mansour P.T. P.C., Colin Clarke, M.D., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1382.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1383.    Defendants Palm Chiropractic, P.C. ("Palm Chiropractic"), Michael Gorelik, D.C., Colin Clarke, M.D., P.C., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Basem Mansour P.T. P.C., Colin Clarke, M.D., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, "Count XXIV Defendants") conspired to defraud Allstate through their unlawful management and control of Palm Chiropractic.

1384. The Count XXIV Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Palm Chiropractic was entitled to receive No-Fault reimbursement under New York law.

1385. The misrepresentations of fact by the Count XXIV Defendants included, but were not limited to, the material misrepresentations of fact made in Palm Chiropractic's NF-3 claim forms, reports, invoices, and other claim-related documentation concerning the legitimacy of the healthcare services purportedly provided to patients and the actual ownership and control of Palm Chiropractic.

1386. The Count XXIV Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

1387. The misrepresentations were intentionally made by the Count XXIV Defendants in furtherance of their scheme to defraud Allstate by submitting claims from Palm Chiropractic—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

1388. The Count XXIV Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1389. Allstate reasonably relied, to its detriment, upon the Count XXIV Defendants' material misrepresentations concerning Palm Chiropractic's eligibility to receive No-Fault reimbursement when making payments for healthcare service purportedly provided to patients through Palm Chiropractic.

1390. Allstate's damages include, but are not necessarily limited to, all No-Fault benefit payments made by Allstate to Palm Chiropractic—in excess of $118,616.29—for healthcare services purportedly provided to patients through Palm Chiropractic, even though Palm

Chiropractic was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT XXV
## UNJUST ENRICHMENT
**(Against Bay Medical, P.C., Ramy Hanna, M.D., Belam Acupuncture, P.C., Ariel Chiropractic, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Michael Gorelik, D.C., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1391.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1392.   As alleged herein, Defendants Bay Medical, P.C. ("Bay Medical"), Ramy Hanna, M.D., Belam Acupuncture, P.C., Ariel Chiropractic, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Michael Gorelik, D.C., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, "Count XXV Defendants") conspired to induce Allstate to make numerous substantial payments to Bay Medical pursuant to New York's No-Fault Laws.

1393.   When Allstate made No-Fault payments to Bay Medical, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XXV Defendants, or those persons working under their control, made concerning Bay Medical's reimbursement eligibility under New York's No-Fault Laws.

1394.   Each and every No-Fault benefit payment that Allstate was caused to make to Bay Medical during the course of this scheme constitutes a benefit that the Count XXV Defendants aggressively caused Bay Medical to seek and voluntarily accept.

1395.   Throughout the course of their scheme, the Count XXV Defendants caused Bay Medical to wrongfully obtain from Allstate No-Fault benefit payments totaling over $709,146.81 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1396. Throughout the duration of this scheme, the Count XXV Defendants obtained substantial monetary benefits as a result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault benefit payments that Allstate was wrongfully induced to make to Bay Medical.

1397. Retention of those benefits by the Count XXV Defendants would violate fundamental principles of justice, equity, and good conscience.

## COUNT XXVI
## UNJUST ENRICHMENT
**(Against Ariel Chiropractic, P.C., Michael Gorelik, D.C., Bay Medical, P.C., Belam Acupuncture, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Ramy Hanna, M.D., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1398. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1399. As alleged herein, Defendants Ariel Chiropractic, P.C. ("Ariel Chiropractic"), Michael Gorelik, D.C., Bay Medical, P.C., Belam Acupuncture, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Ramy Hanna, M.D., Michael S. Minick, D.C., David Colarusso D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, "Count XXVI Defendants") conspired to induce Allstate to make numerous substantial payments to Ariel Chiropractic pursuant to New York's No-Fault Laws.

1400. When Allstate made No-Fault payments to Ariel Chiropractic, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XXVI Defendants, or those persons working under their control, made concerning Ariel Chiropractic's reimbursement eligibility under New York's No-Fault Laws.

215

1401.   Each and every No-Fault benefit payment that Allstate was caused to make to Ariel Chiropractic during the course of this scheme constitutes a benefit that the Count XXVI Defendants aggressively caused Ariel Chiropractic to seek and voluntarily accept.

1402.   Throughout the course of their scheme, the Count XXVI Defendants caused Ariel Chiropractic to wrongfully obtain from Allstate No-Fault benefit payments totaling over $465,072.61 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1403.   Throughout the duration of this scheme, the Count XXVI Defendants obtained substantial monetary benefits as a result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault benefit payments that Allstate was wrongfully induced to make to Ariel Chiropractic.

1404.   Retention of those benefits by the Count XXVI Defendants would violate fundamental principles of justice, equity, and good conscience.

## COUNT XXVII
## UNJUST ENRICHMENT
**(Against Belam Acupuncture, P.C., Bay Medical, P.C., Ariel Chiropractic, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Ramy Hanna, M.D., Michael Gorelik, D.C., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1405.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1406.   As alleged herein, Defendants Belam Acupuncture, P.C. ("Belam Acupuncture"), Bay Medical, P.C., Ariel Chiropractic, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Ramy Hanna, M.D., Michael Gorelik, D.C., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, "Count XXVII

Defendants") conspired to induce Allstate to make numerous substantial payments to Belam Acupuncture pursuant to New York's No-Fault Laws.

1407. When Allstate made No-Fault payments to Belam Acupuncture, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XXVII Defendants, or those persons working under their control, made concerning Belam Acupuncture's reimbursement eligibility under New York's No-Fault Laws.

1408. Each and every No-Fault benefit payment that Allstate was caused to make to Belam Acupuncture during the course of this scheme constitutes a benefit that the Count XXVII Defendants aggressively caused Belam Acupuncture to seek and voluntarily accept.

1409. Throughout the course of their scheme, the Count XXVII Defendants caused Belam Acupuncture to wrongfully obtain from Allstate No-Fault benefit payments totaling over $398,115.37 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1410. Throughout the duration of this scheme, the Count XXVII Defendants obtained substantial monetary benefits as a result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault benefit payments that Allstate was wrongfully induced to make to Belam Acupuncture.

1411. Retention of those benefits by the Count XXVII Defendants would violate fundamental principles of justice, equity, and good conscience.

## COUNT XXVIII
## UNJUST ENRICHMENT
**(Against Cyrus Chiropractic, P.C., Michel Gorelik, D.C., Bay Medical, P.C., Belam Acupuncture, P.C., Ariel Chiropractic, P.C., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1412.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1413.   As alleged herein, Defendants Cyrus Chiropractic, P.C. ("Cyrus Chiropractic"), Michael Gorelik, D.C., Bay Medical, P.C., Belam Acupuncture, P.C., Ariel Chiropractic, P.C., C&M Chiropractic, P.C., Ramy Hanna, M.D., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, "Count XXVIII Defendants") conspired to induce Allstate to make numerous substantial payments to Cyrus Chiropractic pursuant to New York's No-Fault Laws.

1414.   When Allstate made No-Fault payments to Cyrus Chiropractic, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XXVIII Defendants, or those persons working under their control, made concerning Cyrus Chiropractic's reimbursement eligibility under New York's No-Fault Laws.

1415.   Each and every No-Fault benefit payment that Allstate was caused to make to Cyrus Chiropractic during the course of this scheme constitutes a benefit that the Count XVIII Defendants aggressively caused Cyrus Chiropractic to seek and voluntarily accept.

1416.   Throughout the course of their scheme, the Count XXVIII Defendants caused Cyrus Chiropractic to wrongfully obtain from Allstate No-Fault benefit payments totaling over $15,349.40 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1417. Throughout the duration of this scheme, the Count XXVIII Defendants obtained substantial monetary benefits as a result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault benefit payments that Allstate was wrongfully induced to make to Cyrus Chiropractic.

1418. Retention of those benefits by the Count XXVIII Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT XXIX**
**UNJUST ENRICHMENT**
**(Against Ambel Acupuncture, P.C., Colin Clarke M.D., P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C. Basem Mansour P.T. P.C., Colin Clarke, M.D., Michael Gorelik, D.C., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1419. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1420. As alleged herein, Defendants Ambel Acupuncture, P.C. ("Ambel Acupuncture"), Colin Clarke M.D. P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Manour P.T. P.C., Colin Clarke, M.D., Michael Gorelik, D.C., Basem Salah El-Din Manour, P.T., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, "Count XXIX Defendants") conspired to induce Allstate to make numerous substantial payments to Ambel Acupuncture pursuant to New York's No-Fault Laws.

1421. As alleged herein, Ambel Acupuncture was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Ambel Acupuncture was unlawfully operated and controlled by non-physician Anthony Rose, Sr.

1422. When Allstate made No-Fault payments to Ambel Acupuncture, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XXIX Defendants, or those persons working

under their control, made concerning Ambel Acupuncture's reimbursement eligibility under New York's No-Fault Laws.

1423. Each and every No-Fault benefit payment that Allstate was caused to make to Ambel Acupuncture during the course of this scheme constitutes a benefit that the Count XXIX Defendants aggressively caused Ambel Acupuncture to seek and voluntarily accept.

1424. Throughout the course of their scheme, the Count XXIX Defendants caused Ambel Acupuncture to wrongfully obtain from Allstate No-Fault benefit payments totaling over $87,415.00 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1425. Under New York law, Anthony Rose, Sr. lacked legal authorization to (a) provide professional physician services, (b) control the provision of professional physician services, and (c) receive any fees or profits derived from the provision of professional physician services, and thus never had any legal right to control Ambel Acupuncture, including its account receivables and/or the receipt and disbursement of any professional physician fees and profits obtained by Ambel Acupuncture, or to participate in the operation and management of Ambel Acupuncture.

1426. As a direct and proximate result of Rose's unlawful control over Ambel Acupuncture (and/or their participation in the operation and management of Ambel Acupuncture), Ambel Acupuncture was never eligible for reimbursement under New York's No-Fault Laws at any time during the course of this scheme.

1427. Throughout the duration of this scheme, the Count XXIX Defendants obtained substantial monetary benefits as a result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault benefit payments that Allstate was wrongfully induced to make to Ambel Acupuncture.

1428. Retention of those benefits by the Count XXIX Defendants would violate fundamental principles of justice, equity, and good conscience.

## COUNT XXX
## UNJUST ENRICHMENT
**(Against Basem Mansour, P.T., P.C., Basem Salah El-Din Mansour, P.T., Colin Clarke, M.D. P.C., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Colin Clarke, M.D., Michael Gorelik, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1429. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1430. As alleged herein, Defendants Basem Mansour, P.T., P.C. ("Mansour PT"), Basem Salah El-Din Mansour, P.T., Colin Clarke M.D. P.C., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Colin Clarke, M.D., Michael Gorelik, D.C., Aleksandr Belotserkovskiy, L.Ac. and Anthony Rose, Sr. (collectively, "Count XXX Defendants") conspired to induce Allstate to make numerous substantial payments to Mansour PT pursuant to New York's No-Fault Laws.

1431. As alleged herein, Mansour PT was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Mansour PT was unlawfully operated and controlled by non-physician Anthony Rose, Sr..

1432. When Allstate made No-Fault payments to Mansour PT, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XXX Defendants, or those persons working under their control, made concerning Mansour PT's reimbursement eligibility under New York's No-Fault Laws.

1433. Each and every No-Fault benefit payment that Allstate was caused to make to Mansour PT during the course of this scheme constitutes a benefit that the Count XXX Defendants aggressively caused Mansour PT to seek and voluntarily accept.

1434. Throughout the course of their scheme, the Count XXX Defendants caused Mansour PT to wrongfully obtain from Allstate No-Fault benefit payments totaling over $203,613.36 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1435. Under New York law, Rose lacked legal authorization to (a) provide professional physician services, (b) control the provision of professional physician services, and (c) receive any fees or profits derived from the provision of professional physician services, and thus never had any legal right to control Mansour PT, including its account receivables and/or the receipt and disbursement of any professional physician fees and profits obtained by Mansour PT, or to participate in the operation and management of Mansour PT.

1436. As a direct and proximate result of Rose's unlawful control over Mansour PT (and/or their participation in the operation and management of Mansour PT), Mansour PT was never eligible for reimbursement under New York's No-Fault Laws at any time during the course of this scheme.

1437. Throughout the duration of this scheme, the Count XXX Defendants obtained substantial monetary benefits as a result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault benefit payments that Allstate was wrongfully induced to make to Mansour PT.

1438. Retention of those benefits by the Count XXX Defendants would violate fundamental principles of justice, equity, and good conscience.

## COUNT XXXI
## UNJUST ENRICHMENT
**(Against Colin Clarke, M.D., P.C., Colin Clarke, M.D., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Mansour P.T. P.C., Michael Gorelik, D.C., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1439. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1440. As alleged herein, Defendants Colin Clarke, M.D., P.C. ("Clarke PC"), Colin Clarke, M.D., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Mansour P.T. P.C., Michael Gorelik, D.C., Basem Salah El-din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, "Count XXXI Defendants") conspired to induce Allstate to make numerous substantial payments to Clarke PC pursuant to New York's No-Fault Laws.

1441. As alleged herein, Clarke PC was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Clarke PC was unlawfully operated and controlled by non-physician Anthony Rose, Sr.

1442. When Allstate made No-Fault payments to Clarke PC, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XXXI Defendants, or those persons working under their control, made concerning Clarke PC's reimbursement eligibility under New York's No-Fault Laws.

1443. Each and every No-Fault benefit payment that Allstate was caused to make to Clarke PC during the course of this scheme constitutes a benefit that the Count XXXI Defendants aggressively caused Clarke PC to seek and voluntarily accept.

1444.   Throughout the course of their scheme, the Count XXXI Defendants caused Clarke PC to wrongfully obtain from Allstate No-Fault benefit payments totaling over $295,116.94 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1445.   Under New York law, Rose lacked legal authorization to (a) provide professional physician services, (b) control the provision of professional physician services, and (c) receive any fees or profits derived from the provision of professional physician services, and thus never had any legal right to control Clarke PC, including its account receivables and/or the receipt and disbursement of any professional physician fees and profits obtained by Clarke PC, or to participate in the operation and management of Clarke PC.

1446.   As a direct and proximate result of Rose's unlawful control over Clarke PC (and/or their participation in the operation and management of Clarke PC), Clarke PC was never eligible for reimbursement under New York's No-Fault Laws at any time during the course of this scheme.

1447.   Throughout the duration of this scheme, the Count XXXI Defendants obtained substantial monetary benefits as a result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault benefit payments that Allstate was wrongfully induced to make to Clarke PC.

1448.   Retention of those benefits by the Count XXXI Defendants would violate fundamental principles of justice, equity, and good conscience.

## COUNT XXXII
## UNJUST ENRICHMENT
**(Against Palm Chiropractic, P.C., Michael Gorelik, D.C., Colin Clarke M.D. P.C., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Basem Mansour P.T. P.C., Colin Clarke, M.D., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

1449.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

224

1450.  As alleged herein, Defendants Palm Chiropractic, P.C. ("Palm Chiropractic"), Michael Gorelik, D.C., Colin Clarke M.D. P.C., Ambel Acupuncture, P.C, Ariel Chiropractic, P.C., Basem Mansour P.T. P.C., Colin Clarke, M.D., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr. (collectively, "Count XXXII Defendants") conspired to induce Allstate to make numerous substantial payments to Palm Chiropractic pursuant to New York's No-Fault Laws.

1451.  As alleged herein, Palm Chiropractic was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Palm Chiropractic was unlawfully operated and controlled by non-physician Anthony Rose, Sr.

1452.  When Allstate made No-Fault payments to Palm Chiropractic, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XXXII Defendants, or those persons working under their control, made concerning Palm Chiropractic's reimbursement eligibility under New York's No-Fault Laws.

1453.  Each and every No-Fault benefit payment that Allstate was caused to make to Palm Chiropractic during the course of this scheme constitutes a benefit that the Count XXXII Defendants aggressively caused Palm Chiropractic to seek and voluntarily accept.

1454.  Throughout the course of their scheme, the Count XXXII Defendants caused Palm Chiropractic to wrongfully obtain from Allstate No-Fault benefit payments totaling over $118,616.29 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1455.  Under New York law, Rose lacked legal authorization to (a) provide professional physician services, (b) control the provision of professional physician services, and (c) receive any

fees or profits derived from the provision of professional physician services, and thus never had any legal right to control Palm Chiropractic, including its account receivables and/or the receipt and disbursement of any professional physician fees and profits obtained by Palm Chiropractic, or to participate in the operation and management of Palm Chiropractic.

1456.    As a direct and proximate result of Rose's unlawful control over Palm Chiropractic (and/or their participation in the operation and management of Palm Chiropractic), Palm Chiropractic was never eligible for reimbursement under New York's No-Fault Laws at any time during the course of this scheme.

1457.    Throughout the duration of this scheme, the Count XXXII Defendants obtained substantial monetary benefits as a result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault benefit payments that Allstate was wrongfully induced to make to Palm Chiropractic.

1458.    Retention of those benefits by the Count XXXII Defendants would violate fundamental principles of justice, equity, and good conscience.

### COUNT XXXIII
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Bay Medical, P.C.)

1459.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1460.    To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1461.    In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-physician (i.e. Anthony Rose, Sr.), (c) unlawful sharing of professional physician fees with

one or more non-physician (i.e., Anthony Rose, Sr.), (d) billing for healthcare services that were not actually rendered, (e) billing for services rendered pursuant to an unlawful referral, and (f) billing for excessive and medically unnecessary healthcare services, Bay Medical, P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to seek or collect any No-Fault benefit payments from Allstate including, but not limited to, No-Fault benefits that were assigned to Bay Medical, P.C. by its patients.

1462.   Bay Medical, P.C. continues to challenge Allstate's prior claim denials.

1463.   Bay Medical, P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1464.   A justifiable controversy exists between Allstate and Bay Medical, P.C. because Bay Medical, P.C. rejects Allstate's ability to deny such claims.

1465.   Allstate has no adequate remedy at law.

1466.   Bay Medical, P.C. will also continue to demand No-Fault benefit payments from Allstate absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Bay Medical, P.C.

1467.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Bay Medical, P.C., at all relevant times, was (a) engaged in the unlawful sharing of fees derived from the provision of professional physician services, (b) billing for healthcare services that were not actually rendered, (c) billing for services

rendered pursuant to an unlawful referral, and (d) engaged in the billing for medically unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

## COUNT XXXIV
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Ariel Chiropractic, P.C.)

1468.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1469.   To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1470.   In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-physician (i.e. Anthony Rose, Sr.), (c) unlawful sharing of professional physician fees with one or more non-physician (i.e., Anthony Rose, Sr.), (d) billing for healthcare services that were not actually rendered, (e) billing for services rendered pursuant to an unlawful referral, and (f) billing for excessive and medically unnecessary healthcare services, Ariel Chiropractic, P.C., has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to seek or collect any No-Fault benefit payments from Allstate including, but not limited to, No-Fault benefits that were assigned to Ariel Chiropractic, P.C. by its patients.

1471.   Ariel Chiropractic, P.C. continues to challenge Allstate's prior claim denials.

1472.   Ariel Chiropractic, P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1473. A justifiable controversy exists between Allstate and Ariel Chiropractic, P.C. because Ariel Chiropractic, P.C. rejects Allstate's ability to deny such claims.

1474. Allstate has no adequate remedy at law.

1475. Ariel Chiropractic, P.C. will also continue to demand No-Fault benefit payments from Allstate absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Ariel Chiropractic, P.C.

1476. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Ariel Chiropractic, P.C., at all relevant times, was (a) engaged in the unlawful sharing of fees derived from the provision of professional physician services, (b) billing for healthcare services that were not actually rendered, (c) billing for services rendered pursuant to an unlawful referral, and (d) engaged in the billing for medically unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

**COUNT XXXV**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Belam Acupuncture, P.C.)**

1477. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1478. To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1479. In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-physician (i.e. Anthony Rose, Sr.), (c) unlawful sharing of professional physician fees with one or more non-physician (i.e., Anthony Rose, Sr.), (d) billing for healthcare services that were

not actually rendered, (e) billing for services rendered pursuant to an unlawful referral, and (f) billing for excessive and medically unnecessary healthcare services, Belam Acupuncture, P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to seek or collect any No-Fault benefit payments from Allstate including, but not limited to, No-Fault benefits that were assigned to Belam Acupuncture, P.C. by its patients.

1480.   Belam Acupuncture, P.C. continues to challenge Allstate's prior claim denials.

1481.   Belam Acupuncture, P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1482.   A justifiable controversy exists between Allstate and Belam Acupuncture, P.C. because Belam Acupuncture, P.C. rejects Allstate's ability to deny such claims.

1483.   Allstate has no adequate remedy at law.

1484.   Belam Acupuncture, P.C. will also continue to demand No-Fault benefit payments from Allstate absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Belam Acupuncture, P.C.

1485.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Belam Acupuncture, P.C., at all relevant times, was (a) billing for healthcare services that were not actually rendered, (b) billing for services rendered pursuant to an unlawful referral, and (c) engaged in the billing for medically unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

## COUNT XXXVI
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against C&M Chiropractic, P.C.)

1486.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1487.   To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1488.   In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-physician (i.e. Anthony Rose, Sr.), (c) unlawful sharing of professional physician fees with one or more non-physician (i.e., Anthony Rose, Sr.), (d) billing for healthcare services that were not actually rendered, (e) billing for services rendered pursuant to an unlawful referral, and (f) billing for excessive and medically unnecessary healthcare services, C&M Chiropractic, P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to seek or collect any No-Fault benefit payments from Allstate including, but not limited to, No-Fault benefits that were assigned to C&M Chiropractic, P.C. by its patients.

1489.   C&M Chiropractic, P.C. continues to challenge Allstate's prior claim denials.

1490.   C&M Chiropractic, P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1491.   A justifiable controversy exists between Allstate and C&M Chiropractic, P.C. because C&M Chiropractic, P.C. rejects Allstate's ability to deny such claims.

1492.   Allstate has no adequate remedy at law.

1493.   C&M Chiropractic, P.C. will also continue to demand No-Fault benefit payments from Allstate absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by C&M Chiropractic, P.C.

1494.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that C&M Chiropractic, P.C., at all relevant times, was (a) billing for healthcare services that were not actually rendered, (b) billing for services rendered pursuant to an unlawful referral, and (c) engaged in the billing for medically unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

### COUNT XXXVII
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Cyrus Chiropractic, P.C.)

1495.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1496.   To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1497.   In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-physician (i.e. Anthony Rose, Sr.), (c) unlawful sharing of professional physician fees with one or more non-physician (i.e., Anthony Rose, Sr.), (d) billing for healthcare services that were not actually rendered, (e) billing for services rendered pursuant to an unlawful referral, and (f) billing for excessive and medically unnecessary healthcare services, Cyrus Chiropractic, P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing

requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to seek or collect any No-Fault benefit payments from Allstate including, but not limited to, No-Fault benefits that were assigned to Cyrus Chiropractic, P.C. by its patients.

1498.   Cyrus Chiropractic, P.C. continues to challenge Allstate's prior claim denials.

1499.   Cyrus Chiropractic, P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1500.   A justifiable controversy exists between Allstate and Cyrus Chiropractic, P.C. because Cyrus Chiropractic, P.C. rejects Allstate's ability to deny such claims.

1501.   Allstate has no adequate remedy at law.

1502.   Cyrus Chiropractic, P.C. will also continue to demand No-Fault benefit payments from Allstate absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Cyrus Chiropractic, P.C.

1503.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Cyrus Chiropractic, P.C., at all relevant times, was (a) billing for healthcare services that were not actually rendered, (b) billing for services rendered pursuant to an unlawful referral, and (c) engaged in the billing for medically unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

**COUNT XXXVIII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Ambel Acupuncture, P.C.)**

1504.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1505.   To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1506.   In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-physician (i.e. Anthony Rose, Sr.), (c) unlawful sharing of professional physician fees with one or more non-physician (i.e., Anthony Rose, Sr.), (d) billing for healthcare services that were not actually rendered, (e) billing for services rendered pursuant to an unlawful referral, and (f) billing for excessive and medically unnecessary healthcare services, Ambel Acupuncture, P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to seek or collect any No-Fault benefit payments from Allstate including, but not limited to, No-Fault benefits that were assigned to Ambel Acupuncture, P.C. by its patients.

1507.   Ambel Acupuncture, P.C. continues to challenge Allstate's prior claim denials.

1508.   Ambel Acupuncture, P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1509.   A justifiable controversy exists between Allstate and Ambel Acupuncture, P.C. because Ambel Acupuncture, P.C. rejects Allstate's ability to deny such claims.

1510.   Allstate has no adequate remedy at law.

1511.   Ambel Acupuncture, P.C. will also continue to demand No-Fault benefit payments from Allstate absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Ambel Acupuncture, P.C.

1512.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Ambel Acupuncture, P.C., at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by one or more non-physician, (c) engaged in the unlawful sharing of fees derived from the provision of professional physician services, (d) billing for healthcare services that were not actually rendered, (e) billing for services rendered pursuant to an unlawful referral, and (f) engaged in the billing for medically unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

## COUNT XXXIX
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Basem Mansour, P.T., P.C.)

1513.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1514.   To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1515.   In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-physician (i.e. Anthony Rose, Sr.), (c) unlawful sharing of professional physician fees with one or more non-physician (i.e., Anthony Rose, Sr.), (d) billing for healthcare services that were

not actually rendered, (e) billing for services rendered pursuant to an unlawful referral, and (f) billing for excessive and medically unnecessary healthcare services, Basem Mansour, P.T., P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to seek or collect any No-Fault benefit payments from Allstate including, but not limited to, No-Fault benefits that were assigned to Basem Mansour, P.T., P.C. by its patients.

1516.  Basem Mansour, P.T., P.C. continues to challenge Allstate's prior claim denials.

1517.  Basem Mansour, P.T., P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1518.  A justifiable controversy exists between Allstate and Basem Mansour, P.T., P.C. because Basem Mansour, P.T., P.C. rejects Allstate's ability to deny such claims.

1519.  Allstate has no adequate remedy at law.

1520.  Basem Mansour, P.T., P.C. will also continue to demand No-Fault benefit payments from Allstate absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Basem Mansour, P.T., P.C.

1521.  Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Basem Mansour, P.T., P.C., at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by one or more non-physician, (c) engaged in the unlawful sharing of fees derived from the provision of professional physician services, (d) billing for healthcare services that were not actually

rendered, (e) billing for services rendered pursuant to an unlawful referral, and (f) engaged in the billing for medically unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

<strong><u>COUNT XL</u></strong><br><strong>DECLARATORY RELIEF UNDER 28 U.S.C. § 2201</strong><br><strong>(Against Colin Clarke, M.D., P.C.)</strong>

1522.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1523.    To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1524.    In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-physician (i.e. Anthony Rose, Sr.), (c) unlawful sharing of professional physician fees with one or more non-physician (i.e., Anthony Rose, Sr.), (d) billing for healthcare services that were not actually rendered, (e) billing for services rendered pursuant to an unlawful referral, and (f) billing for excessive and medically unnecessary healthcare services, Colin Clarke, M.D., P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to seek or collect any No-Fault benefit payments from Allstate including, but not limited to, No-Fault benefits that were assigned to Colin Clarke, M.D., P.C. by its patients.

1525.    Colin Clarke, M.D., P.C. continues to challenge Allstate's prior claim denials.

1526. Colin Clarke, M.D., P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1527. A justifiable controversy exists between Allstate and Colin Clarke, M.D., P.C. because Colin Clarke, M.D., P.C. rejects Allstate's ability to deny such claims.

1528. Allstate has no adequate remedy at law.

1529. Colin Clarke, M.D., P.C. will also continue to demand No-Fault benefit payments from Allstate absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Colin Clarke, M.D., P.C.

1530. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Colin Clarke, M.D., P.C., at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by one or more non-physician, (c) engaged in the unlawful sharing of fees derived from the provision of professional physician services, (d) billing for healthcare services that were not actually rendered, (e) billing for services rendered pursuant to an unlawful referral, and (f) engaged in the billing for medically unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

## COUNT XLI
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Palm Chiropractic, P.C.)

1531. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-1102 as if set forth fully herein.

1532. To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1533. In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-physician (i.e. Anthony Rose, Sr.), (c) unlawful sharing of professional physician fees with one or more non-physician (i.e., Anthony Rose, Sr.), (d) billing for healthcare services that were not actually rendered, (e) billing for services rendered pursuant to an unlawful referral, and (f) billing for excessive and medically unnecessary healthcare services, Palm Chiropractic, P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to seek or collect any No-Fault benefit payments from Allstate including, but not limited to, No-Fault benefits that were assigned to Palm Chiropractic, P.C. by its patients.

1534. Palm Chiropractic, P.C. continues to challenge Allstate's prior claim denials.

1535. Palm Chiropractic, P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1536. A justifiable controversy exists between Allstate and Palm Chiropractic, P.C. because Palm Chiropractic, P.C. rejects Allstate's ability to deny such claims.

1537. Allstate has no adequate remedy at law.

1538. Palm Chiropractic, P.C. will also continue to demand No-Fault benefit payments from Allstate absent a declaration by this Court that its activities are unlawful, and that Allstate

has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Palm Chiropractic, P.C.

1539. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Palm Chiropractic, P.C., at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by one or more non-physician, (c) engaged in the unlawful sharing of fees derived from the provision of professional physician services, (d) billing for healthcare services that were not actually rendered, (e) billing for services rendered pursuant to an unlawful referral, and (f) engaged in the billing for medically unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

## XI. DEMAND FOR RELIEF

WHEREFORE, plaintiffs, Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate Indemnity Company (collectively, "Allstate"), respectfully pray that judgment enter in their favor, as follows:

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**BAY MEDICAL, P.C. ENTERPRISE**
**(Against Belam Acupuncture, P.C., Ariel Chiropractic, P.C., Cyrus Chiropractic, P.C., C& M Chiropractic, P.C., Ramy Hanna, M.D., Michael Gorelik, D.C., Michael S. Minick, D.C., David Colarussso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### BAY MEDICAL, P.C. ENTERPRISE
**(Against Belam Acupuncture, P.C., Ariel Chiropractic, P.C., Cyrus Chiropractic, P.C., C& M Chiropractic, P.C., Ramy Hanna, M.D., Michael Gorelik, D.C., Michael S. Minick, D.C., David Colarussso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### ARIEL CHIROPRACTIC, P.C. ENTERPRISE
**(Against Bay Medical, P.C., Belam Acupuncture, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Michael Gorelik, D.C., Ramy Hanna, M.D., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT IV
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## ARIEL CHIROPRACTIC, P.C. ENTERPRISE
**(Against Bay Medical, P.C., Belam Acupuncture, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Michael Gorelik, D.C., Ramy Hanna, M.D., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT V
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## BELAM ACUPUNCTURE, P.C. ENTERPRISE
**(Against Bay Medical, P.C., Ariel Chiropractic, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Ramy Hanna, M.D., Michael Gorelik, D.C., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac. and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT VI
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### BELAM ACUPUNCTURE, P.C. ENTERPRISE
**(Against Bay Medical, P.C., Ariel Chiropractic, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Ramy Hanna, M.D., Michael Gorelik, D.C., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac. and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT VII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### CYRUS CHIROPRACTIC, P.C. ENTERPRISE
**(Against Bay Medical, P.C., Belam Acupuncture, P.C., Ariel Chiropractic, P.C., C&M Chiropractic, P.C., Michael Gorelik, D.C., Ramy Hanna, M.D., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT VIII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### CYRUS CHIROPRACTIC, P.C. ENTERPRISE
**(Against Bay Medical, P.C., Belam Acupuncture, P.C., Ariel Chiropractic, P.C., C&M Chiropractic, P.C., Michael Gorelik, D.C., Ramy Hanna, M.D., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT IX
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### AMBEL ACUPUNCTURE, P.C. ENTERPRISE
**(Against Colin Clarke M.D. P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Mansour P.T. P.C., Colin Clarke, M.D., Michael Gorelik, D.C., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac. and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT X**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**AMBEL ACUPUNCTURE, P.C. ENTERPRISE**
**(Against Colin Clarke M.D. P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Mansour P.T. P.C., Colin Clarke, M.D., Michael Gorelik, D.C., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac. and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XI**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**BASEM MANSOUR, P.T., P.C. ENTERPRISE**
**(Against Colin Clarke M.D. P.C., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Mansour P.T. P.C., Colin Clarke, M.D., Michael Gorelik, D.C., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac. and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XII
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## BASEM MANSOUR, P.T., P.C. ENTERPRISE
**(Against Colin Clarke, M.D. P.C., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Salah El-Din Mansour, P.T., Colin Clarke, M.D., Michael Gorelik, D.C., Aleksandr Belotserkovskiy, L.Ac. and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just

## COUNT XIII
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## COLIN CLARKE, M.D., P.C. ENTERPRISE
**(Against Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Mansour P.T. P.C., Colin Clarke, M.D., Michael Gorelik, D.C., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XIV
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## COLIN CLARKE, M.D., P.C. ENTERPRISE
**(Against Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Mansour P.T. P.C., Colin Clarke, M.D., Michael Gorelik, D.C., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just

## COUNT XV
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### PALM CHIROPRACTIC, P.C. ENTERPRISE
**(Against Colin Clarke M.D. P.C., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Basem Mansour P.T. P.C., Michael Gorelik, D.C., Colin Clarke, M.D., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XVI
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### PALM CHIROPRACTIC, P.C. ENTERPRISE
**(Against Colin Clarke M.D. P.C., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Basem Mansour P.T. P.C., Michael Gorelik, D.C., Colin Clarke, M.D., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XVII
## COMMON LAW FRAUD
**(Against Bay Medical, P.C., Ramy Hanna, M.D., Belam Acupuncture, P.C., Ariel Chiropractic, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Michael Gorelik, D.C., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

## COUNT XVIII
## COMMON LAW FRAUD
**(Against Ariel Chiropractic, P.C., Michael Gorelik, D.C., Bay Medical, P.C., Belam Acupuncture, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Ramy Hanna, M.D., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

## COUNT XIX
## COMMON LAW FRAUD
**(Against Belam Acupuncture, P.C., Bay Medical, P.C., Ariel Chiropractic, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Ramy Hanna, M.D., Michael Gorelik, D.C., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

## COUNT XX
## COMMON LAW FRAUD
**(Against Cyrus Chiropractic, P.C., Michael Gorelik, D.C., Bay Medical, P.C., Belam Acupuncture, P.C., Ariel Chiropractic, P.C., C&M Chiropractic, P.C., Ramy Hanna, M.D., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

## COUNT XXI
## COMMON LAW FRAUD
**(Against Ambel Acupuncture, P.C., Colin Clarke M.D. P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Mansour P.T. P.C., Colin Clarke, M.D., Micahel Gorelik, D.C., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

## COUNT XXII
## COMMON LAW FRAUD
**(Against Basem Mansour, P.T., P.C., Basem Salah El-Din Mansour, P.T., Colink Clarke M.D. P.C., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Colin Clarke, M.D., Michael Gorelik, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

## COUNT XXIII
## COMMON LAW FRAUD
**(Against Colin Clarke, M.D., P.C., Colin Clarke, M.D., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Mansour P.T. P.C., Michael Gorelik, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

## COUNT XXIV
## COMMON LAW FRAUD
**(Against Palm Chiropractic, P.C., Michael Gorelik, D.C., Colin Clarke, M.D. P.C., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Basem Mansour P.T. P.C., Colin Clarke, M.D., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

## COUNT XXV
## UNJUST ENRICHMENT
**(Against Bay Medical, P.C., Ramy Hanna, M.D., Belam Acupuncture, P.C., Ariel Chiropractic, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Michael Gorelik, D.C., Michael S. Minick, D.C., David Colarusso, D.C.,Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just

## COUNT XXVI
## UNJUST ENRICHMEN
**(Against Ariel Chiropractic, P.C., Michael Gorelik, D.C., Bay Medical, P.C., Belam Acupuncture, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Ramy Hanna, M.D., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

## COUNT XXVII
### UNJUST ENRICHMENT
**(Against Belam Acupuncture, P.C., Bay Medical, P.C., Ariel Chiropractic, P.C., Cyrus Chiropractic, P.C., C&M Chiropractic, P.C., Ramy Hanna, M.D., Michael Gorelik, D.C., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

## COUNT XXVIII
### UNJUST ENRICHMENT
**(Against Cyrus Chiropractic, P.C., Michael Gorelik, D.C., Bay Medical, P.C., Belam Acupuncture, P.C., Ariel Chiropractic, P.C., C&M Chiropractic, P.C., Ramy Hanna, M.D., Michael S. Minick, D.C., David Colarusso, D.C., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

## COUNT XXIX
### UNJUST ENRICHMENT
**(Against Ambel Acupuncture, P.C., Colin Clarke M.D. P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Mansour P.T., P.C., Colin Clarke, M.D., Michael Gorelik, D.C., Base Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

## COUNT XXX
### UNJUST ENRICHMENT
**(Against Basem Mansour, P.T., P.C., Basem Salah El-Din Mansour, P.T., Colin Clarke M.D., P.C., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Michael Gorelik, D.C., Colin Clarke, M.D., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

## COUNT XXXI
## UNJUST ENRICHMENT
**(Against Colin Clarke, M.D., P.C., Colin Clarke, M.D., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Palm Chiropractic, P.C., Basem Mansour P.T. P.C., Michael Gorelik, D.C., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.


## COUNT XXXII
## UNJUST ENRICHMENT
**(Against Palm Chiropractic, P.C., Michael Gorelik, D.C., Colin Clarke M.D. P.C., Ambel Acupuncture, P.C., Ariel Chiropractic, P.C., Basem Mansour P.T. P.C., Colin Clarke, M.D., Basem Salah El-Din Mansour, P.T., Aleksandr Belotserkovskiy, L.Ac., and Anthony Rose, Sr.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.


## COUNT XXXIII
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
**(Against Bay Medical, P.C.)**

(a) DECLARE that Bay Medical, P.C., at all relevant times, has been operated in violation of at least one New York state and/or local licensing requirement necessary to provide professional physician services in New York;

(b) DECLARE that Bay Medical, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Bay Medical, P.C.; and

(d) GRANT all other relief this Court deems just.

## COUNT XXXIV
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Ariel Chiropractic, P.C.)

(a) DECLARE that Ariel Chiropractic, P.C., at all relevant times, has been operated in violation of at least one New York state and/or local licensing requirement necessary to provide professional physician services in New York;

(b) DECLARE that Ariel Chiropractic, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Ariel Chiropractic, P.C.; and

(d) GRANT all other relief this Court deems just.

## COUNT XXXV
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Belam Acupuncture, P.C)

(a) DECLARE that Belam Acupuncture, P.C., at all relevant times, has been operated in violation of at least one New York state and/or local licensing requirement necessary to provide professional physician services in New York;

(b) DECLARE that Belam Acupuncture, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Belam Acupuncture, P.C.; and

(d) GRANT all other relief this Court deems just.

## COUNT XXXVI
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against C&M Chiropractic, P.C.)

(a) DECLARE that C&M Chiropractic, P.C., at all relevant times, has been operated in violation of at least one New York state and/or local licensing requirement necessary to provide professional physician services in New York;

(b) DECLARE that C&M Chiropractic, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by C&M Chiropractic, P.C.; and

(d) GRANT all other relief this Court deems just.

## COUNT XXXVII
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Cyrus Chiropractic, P.C.)

(a) DECLARE that Cyrus Chiropractic, P.C., at all relevant times, has been operated in violation of at least one New York state and/or local licensing requirement necessary to provide professional physician services in New York;

(b) DECLARE that Cyrus Chiropractic, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Cyrus Chiropractic, P.C.; and

(d) GRANT all other relief this Court deems just.

## COUNT XXXVIII
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Ambel Acupuncture, P.C.)

(a) DECLARE that Ambel Acupuncture, P.C., at all relevant times, has been unlawfully organized, controlled, and/or operated by at least one non-physician, and otherwise operated in violation of at least one New York state and/or local licensing requirement necessary to provide professional physician services in New York;

(b) DECLARE that Ambel Acupuncture, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Ambel Acupuncture, P.C.; and

(d) GRANT all other relief this Court deems just.

## COUNT XXXIX
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
#### (Against Basem Mansour, P.T., P.C.)

(a) DECLARE that Basem Mansour, P.T., P.C., at all relevant times, has been unlawfully organized, controlled, and/or operated by at least one non-physician, and otherwise operated in violation of at least one New York state and/or local licensing requirement necessary to provide professional physician services in New York;

(b) DECLARE that Basem Mansour, P.T., P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Basem Mansour, P.T., P.C.; and

(d) GRANT all other relief this Court deems just.

## COUNT XL
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
#### (Against Colin Clarke, M.D., P.C.)

(a) DECLARE that Colin Clarke, M.D., P.C., at all relevant times, has been unlawfully organized, controlled, and/or operated by at least one non-physician, and otherwise operated in violation of at least one New York state and/or local licensing requirement necessary to provide professional physician services in New York;

(b) DECLARE that Colin Clarke, M.D., P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Colin Clarke, M.D., P.C.; and

(d) GRANT all other relief this Court deems just.

## COUNT XLI
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Palm Chiropractic, P.C.)

(a) DECLARE that Palm Chiropractic, P.C., at all relevant times, has been unlawfully organized, controlled, and/or operated by at least one non-physician, and otherwise operated in violation of at least one New York state and/or local licensing requirement necessary to provide professional physician services in New York;

(b) DECLARE that Palm Chiropractic, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Palm Chiropractic, P.C.; and

(d) GRANT all other relief this Court deems just.

## XII.   JURY TRIAL DEMAND

The plaintiffs demand a trial by jury on all claims.


[SIGNATURE PAGE FOLLOWS]

KING, TILDEN, MCETTRICK & BRINK, P.C.

*/s/ Richard D. King, Jr.*
_____
Richard D. King, Jr. (RK8381)
rking@ktmpc.com
Nathan A. Tilden (NT0571)
ntilden@ktmpc.com
Shauna L. Sullivan (SS5624)
ssullivan@ktmpc.com
Hugh C.M. Brady (HB4724)
hbrady@ktmpc.com
350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

Attorneys for the Plaintiffs,
*Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Indemnity Company,*

Dated: January 18, 2022